E-FILED
Friday, 06 March, 2020 05:22:50 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4

CONFIDENTIAL

Page 1

1  UNITED STATES DISTRICT COURT
2  CENTRAL DISTRICT OF ILLINOIS
3  SPRINGFIELD DIVISION
4  JANE DOE,
5
6       Plaintiff,
7
8  VS.            Cause No.  3:18-cv-03191-SEM-TSH
9
10 RICHARD MACLEOD, et al.,
11
12      Defendants.
13 ─────────────────────────────────
14      VIDEOTAPE DEPOSITION OF
15   SPECIAL AGENT MONICA STRANDBERG
16
17        January 23, 2020
18           10:00 a.m.
19
20           Taken at:
21 Illinois State Police Central Headquarters
22          801 S. 7th Street
23         Springfield, Illinois
24 Nancy Prange, CCR, CSR, Notary Public

Page 74

1  Exhibit 5 relating to the Shinnebarger case lists
2  Matos at the top and you said that means he was the
3  lead investigator?
4     A  Correct. He was the primary investigator.
5  So he's going to be listed at the top.
6     Q  Is the other secondary agent listed anywhere
7  in this report?
8     A  Not in this report unless I specifically --
9  this is just an overview, a summary. In the
10 subsequent reports I will be listed or whoever sat
11 second chair or did any investigation in it their
12 name will be in there.
13    Q  The status of the Shinnebarger case as of May
14 3rd, 2018, the date of Exhibit 5, is pending
15 prosecution. Do you see that?
16    A  That's correct, yes.
17    Q  What does that mean?
18    A  It's at the State's Attorney's Office and
19 the State's Attorney is going to review the case and
20 decide if he's going go file charges or not.
21    Q  And I don't want to spend 30 minutes on this,
22 but just at a high level are you able to look at
23 Exhibit 5 and give us an understanding of what the
24 allegations against Correctional Officer Shinnebarger

Page 75

1  were at that time and what the investigation
2  entailed?
3     A  Yeah. So we got the initial complaint from
4  DOC. We arrived. Special Agent Matos and I
5  arrived. We talked to initial complainant who --
6  basically we weeded through it. She was part of
7  basically harassment, not the sexual assault itself,
8  and we weeded through other names that were given
9  and the person that or the victim that it happened
10 to was somebody totally different than what we
11 initially walked in the door for. And that name
12 would be -- I'm sorry. It's in the synopsis. There
13 were so many names that day. It was Rector, Inmate
14 Rector would have been the -- hold on. That's not
15 true. She was the initial complainant. Let's see.
16 I have to read through this. I'm sorry. I have to
17 read through this to where -- because the initial
18 complaint, the initial female complainant, wasn't
19 the actual one that had sex with Shinnebarger in the
20 broom closet essentially. We had to weed through
21 all that, even though she said an incident happened
22 in the bathroom with her and her girlfriend, and
23 that he asked them to have sexual contact with each
24 other.

Page 76

1     Okay. Karaszewski would have been the
2  actual victim in this case. Yes. All right. So
3  there's a lot of names in this one. I'm sorry. The
4  original complaint came in and that was -- it came
5  in as harassment, but how it came in to us we
6  thought that she was actually the one that was
7  sexually assaulted or abused and weeding through all
8  of that she wasn't. She was essentially harassed
9  with inmate on inmate sexual contact and another
10 inmate came in, another inmate was dropped, the name
11 was dropped to us, it was not in the original
12 complaint, and that's when we brought her in and she
13 admitted to having sex with Shinnebarger in a supply
14 broom closet essentially.
15    Q  Okay.
16    A  There. Sorry.
17    Q  To sort of take that just a few pieces at a
18 time, it looks like from the synopsis that on
19 April 4, 2017 ISP received a Checklist for File from
20 IDOC?
21    A  Correct.
22    Q  What's a Checklist for File?
23    A  Checklist for File Initiation is a
24 complaint, an outside complaint to us to investigate

Page 77

1  an allegation.
2     Q  And that's a document that would be completed
3  by Logan or IDOC staff?
4     A  Correct.
5     Q  It's a document that it sounds like if they
6  want ISP to assist in an investigation that's how
7  they trigger ISP's involvement?
8     A  Absolutely.
9     Q  If you look at Exhibit 6, it's a longer
10 collection of documents that bears the Bates range
11 ISP 02739 and goes all the way to ISP 02895. Do you
12 see that?
13    A  That's correct.
14    Q  Do you recognize that as the ISP
15 investigation file for the Shinnebarger
16 investigation?
17    A  Yes.
18    Q  What is contained at a high level in this
19 investigation file?
20    A  All the reports, all the witness reports,
21 the evidence reports, the Checklist for File
22 Initiation that we received from DOC to open the
23 case. Any documentation incident reports that DOC
24 provided us. Just to get a background on what was

Page 94

1 they'll decide if they're going to lock them out or
2 not. That's their decision.
3   Q   Okay. Are there situations that you can
4 remember where you presented a case to a warden that
5 you believed was substantiated and you were going
6 present it to the State's Attorney for prosecution
7 but they decided not to lock out the perpetrator?
8   A   Okay. So the only reason why that Warden
9 Wilson is she came into the room.
10  Q   Yeah.
11  A   And was directly asking the questions.
12 Otherwise, we'll confer with IA, IA will pass the
13 information to -- this was verbally between Special
14 Agent Matos and myself, we told the warden. We'll
15 give the information to IA on other cases, on other
16 instances, and IA will present that information to
17 the warden. And I know IA presents exactly what we
18 present them. What we tell IA, IA tells the warden.
19 And we're not there face-to-face and then the warden
20 will make that decision what he or she wants to do.
21  Q   I was confused about that. So it sounds like
22 in the average case it's, in fact, IA that's
23 reporting to the warden?
24  A   Yes.

Page 95

1   Q   And not ISP?
2   A   Correct.
3   Q   And do you know approximately when in the
4 investigatory time line they make that report?
5   A   We'll, I'll tell them when I gather all the
6 information, I'm like, hey, I'm going to put the
7 summary together and I'm taking it to the State's
8 Attorney for review.
9   Q   So typically at the end around the time this
10 summary is made?
11  A   Yes.
12  Q   So if we look at an investigation that went
13 from January 1st of 2017 to January 1st of 2018, it's
14 your understanding that the warden would be brought
15 into the loop for a lockout decision near the end of
16 that?
17  A   No.
18  Q   I don't know why I'm missing these questions
19 so bad.
20  A   No. Sorry. So in the Shinnebarger case
21 there was -- the warden came into the interview room
22 and says what do you have? And it was in her
23 opinion I'm locking him out. Okay. I can't say
24 another warden would do that. And other wardens

Page 96

1 have not done that. It's sort of like, well, it's
2 just not enough. We'll either move him someplace
3 else or her someplace else, wherever the suspect may
4 be. However it goes is I present, I tell IA what's
5 going on, IA will let the warden know.
6   Q   Okay.
7   A   And then the warden will make that decision.
8   Q   Understood. Is it fair to say then you just
9 don't know when IA would communicate that to --
10  A   I think they do it pretty relatively because
11 no warden wants the state police coming in there and
12 investigating and wardens want to know what's going
13 on. But the conversation between IA and the warden,
14 I'm not quite sure how that goes down. You would
15 have to ask them.
16  Q   All right. I'm killing too much of our time
17 here. Let me try and speed up a little bit.
18      Going back to Exhibit 3, the next case
19 listed here is against a Logan employee Jack Gibson.
20  A   That's correct.
21  Q   Do you remember what Mr. Gibson's role at
22 Logan was?
23  A   Yes. He was the plumber in the maintenance
24 shop.

Page 97

1   Q   Did we say that Wolfsberger, the suspect in
2 the third down, was also in the maintenance shop?
3   A   Wolfsberger was not in the maintenance shop.
4 I believe he was in laundry. You'll have to ask
5 Special Agent Matos that because he was on that case
6 exactly where he worked.
7   Q   Do you remember where Mr. Allison worked?
8   A   No.
9   Q   And Shinnebarger was a CO, right?
10  A   Correct.
11  Q   So focusing on Mr. Gibson's case, that's one
12 where you were the lead investigator?
13  A   Correct.
14  Q   And that case was referred to ISP in June, on
15 June 9th of 2017, right?
16  A   Yes.
17  Q   And it's still open today?
18  A   Yes.
19  Q   Can you talk about that case?
20  A   Yes.
21  Q   Okay.
22  A   He declined. Go ahead. What's your
23 question?
24  Q   Can you tell from Exhibit 3 what the

25 (Pages 94 - 97)

Page 122

1  She's not a member who would have put this
2  report together.
3      MR. TYRRELL: I'll join. You can answer.
4  A  The population of the facilities are
5  different. Obviously, Decatur has a lower
6  population of inmates than Logan. And that facility
7  in Decatur is all -- it's an old mental health
8  facility so it's all contained. You don't have to
9  walk outside to go anywhere into different housing
10 units and it's run very, very, very strictly.
11 There's eyes on everybody and cameras everywhere.
12    Q  (By Mr. Wasdin) Do you attribute the strict
13 administration of Decatur and the presence of
14 cameras to have lowered the number of reported
15 sexual abuses at that facility?
16    A  Yes.
17    Q  And so when you think about Logan does one
18 reason why the number is so much higher than Decatur
19 relate to how the prison is run and whether or not
20 they have a lot of cameras?
21      MS. HAYES: I'm going to object. It calls
22    for speculation.
23      MR. TYRRELL: I'll join. You can answer.
24    A  I know that the maintenance shop was

Page 123

1  together in the plumbers shop and the electricians
2  shop worked together to put cameras in because most
3  of the cameras were not working. And they were
4  installing cameras and they weren't installing them.
5  They weren't installing them. They were just
6  delaying, the maintenance shop was for whatever
7  reason, and once all these allegations came about
8  between Shinnebarger, Gibson, and the others, then
9  other maintenance shop people from other prisons
10 came in and installed cameras everywhere in the
11 prison. Everybody knows where these cameras are.
12    Q  (By Mr. Wasdin) Did Logan have less cameras
13 than other facilities?
14    A  I don't know if they were operating
15 correctly. Some were broken. I mean, it's money.
16 So ...
17    Q  And was that -- how long, you know, of a
18 period of time?
19    A  I can't tell you that.
20    Q  But as you pointed out, just in 2017 there's
21 a disproportionate amount of people, Logan staff, in
22 the maintenance group that is, that are being
23 determined to have sexually assaulted Logan inmates
24 and what you're saying is one of the reason that is

Page 124

1  because the maintenance department was not monitored?
2      MR. TYRRELL: To object to the form and
3    foundation. Misstates the testimony. You can
4    answer.
5      MS. HAYES: Join.
6    Q  (By Mr. Wasdin) Just correct me.
7    A  I don't know if they're monitored or not. I
8  mean, I'm not there. They were tasked to install
9  the cameras.
10   Q  Let me try my question again. In your view
11 one reason why there are so many reported instances
12 of the sexual assault in 2017 from the maintenance
13 department was that there were either faulty or an
14 insufficient number of cameras in that region?
15   A  Correct.
16   Q  Now we'll talk about Richard MacLeod, which
17 is what we came here to talk about. So I apologize
18 it took me so long to get there.
19   A  That's okay.
20   Q  If we go back to Exhibit 3, the next case
21 listed is for Richard MacLeod. Do you see that?
22   A  Yes.
23   Q  Mr. MacLeod was a counselor at Logan
24 Correctional Center, right?

Page 125

1    A  That is correct.
2    Q  And the victims listed in that case are
3  Andrea Nielsen, Amanda Binkley, and Kristy Wright,
4  correct?
5    A  That is correct.
6    Q  Those are three inmates or former inmates at
7  Logan?
8    A  That's correct.
9    Q  You were the principal investigator for ISP
10 on that case?
11   A  Yes.
12   Q  And do you recall at a high level what the
13 allegations against Mr. MacLeod were in that case?
14   A  Yes. Macleod had sexual contact with these
15 three inmates and suspectedly more inmates as well
16 in several different areas in the vocational
17 building as he was a counselor and it was for
18 favors.
19   Q  What types of favors would Mr. MacLeod
20 provide in exchange for sexual contact?
21   A  Some of these -- most of these inmates have
22 children and they would go over there and get either
23 court ordered phone calls and he would allow them
24 for sexual favors to make more phone calls than a

Page 134

1  one else would be in the building and if she was okay
2  with that. Nielsen was fine with working in the
3  vocational building but thought it was weird for
4  MacLeod would ask for her permission. MacLeod stated
5  he would interview Nielsen on Saturday, August 13th,
6  2016 for the healthy relationships class. Can you --
7  what's being described there?
8     A  So why is a CO or a counselor or a staff
9  member asking an inmate's permission to do
10 something. Why did he reach out to an inmate to
11 say, hey, I think you would be good for this class.
12 The inmates, there's an abundance of inmates that
13 want to attend these classes for whatever their
14 reasons, you know, help them to get out, help them
15 to rehabilitate, all those sorts of things. She
16 wanted to do something. She needed to do something,
17 have time on -- with time on your hands you get in
18 trouble in prison. She wanted to do something so he
19 said, hey, come over here and I'll interview you for
20 this and I'll get you into this class.
21    Q  So basically MacLeod, at least as reported by
22 Nielsen, is asking her to come to the vocational
23 building on a weekend to interview for the healthy
24 relationships class?

Page 135

1     A  That's correct.
2     Q  The next paragraph goes on to describe what
3  happened after Nielsen arrived. Let me strike that.
4  Is that a normal thing for inmates to be invited to
5  one area of the facility on the weekend to interview
6  for a vocational class?
7     A  He did work, MacLeod did work weekends and
8  one night a week, that was his schedule. But
9  according to Nielsen, the victim, it was unusual to
10 be there when a full staff wasn't there. It's
11 unusual to be one-on-one with somebody like that in
12 a building when it wasn't fully staffed or a CO may
13 not be in that direct area to sign people in and
14 out. That is unusual.
15    Q  So it sounds like MacLeod worked weekends and
16 had the authority as a counselor to take inmates out
17 of their cell or get them released from their cell
18 and have them brought to an unmonitored location at
19 the facility?
20    MR. TYRRELL: Object to the form of the
21    question. You can answer.
22    A  Correct.
23    Q  (By Mr. Wasdin) Do you know whether there
24 were cameras in the vocational building?

Page 136

1     A  There's cameras in the vocational building
2  but not in the area where the allegations occurred.
3     Q  In your experience investigating sexual
4  assaults at other facilities, is it unusual for a
5  counselor of MacLeod's title to have that type of
6  ability to actually remove an inmate from a monitored
7  area on the weekend and have them come to wherever he
8  wants or the vocational building or is that an
9  unusual -- it just strikes me as a little strange is
10 all.
11    MR. TYRRELL: Object to form of the
12    question. You can answer.
13    A  I don't know the, the counselor's -- Nielsen
14 said it was unusual. I don't know what the actual
15 policy is for counselors, if they have the ability
16 to bring somebody in and have conversations with
17 them. Hopefully the door is open. But there's
18 always somebody else there. One-on-one is unusual.
19 But he has the ability, yes, to call somebody over
20 to his office or the vocational building.
21    Q  (By Mr. Wasdin) The interview goes on to
22 describe, I guess Nielsen actually went and met him
23 and MacLeod started interviewing her for the class?
24    A  Correct.

Page 137

1     Q  During the course of the interview MacLeod
2  transitioned to telling Nielsen she was beautiful and
3  very attractive?
4     A  Correct.
5     Q  Looking at the portion of the interview, it's
6  the bottom paragraph on ISP 03257 and that paragraph
7  moves over to 02358. I won't read every sentence but
8  essentially the top half of that is describing
9  MacLeod complimenting Nielsen and flirting with her?
10    A  Correct.
11    Q  At the end of the interview Nielsen walked
12 out into the hallway to leave and MacLeod said
13 something she didn't hear clearly, she turned to get
14 clarification, and as she turned MacLeod moved in,
15 touched her, and began kissing her?
16    A  Correct.
17    Q  It sounds like Nielsen confirmed during your;
18 interview that there were no cameras in that hallway
19 and that the correctional officer's desk was located
20 down the hall and around the corner and that the CO
21 would be unable to see the location where she was
22 being kissed.
23    A  That is correct. I've been in the building
24 and did a walk through and that is correct.

35 (Pages 134 - 137)