## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 18-3191 |
| | ) |
| RICHARD MacLEOD, WARDEN | ) |
| MARGARET BURKE, TODD | ) |
| SEXTON, MIKE ATCHISON, | ) |
| ANGELA LOCKE, KESS ROBERSON, | ) |
| CHRISTINE BRANNON, PATRICK | ) |
| KEANE, FELIPE ZAVALA, MICHAEL | ) |
| FUNK, ALAN PASLEY, CLARA | ) |
| CHARRON, SHARI KLASSEN, | ) |
| JENNIFER MEAKER, MARCIA MIBBS, | ) |
| HEIDI BROWNE, LISA JOHNSON, | ) |
| DEBRA POLLOCK, MELINDA EDDY, | ) |
| GRANT WILLIS, CHARLES GIBBONS, | ) |
| BOBBIE LeDUC, BRENT BLANCO, and | ) |
| other as-yet unidentified employees of | ) |
| the Illinois Department of Corrections, | ) |
| | ) |
|     Defendants. | ) |

## OPINION

**SUE E. MYERSCOUGH, United States District Judge:**

This is an action under 42 U.S.C. § 1983 wherein Plaintiff Jane

Doe alleges she was sexually abused by her counselor, Defendant

Richard MacLeod, while incarcerated at Logan Correctional Center

1

(Logan).  In addition to Defendant MacLeod, the Plaintiff names 22 other  Defendants who were employed by the Illinois Department of Corrections (IDOC).[1]   Before the Court is the IDOC Defendants' Motion for Summary Judgment [d/e 156].  For the following reasons, the Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.    INTRODUCTION

On May 20, 2019, following the completion of Plaintiff Jane Doe's IDOC sentence, the Plaintiff filed an Amended Complaint alleging Defendants were deliberately indifferent to her health and safety.  See d/e 37.  The Plaintiff generally alleges that, while  the Defendants knew about MacLeod's sexual abuse of Plaintiff and other prisoners, Defendants turned a blind eye to those risks and failed to take reasonable steps to prevent the abuse.

In Count I, the Plaintiff asserts an Eighth Amendment claim alleging Defendants violated Plaintiff's right to be free from cruel and unusual punishment by failing to prevent the harm and/or by

---

[1] The Plaintiff's Amended Complaint also included claims asserted against Dr. Jennifer McClellan and Dr. Keena Peek, both of whom were employed by Wexford Health Services, Inc.  Pursuant to the Parties' Stipulation of Dismissal [d/e 183], Dr. McClellan and Dr. Peek have been dismissed as Defendants.

consciously disregarding the risk of harm.  Id. at 7-8.  In Count II, the Plaintiff alleges certain Defendants retaliated against her for engaging in protected First Amendment activity when she reported Defendant MacLeod's misconduct.  Id. at 13.  Because a default judgment has been entered against Defendant MacLeod, Defendant MacLeod has admitted the allegations in the Complaint and Amended Complaint and his liability is no longer at issue.  See Text Order of Apr. 22, 2021.

The Defendants allege Plaintiff cannot demonstrate that each Defendant was aware of facts from which an inference could be drawn that Plaintiff faced a substantial risk of serious harm.  See d/e 156-1, at 4.  The Defendants also assert it is undisputed that prison officials responded reasonably to any known risk of harm.  Id. Additionally, the Defendants claim Plaintiff cannot prevail under a Monell theory of liability brought against employees sued in their individual capacities.  Id.  The Defendants further claim they are entitled to qualified immunity.  Id.  For these reasons and because the Defendants assert they had no personal involvement in any alleged constitutional deprivation, the Defendants allege summary judgment must be entered in their favor.  Id.

## II.    FACTS

### A. <u>Parties</u>

Plaintiff Jane Doe is the mother of a young daughter and began serving a sentence within IDOC at Logan in 2015.  <u>See</u> d/e 37 ¶ 3, d/e 153, at 2.  Logan is a female prison that houses inmates classified as maximum, medium, and minimum security.  <u>See</u> d/e 156-1, at 18.  The Plaintiff was released from custody on August 4, 2017.  <u>See</u> d/e 156, at 4.

Defendant Richard MacLeod is employed as a Correctional Counselor II by IDOC.  <u>See</u> d/e 37 ¶ 4.  At all relevant times, MacLeod provided counseling services for female inmates at Logan.  <u>Id</u>.

Defendant Todd Sexton was a supervisory officer at Logan and a member of the prison's Internal Affairs Department at the time of the events relevant to this case.  <u>Id</u>. ¶ 5.

Defendants Mike Atchison, Mike Funk, Patrick Keane, Felipe Zavala, and Alan Pasley were employed as administrators within IDOC and were responsible for developing, implementing, and overseeing implementation of the Prison Rape Elimination Act ("PREA") at all IDOC facilities, including Logan; for ensuring that administrators and staff at Logan and other IDOC facilities took steps

to address the problem of custodial sexual assault; and for ensuring the reasonable safety of women in IDOC custody.  Id. ¶ 6.

Defendants Christine Brannon, Kess Roberson, Angela Locke, and Margaret Burke held the position of Warden and/or Acting Warden of Logan during the relevant time period.  Id. ¶ 7.  These Defendants were responsible for overseeing day-to-day operations at Logan, including compliance with PREA; for promulgating rules, regulations, policies, and procedures to ensure reasonable safety of women prisoners at Logan; and for supervising, training, assigning, and disciplining counselors, correctional officers, and internal affairs investigators at Logan, including Defendants Richard MacLeod and Todd Sexton.  Id.

Defendants Clara Charron, Shari Klassen, Jennifer Meaker, Heidi Browne, Lisa Johnson, Debra Pollock, and Melinda Eddy held the position of PREA compliance manager and/or backup PREA compliance manager for Logan during the relevant time period.  Id. ¶ 8.  These Defendants were responsible for developing, planning, and overseeing efforts to address the problem of custodial sexual assault at Logan and for ensuring compliance with PREA regulations and standards.  Id.

Defendants Grant Willis, Charles Gibbons, Bobbie LeDuc, and Brent Blanco were members of the PREA incident review team at Logan during the relevant time period.  Id. ¶ 9.  In that role, the Defendants were responsible for reviewing investigations into allegations of sexual assault at Logan and for evaluating and recommending policy changes to prison administrators to address the problem of sexual assault at the facility.  Id.

### B. Allegations against Richard MacLeod

The Plaintiff first met Richard MacLeod in August of 2016.  See d/e 159-1, at 29.  MacLeod was assigned as the Plaintiff's Women and Family Services counselor, a program at Logan designed to help female inmates stay in touch with their children.  Id.  MacLeod was a counselor in the Children and Family Services department with responsibility over teaching classes, teaching groups, and providing services to certain assigned female inmates.  Id. at 30.  The Plaintiff was receiving bi-weekly court ordered phone calls with her child.  Id. For Plaintiff to receive the phone calls, she would have to visit her Women and Family Services counselor.  Id. at 32.

The Plaintiff attended multiple classes within the Women and Family Services housing unit, including Leadership and Healthy

Relationships.  Id. at 35.  MacLeod was the instructor for the Leadership and Healthy Relationships classes and was Plaintiff's Women and Family Services counselor.  Id.  The Plaintiff and MacLeod's first meeting was in mid-August 2016 when MacLeod asked Plaintiff if she would like to be screened to attend a healthy relationships class, to which Plaintiff responded affirmatively.  Id. at 38, 83-84.

The Vocational Building at Logan has two classrooms, a front one and a classroom further down the hall.  Id. at 36-37.  In August 2016, MacLeod told the Plaintiff she was pretty and asked her if she would tell anyone if MacLeod kissed her, to which Plaintiff responded, "I don't know, probably not."  See d/e 156-1, at 7; d/e 162, at 31.  The Plaintiff testified MacLeod first kissed her in mid-August 2016 in the back classroom of the Vocational Building.  See d/e 159, at 39, 84.  Plaintiff and MacLeod had sexual intercourse for the first time in late August or early September 2016.  Id. at 84.  The first instance of sexual intercourse occurred in the front classroom of the Vocational Building on a Saturday after 6:00 p.m.  Id. at 39-41.  The Plaintiff and MacLeod had intercourse for a second time approximately three weeks to one month after the first time they had sex.  Id. at 84.  The

7

second time Plaintiff and MacLeod had sexual intercourse was in the office of the head counselor for the Women and Family Services program, Sherrin Fitzer. Id. at 46. After the second instance of sexual intercourse and before the last instance of sexual intercourse, MacLeod masturbated in front of the Plaintiff while Plaintiff was on the phone with her daughter. Id. at 51-52.

Between August 2016 and March or April of 2017, the Plaintiff had sexual intercourse with MacLeod on at least three occasions, and Plaintiff performed oral sex on MacLeod on at least two occasions. See 156-1, at 7. The sex acts occurred in the Logan Vocational Building, either in a classroom or in the private office of MacLeod's supervisor, Sherrin Fitzer. Id. On several occasions, MacLeod exposed his penis to the Plaintiff while she was on the phone with her child. Id.

In approximately December of 2016, the Plaintiff reported an allegation of sexual assault or harassment by her roommate. Id. The Plaintiff reported the allegation by submitting a written piece of paper directed to the internal affairs department. Id. at 8. The Plaintiff contends it is immaterial she did not report MacLeod's abuse of her prior to August 2017 in part because MacLeod had threatened

8

Plaintiff with harsh punishments if she had reported the abuse.  <u>See</u> d/e 162, at 31.

Monica Strandberg is an Illinois State Police (ISP) Special Agent who began working in the Division of Internal Investigation in February 2016.  <u>See</u> d/e 164-2, at 24-25.  During the criminal investigation of MacLeod, Strandberg interviewed the Plaintiff and two other inmates who claimed MacLeod had sexually abused them before and after his sexual abuse of Plaintiff.  <u>Id</u>. at 142; d/e 165-17.  Strandberg testified she suspected that MacLeod sexually abused Logan inmates in addition to Plaintiff and the two other individuals.  <u>See</u> d/e 164-2, at 125.  Logan scheduling records generally corroborated the time of the victims' accounts of being sexually assaulted by MacLeod.  <u>Id</u>. at 168.

On August 4, 2017, MacLeod was removed from working in the vocational building and transferred to Logan administration.  <u>See</u> d/e 162, at 138.  At that time, Assistant Warden Wilson recommended that MacLeod be locked out of Logan but that recommendation was not followed.  <u>Id</u>.  Warden Burke testified that, while she also recommended that MacLeod be locked out, IDOC officials did not follow that recommendation.  <u>See</u> d/e 182-1 at 66.  MacLeod

continued working at Logan for thirteen months after he was formally referred to ISP for investigation.  See d/e 162, at 138.  After thirteen months, MacLeod was placed on administrative leave with pay.  Id. MacLeod earned over $97,500 plus benefits in 2019.  Id. at 139.

## C. **Handbook and IDOC training**

According to the Plaintiff's Cumulative Counseling Summary, the Plaintiff received an offender handbook and orientation manual (handbook) on April 16, 2015.  See d/e 158-28, at 8.  The Plaintiff disputes this allegation on the basis that she does not recall receiving the handbook.  See d/e 162, at 23.  The handbook contained a section labeled "Offender Sexual Abuse/Assault Misconduct— Prevention and Intervention Procedure."  See d/e 156-1, at 5.  The handbook explained that an inmate can report sexual abuse by making a free call from any inmate phone to a PREA Report Line and leaving a message.  Id.  The handbook explained that an inmate should immediately report an incident of sexual abuse to a counselor, chaplain, psychologist, medical personnel, or any other staff member.  Id.  The handbook explained that an inmate can report sexual abuse by filling out a request slip asking to speak with internal affairs, an assistant warden, or the warden.  Id.  The handbook

explained that an inmate can report sexual abuse by sending a sealed letter describing the allegations to the warden, a Deputy Director for IDOC, or the Director for IDOC. Id. The handbook explained that an inmate can report sexual abuse by sending a letter to IDOC headquarters in Springfield, Illinois, or to the John Howard Association in Chicago, Illinois. Id. The handbook explained that an inmate should seek medical assistance if she has been sexually assaulted, may be pregnant, or may have been exposed to sexually transmitted diseases. Id.

IDOC Administrative Directive 04.01.301 governs the sexual abuse and harassment prevention and intervention program for all IDOC facilities. Id. Logan Institutional Directive 04.01.301 governs the sexual abuse and harassment prevention and intervention programs specific to Logan. Id. IDOC created a PREA sexual abuse and harassment prevention and intervention program manual effective February 16, 2016, in order to provide guidance towards implementing zero tolerance against all forms of sexual abuse and harassment. Id. at 6. All IDOC employees receive annual "cycle training" that includes a section on PREA reporting and policies. Id.

In 2015, inmates at Logan alleged sixteen instances of staff on inmate sexual abuse or harassment, two of which were substantiated.  Id.  In 2016, inmates at Logan alleged 54 instances of staff on inmate sexual abuse or harassment, three of which were substantiated.  Id.

In 2016, Philip Bradshaw, an independent auditor, found Logan met all 42 required standards under PREA.  Id.; d/e 162, at 26.  At the time of the 2016 audit, Logan had 249 surveillance cameras located throughout the facility, as well as mirrors to assist in alleviating blind spots.  See d/e 156-1, at 6.  At the time of the 2016 audit, Logan had postings regarding PREA reporting and IDOC's zero tolerance policy for sexual abuse and harassment prominently displayed in all housing units, common areas, and throughout the facility.  Id.  Bradshaw found that the inmate population at Logan was 1,017 at the time of the 2016 audit.  Id.

In 2017, inmates at Logan alleged 45 instances of staff on inmate sexual abuse or harassment, none of which were substantiated.  Id.  In 2019, Dwight Fondren, an independent auditor, found Logan met all 43 standards under PREA.  Id. at 7; d/e 162, at 29.  Fondren found that posters containing the PREA hotline

number were prominently displayed in the main lobby area and hallways at the time of the 2019 audit. See d/e 156-1, at 7. At that time, Logan had 500 surveillance cameras located throughout the facility. Id. At the time of the 2019 audit, the inmate population at Logan was 1,715. Id.

**D. Other Defendants**

### (1) Todd Sexton

Todd Sexton was employed as a correctional lieutenant assigned to the internal affairs unit at Logan from August 2016 to October 2017. See d/e 156-1, at 8. On December 8, 2016, Sexton interviewed a third-party female inmate regarding an allegation of staff on inmate sexual abuse. Id. According to the third party inmate, the Plaintiff told her that (1) Plaintiff has been having sexual intercourse with MacLeod for a couple of months, (2) Plaintiff had asked MacLeod to start bringing condoms into the facility but he said it was too risky, and (3) while showering, Plaintiff told the third party inmate that Plaintiff had to "get freshened up for [her] man." Id. The Plaintiff responds to the third allegation by noting that Logan inmates cannot consent to being sexually abused by Logan staff and, even if Defendants were under the impression that Plaintiff welcomed the

sex acts, the Defendants still had an obligation to protect the Plaintiff from MacLeod. See d/e 162, at 32.

The Defendants allege that, after receiving the third party inmate's allegation, Sexton asked the Plaintiff if there was anything she wanted to talk to him about but she acted like nothing was wrong.  See d/e 156-1, at 8.  The Plaintiff disputes this allegation.  See d/e 162, at 20.  Sexton relayed the third party inmate's allegation to Warden Margaret Burke and Sexton's supervisors within the IDOC investigations department, who told Sexton to collect more evidence.  See d/e 156-1, at 8.  Sexton took steps such as hiding in the vocation building and speaking with others but was unable to obtain any corroborating evidence.  Id.  In response to the allegation that Sexton was unable to obtain any corroborating evidence, the Plaintiff claims that Sexton failed to perform basic investigatory steps, such as (1) interviewing MacLeod; (2) looking at MacLeod's scheduling logs; or (3) attempting to collect physical evidence.  See d/e 162, at 4.  The Plaintiff further questions whether, in "speaking with others," Sexton appropriately questioned witnesses.  Id.

The Plaintiff told her mother about the sexual relationship with MacLeod but made her mother promise not to report it to the

authorities.  <u>See</u> d/e 156-1, at 8.  On August 4, 2017, the Plaintiff finally told Sexton that Plaintiff and MacLeod had previously had sexual intercourse and that she had performed oral sex on MacLeod. <u>Id</u>. at 9.  After the Plaintiff spoke with Sexton, Plaintiff also spoke with psychologist Michael Kessler on August 4, 2017.  <u>Id</u>.  The Plaintiff also spoke with medical professional Lisa Johnson on August 4, 2017.  <u>Id</u>.  On August 4, 2017, after reporting MacLeod to Sexton, the Plaintiff was transferred from Logan to Decatur Correctional Center (Decatur).  <u>Id</u>.  Decatur is a female prison that houses inmates classified as minimum security.  <u>Id</u>. at 18.  The Defendants allege non-party Assistant Warden Angel Wilson made the determination to transfer the Plaintiff to Decatur.  <u>Id</u>. at 9.  The Plaintiff disputes this assertion on the basis that multiple Defendants including Burke, Sexton, and Marcia Mibbs participated in the decision to transfer Plaintiff to Decatur.  <u>See</u> d/e 162, at 6-7.

### (2) Mike Atchison

Mike Atchison never worked at Logan, but he visited the facility during site visits.  <u>See</u> d/e 156-1, at 9.  Atchison was the IDOC deputy chief of operations from January 2012 to March 2016.  <u>See</u> d/e 162, at 7.  Atchison was the IDOC chief of operations from

approximately March 2016 through October 2017.  Id.  The Plaintiff did not report MacLeod's sexual abuse directly to Atchison at any time, though Plaintiff alleges Atchison knew or should have known about the sexual abuse because of his position at IDOC.  See d/e 156-1, at 9; d/e 162, at 7-8.

### (3) Brent Blanco

Brent Blanco worked at Logan from 1995 to present, first as a correctional officer from 1995 to 2007 and then as a counselor from 2007 to present.  See d/e 156-1, at 10.  Blanco was on the Logan PREA incident review team from September 2016 to May 2017.  See d/e 162, at 98-99.  The Plaintiff did not report MacLeod's sexual abuse to Blanco at any time, though Plaintiff alleges Blanco knew or should have known about the sexual abuse.  Id. at 35.

### (4) Christine Brannon

Christine Brannon worked as the warden at Logan from August 2015 to February 2016.  See d/e 156-1, at 10.  The Plaintiff did not report MacLeod's sexual abuse directly to Brannon at any time, though Plaintiff alleges Brannon knew or should have known about the sexual abuse.  Id.; d/e 162, at 37.

### (5) Heidi Browne

Heidi Browne worked at Logan from 2012 to present.  <u>See</u> d/e 156-1, at 10.   From 2012 to April 2015, Browne was an office associate for the Logan receiving and classification department.  <u>Id</u>. In April 2015, Browne became an administrative assistant.   <u>Id</u>. Browne was the Logan PREA compliance manager prior to MacLeod's sexual abuse of Plaintiff from September 2015 to November 2015 and a member of the Logan PREA incident review team from May 2017 to 2018.  <u>See</u> d/e 162, at 97-99.  The Plaintiff did not report MacLeod's sexual abuse directly to Browne at any time, though Plaintiff alleges Browne knew or should have known about the sexual abuse.  <u>Id</u> at 38-39.

### (6) Margaret Burke

Margaret Burke worked in an interim capacity as an IDOC adult transition coordinator from March to September 2013.  <u>See</u> d/e 156, at 11.   As the adult transition coordinator, Burke oversaw the transfer of inmates from one facility to another.  <u>Id</u>.  The Defendants allege that, in March 2013, Burke helped address any necessary modifications related to Logan's transition from an all-male to all-female facility.  <u>Id</u>.  The Plaintiff disputes that allegation on the basis

that Defendants present no evidence that Burke helped to address any necessary modifications to Logan.  See d/e 162, at 9.

Sometime in 2013, Burke became the coordinator for the IDOC Women and Family Services department.  See d/e 156-1, at 11.  In April 2016, Burke became acting warden at Logan and held the position of warden during the time period MacLeod was sexually abusing Plaintiff until Burke retired in December 2017.  Id.  The Plaintiff did not report MacLeod's sexual abuse directly to Burke at any time, though Plaintiff alleges Burke knew or should have known about the sexual abuse because Defendant Sexton had informed Burke of the third party inmate's allegation about MacLeod's sexual abuse of Plaintiff.  Id.; d/e 162 at 41.

### (7) Clara Charron

Clara Charron worked as the assistant warden of programs at Logan from 2013 to June 2016.  See d/e 156, at 11.  Charron was a PREA compliance manager at Logan from September 2015 to November 2015.  See d/e 162, at 97-98.  The Plaintiff did not report MacLeod's sexual abuse directly to Charron at any time, though Plaintiff alleges Charron knew or should have known about the sexual abuse.  Id. at 45-46.

### (8) Melinda Eddy

Melinda Eddy worked as the assistant warden of life skills and re-entry at Logan from March 2017 to present.  <u>See</u> d/e 156-1, at 11. Eddy was a PREA compliance manager from May 2017 to July 2018. <u>See</u> d/e 162, at 97-98.  The Plaintiff did not report MacLeod's sexual abuse directly to Eddy at any time, though Plaintiff alleges Eddy knew or should have known about the sexual abuse.  <u>Id</u>. at 49.

### (9) Michael Funk

Michael Funk never worked at Logan.  <u>See</u> d/e 156, at 12.  Funk worked as the IDOC designee who led the state-wide PREA audit process from November 2015 to May 2016.  <u>Id</u>.  Funk worked as the IDOC manager of the employee services division from June 2016 to June 2018.  <u>Id</u>.  Funk was also an IDOC PREA coordinator from November 2015 to September 2016.  <u>See</u> d/e 162, at 97.  The Plaintiff did not report MacLeod's sexual abuse directly to Funk at any time, though Plaintiff alleges Funk knew or should have known about the sexual abuse.  <u>Id</u>. at 52-53.

### (10) Charles Gibbons

Charles Gibbons worked as a counselor at Logan from 2003 to 2012 and then as a casework supervisor from January 2013 to June

2016.  See d/e 156-1, at 12.  Gibbons was responsible for supervising MacLeod for some period of time prior to Gibbons' departure from Logan in June 2016.  Id.  Gibbons wrote up MacLeod for workplace violations on several occasions for infractions that did not involve sexual abuse or assault.  Id.  Gibbons was a member of Logan's PREA incident review team until May 2016, which was prior to MacLeod's sexual abuse of Plaintiff.  See d/e 162, at 98.  The Plaintiff did not report MacLeod's sexual abuse directly to Gibbons at any time, though Plaintiff alleges Gibbons knew or should have known about the sexual abuse.  Id. at 77.

### (11) Lisa Johnson

Lisa Johnson worked at Logan as the health care unit administrator from December 2013 to 2018.  See d/e 156-1, at 13. Johnson was both a Logan PREA compliance manager and Logan PREA incident review team member during the time MacLeod was sexually abusing the Plaintiff.  See d/e 162, at 12.  The Plaintiff reported MacLeod's sexual abuse directly to Johnson on August 4, 2017.  See d/e 156-1, at 13.  The Defendants allege Johnson did not know any sexual abuse was occurring between MacLeod and Plaintiff

20

prior to August 4, 2017, though Plaintiff alleges Johnson knew or should have known about the sexual abuse.  Id.; d/e 162, at 12-13.

### (12) Patrick Keane

Patrick Keane never worked at Logan.  See d/e 156-1, at 13. Keane worked as the IDOC programs compliance manager from February 2012 to November 2015.  Id.  At some point during his tenure as programs compliance manager, Keane was assigned duties as the IDOC backup PREA coordinator and IDOC PREA coordinator. Id.  The Plaintiff did not report MacLeod's sexual abuse directly to Keane at any time, though Plaintiff alleges Keane knew or should have known about the sexual abuse.  Id; d/e 162, at 60-61.

### (13) Shari Klassen

Shari Klassen worked at Logan as an office administrative specialist from August 2005 to November 2016.  See d/e 156-1, at 13.  As an office administrative specialist, Klassen was the administrator for the computer local area network (LAN) and telecom coordinator.  Id. at 14.  Klassen also held the position of Logan PREA compliance manager from July 2016 to November 2016.  See d/e 162, at 102.  The Plaintiff did not report MacLeod's sexual abuse directly to Klassen at any time, though Plaintiff alleges Klassen knew

or should have known about the sexual abuse.  See d/e 156-1, at 14; d/e 162, at 65.

### (14) Angela Locke

Angela Locke worked as the acting warden at Logan from October 2013 to June 2015.  See d/e 156-1, at 14.  The Plaintiff did not report MacLeod's sexual abuse directly to Locke at any time, though Plaintiff alleges Locke knew or should have known about the sexual abuse.  Id.; d/e 162, at 66-67.

### (15) Jennifer Meaker

Jennifer Meaker worked at Logan from March 2013 to September 2017, first as a correctional nurse and then as the director of nursing from September 2016 to September 2017.  See d/e 156-1, at 14.  Meaker was also a PREA compliance manager from November 2016 to May 2017.  See d/e 162, at 98.  The Plaintiff did not report MacLeod's sexual abuse directly to Meaker at any time, though Plaintiff alleges Meaker knew or should have known about the sexual abuse.  Id. at 69-70; d/e 156, at 14.

### (16) Marcia Mibbs

Marcia Mibbs worked at Logan from February 2016 to July 2018.  See d/e 156-1, at 14.  Mibbs worked as a mail room assistant

at Logan from February 2016 to April 2016.  Id. at 15.  Mibbs worked as a case work supervisor in the Women and Family Services Department at Logan from April 2016 to September 2016.  Id.  Mibbs was temporarily assigned as the IDOC clinical services supervisor at Logan from September 2016 to June 2017.  Id.  Mibbs worked as the IDOC case work supervisor in Women and Family Services at Logan from June 2017 to July 2018.  Id.  Mibbs was responsible for training MacLeod in relation to his duties in Women and Family Services.  Id.  Mibbs also held the position of PREA compliance manager from May 2017 to July 2018.  See d/e 162, at 98.  The Plaintiff did not report MacLeod's sexual abuse directly to Mibbs at any time, though Plaintiff alleges Mibbs knew or should have known about the sexual abuse.  See d/e 156-1, at 15; d/e 162, at 72-73.

### (17) Alan Pasley

Alan Pasley worked at Logan from June 2013 to October 2016 as the superintendent of the Logan reception and ~~as~~ classification center where new female inmates first arrive within the IDOC system. See d/e 156-1, at 15.  Subsequently, Pasley worked as the IDOC PREA coordinator and Americans with Disabilities Act coordinator from October 2016 to January 2018.  Id.  The Plaintiff did not report

MacLeod's sexual abuse directly to Pasley at any time, though Plaintiff alleges Pasley knew or should have known about the sexual abuse.  <u>Id</u>.; d/e 162, at 73.

### (18) Debra Pollock

Debra Pollock worked at Logan as a secretary for approximately 19 years until her retirement in December 2017.  <u>See</u> d/e 156-1, at 16.  Pollock was a PREA compliance manager at Logan from November 2016 to May 2017.  <u>See</u> d/e 162, at 98.  The Plaintiff did not report MacLeod's sexual abuse directly to Pollock at any time, through Plaintiff alleges Pollock knew or should have known about the sexual abuse.  <u>Id</u>. at 75-76.

### (19) Bobbie Jean Reavis (formerly LeDuc)

Bobbie Jean Reavis worked as a correctional officer assigned to the intelligence unit at Logan sometime between 2013 to 2017.  <u>See</u> d/e 156-1, at 16.  As an officer assigned to the intelligence unit, Reavis acted as an investigatory officer at Logan but did not investigate allegations of staff on offender sexual abuse.  <u>Id</u>.  Reavis was also on the PREA incident review team from May 2016 to May 2017.  <u>See</u> d/e 162, at 98.  The Plaintiff did not report MacLeod's sexual abuse directly to Reavis at any time, though Plaintiff alleges

Reavis knew or should have known about the sexual abuse.  <u>Id</u>. at 77-78.

### (20) Kess Roberson

Kess Roberson worked as the assistant warden of operations at Logan from August 2011 to March 2013 and as the warden at Lincoln Correctional Center from March 2013 to December 2018.  <u>See</u> d/e 156, at 16.  Roberson was also assigned as the acting warden at Logan from June to August 2015.  <u>Id</u>.  The Plaintiff did not report Roberson's sexual abuse directly to Roberson at any time, though Plaintiff alleges Roberson knew or should have known about the sexual abuse.  <u>See</u> d/e 162, at 78-79.

### (21) Grant Willis

Grant Willis worked at Logan as a correctional officer assigned to the intelligence unit at Logan in 2016 and 2017, except for two months in 2016 when he worked for the Illinois Department on Aging. <u>See</u> d/e 156-1, at 17.  As a correctional officer assigned to the intelligence unit at Logan, Willis would not have investigated allegations of staff on inmate sexual abuse or harassment.  <u>Id</u>.  Willis was on the PREA incident review team at Logan from May 2016 to May 2017.  <u>See</u> d/e 162, at 98.  The Plaintiff did not report MacLeod's

sexual abuse to Willis at any time, though Plaintiff alleges Willis knew or should have known about the sexual abuse.  Id. at 80-81.

### (22) Felipe Zavala

Felipe Zavala never worked at Logan.  See d/e 156-1, at 17. Zavala was employed by IDOC as the manager for the training academy in Springfield, Illinois from 2013 to 2015.  Id. Subsequently, Zavala was employed as an assistant warden at Taylorville Correctional Center from 2015 to 2017.  Id.  Zavala was the IDOC PREA coordinator from February 2012 to November 2015, prior to MacLeod's abuse of Plaintiff.  See d/e 162, at 97.  The Plaintiff did not report MacLeod's sexual abuse directly to Zavala at any time, though Plaintiff alleges Zavala knew or should have known about the sexual abuse.  Id. at 86.

### E. Plaintiff's expert testimony

In alleging Defendants were deliberately indifferent to the risk that MacLeod posed to the Plaintiff and other Logan inmates, the Plaintiff relies on the testimony of Brenda Smith who, among other areas of expertise, served on the PREA National Prison Rape Elimination Commission at the appointment of then-U.S. House of Representatives Minority Leader Nancy Pelosi between November

2003 and August 2009.  <u>See</u> d/e 164-7, at 7.  The Plaintiff claims Smith's report details Defendants' roles and responsibilities under PREA and their failures in the discharge of those duties.  <u>See</u> d/e 162, at 145-46.  The Plaintiff alleges Smith's report contains the opinion that IDOC and Logan staff knew or should have known of the pervasive risk of staff-on-inmate sexual assault at Logan but failed to address that risk through appropriate supervision, surveillance, investigation, and discipline.  <u>Id</u>.  According to Smith's report, the Defendants were deliberately indifferent to the known and documented risk of staff-on-inmate assault posed to Plaintiff.  <u>Id</u>. Moreover, the practices and culture at Logan facilitated MacLeod's assault of the Plaintiff.  <u>Id</u>.  Smith's report includes the opinion that IDOC and Logan staff knew that MacLeod had a history of sexually inappropriate behavior and thus allowing MacLeod unfettered and unsupervised access to Plaintiff was contrary to the best correctional practices and common sense.  <u>Id</u>.  Finally, Smith's report contains the opinion that Defendants were deliberately indifferent to the risk that MacLeod posed to Plaintiff.  <u>Id</u>.

The Defendants dispute each of the Plaintiff's allegations concerning Smith's opinions because Defendants claim (1) Smith

does not know the correct legal standard for deliberate indifference claims; and (2) Smith could not point to any factual basis for her alleged *ipse dixit* conclusions.  See 182-1, at 77.  The Defendants also claim Smith's opinion is immaterial because it only supports Plaintiff's allegations of a generalized risk of harm and does nothing to connect the dots to acts or omissions by the individual Defendants. Id.

## III.   DISCUSSION

### A. Summary judgment standard

Summary judgment is appropriate if the motion is properly supported, and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  The Court views the evidence and construes all reasonable inferences in favor of the non-movant.  See Driveline Systems, LLC v. Arctic Cat, Inc., 936 F.3d 576, 579 (7th Cir. 2019). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).   "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or

28

balance the relative weight of conflicting evidence." <u>Driveline Systems</u>, 936 F.3d at 579 (internal quotation marks omitted). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. <u>See</u> <u>Springer v. Durflinger</u>, 518 F.3d 479, 484 (7th Cir. 2008). In ruling on cross-motions for summary judgment, the Court views "all facts and inferences in the light most favorable to the nonmoving party on each motion." <u>Lalowski v. City of Des Plaines</u>, 789 F.3d 784, 787 (7th Cir. 2015).

## B. <u>Eighth Amendment--deliberate indifference standard</u>

To establish an Eighth Amendment violation, the Plaintiff must show that Defendants acted with deliberate indifference to an excessive risk to Plaintiff's health or safety. <u>See</u> <u>J.K.J. v. Polk County</u>, 960 F.3d 367, 376 (7th Cir. 2020). Obviously, a staff on inmate sexual assault constitutes an objectively serious risk to an inmate's safety. <u>See</u> <u>id</u>. The deliberate indifference standard is a subjective one. <u>See</u> <u>Estate of Novack ex rel. Turbin v. County of Wood</u>, 226 F.3d 525, 529 (7th Cir. 2000). It is not enough to allege a prison official objectively should have been aware of the danger to the inmate. <u>See</u>

id. "Ordinarily, a prison official does not violate the Eighth Amendment when he should have been aware of a risk that harm would befall an inmate but was not actually subjectively aware of that risk." Id. at 530 (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). In assessing deliberate indifference, therefore, courts examine the prison official's subjective state of mind. See Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016). A plaintiff must show "evidence that an official *actually* knew of and disregarded a substantial risk of harm." Id. (citing Farmer, 511 U.S. at 837).

In Haley v. Gross, 86 F.3d 630 (7th Cir. 1996), the Seventh Circuit noted that actual knowledge of the substantial risk "can be *inferred* by the trier of fact from the obviousness of the risk." Id. at 641 (citing Farmer, 511 U.S. at 842). If a plaintiff presents evidence that a risk of attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it," then an inference of actual knowledge of a substantial risk of harm may be permissible. Farmer, 511 U.S. at

843.  A general risk of harm is not enough to establish the existence of a substantial risk.  See Shields v. Dart, 664 F.3d 178, 181 (7th Cir. 2011).

Individual liability under section 1983 requires personal involvement in the constitutional deprivation.  Gonzalez v. McHenry County, 40 F.4th 824, 828 (7th Cir. 2022).  To establish personal liability under section 1983, a plaintiff must show that the official "caused the constitutional deprivation at issue or acquiesced in some demonstrable way in the alleged constitutional violation."  Id.  "Each case must be examined individually, with particular focus on what the officer knew and how he responded."  Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008).  The Seventh Circuit further explained:

> [I]n order to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show that the defendant was personally responsible for that violation.  A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.  While the defendant need not have participated directly in the deprivation of the plaintiff's constitutional right to be held liable, he or she must nonetheless have known about the conduct, facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see.

Rasho v. Elyea, 856 F.3d 469, 478 (7th Cir. 2017) (internal quotation marks and citations omitted).

The Defendants allege the record does not support the Plaintiff's assertion that the risk of substantial harm from sexual assault was obvious.   See d/e 156-1, at 20.   Initially, the Plaintiff was incarcerated at Logan for fifteen months before any alleged sexual misconduct by MacLeod began in August 2016.   Id.   Another factor cited by Defendants regarding why the risk was not obvious is because, out of 115 allegations of staff on inmate sexual abuse at Logan between 2015 and 2017, only five were substantiated.   Id. Additionally, an independent auditor in 2016 found Logan met all 42 required standards under PREA and was found to be "fully compliant with the PREA."   Id. at 20-21.   In 2019, a different independent auditor found Logan met all 43 required standards under PREA.   Id. at 21.   In further support of the Defendants' argument, Defendants state that at the time of the 2016 and 2019 independent PREA audits, Logan's population was 1,017 and 1,715 respectively.   Id.   The Defendants claim that, even when a conservative calculation is used, only 0.294% of inmates were found to have suffered from a

substantiated instance of staff on inmate sexual abuse or misconduct during 2016.  Id.

### (1) Defendants Burke and Sexton

The Plaintiff first contends that a reasonable jury could conclude that Burke's and Sexton's deliberate indifference caused the Plaintiff's harm.  See d/e 162, at 148.  At the time MacLeod sexually abused the Plaintiff, Burke was the warden at Logan.  Id. On December 8, 2016, Sexton, the investigating internal affairs employee, interviewed a third-party inmate who reported that Plaintiff had described MacLeod as her "man" and indicated she had to shower "to get freshened up for [my] man."  See d/e 159-21, at 15-16, 19-21, 155-156, 172-178.  Sexton testified that the third-party inmate indicated that Plaintiff had been at the vocational center with MacLeod the night of December 7, 2016, the night before Sexton interviewed the third-party inmate, though the third-party inmate did not know whether MacLeod had engaged in any inappropriate conduct on that occasion.  Id. at 175-76.  The Court finds that, based on Sexton's interview with the third party inmate, there is a factual

issue as to whether Defendants Sexton and Burke actually knew of and disregarded a substantial risk of harm to the Plaintiff.

The record establishes that Burke and Sexton did not take any measures to cut off Macleod's access to the Plaintiff, report the incident, question MacLeod, or attempt to collect physical evidence. The Defendants admit that Sexton, with Burke's knowledge, conducted surveillance where he attempted to catch MacLeod in the act of engaging in sexual misconduct with the Plaintiff. See d/e 182-1, at 60. This was the only time Burke approved an investigation like this. Id. After three unsuccessful attempts at catching MacLeod in the act, Sexton discontinued his surveillance efforts in January 2017. Id. at 61. The Plaintiff was sexually assaulted again by MacLeod in February 2017. Id. Sexton did not directly question the Plaintiff regarding her victimization by MacLeod until August 2017 when Sexton learned that MacLeod was sexually harassing a female corrections officer. See 164-7, at 10-11. Based on this portion of the record, there at least is a factual dispute regarding whether Burke and Sexton knew that MacLeod was sexually abusing the Plaintiff while the abuse was occurring. Additionally, there are genuine

issues of material fact concerning whether Burke and Sexton failed to take appropriate action upon first learning of MacLeod's sexual abuse of Plaintiff, thereby allowing the abuse to continue.  A jury could find that constitutes deliberate indifference.  See Haywood v. Hathaway, 842 F.3d 1026, 1031-33 (7th Cir. 2016) (noting that "plainly inappropriate" responses can allow for an inference of deliberate indifference).

To the extent that Defendants argue Plaintiff wanted to engage in sex acts with MacLeod, prisoners cannot consent to sex with prison staff under any circumstances.  See d/e 162-1, at 36.  That constitutes staff sexual misconduct which is against IDOC policy and against the law.  Id.  In J.K.J., the Seventh Circuit noted the obvious reason for that policy is the power disparity between correctional employees and female inmates:

> They were confined in circumstances where they depended on male guards for nearly everything in their lives—their safety as well as their access to food, medical care, recreation, and even contact with family members.  With this authority and control for the guards came power and, in turn, access and opportunity to abuse it.  It is difficult to conceive of any setting where the power dynamic could be more imbalanced than between a male guard and a female inmate. . . . The confinement setting is a tinderbox for sexual abuse.

<u>J.K.J.</u>, 960 F.3d at 381-82.

The Defendants also note that in December 2016, after the third-party inmate told Sexton that MacLeod had been engaging in sex acts with the Plaintiff for several months, Sexton spoke to Plaintiff and asked her if there was anything she needed to talk to him about. <u>See</u> d/e 156-1, at 24.  The Plaintiff responded that she had no issues. <u>Id</u>.    The  Plaintiff  did  not  inform  Sexton  about  MacLeod's inappropriate actions until August 4, 2017.  <u>Id</u>.  The Defendants contend that Plaintiff's own conduct thwarted any effort by Sexton to terminate MacLeod's sexual abuse of Plaintiff until August 2017.  <u>Id</u>. at 25.

However, there is at least a factual dispute as to whether Burke and Sexton should have taken further action upon learning of the abuse in December 2016, notwithstanding the Plaintiff's statement that she had nothing to discuss.  This is particularly true when the power disparity noted in <u>J.K.J.</u> between a male correctional employee and female inmate is considered.  The Plaintiff states that she did not simply "refuse" to report MacLeod to Sexton.  <u>See</u> d/e 162, at 151.  It

is undisputed that MacLeod threatened the Plaintiff that she would be punished and placed into segregation for a year if she told anyone about the abuse.  <u>See</u> d/e 182-1, at 55.  MacLeod also told the Plaintiff that he was protected from discovery and discipline because of his relationship with Sexton, who was the head of investigations at Logan.  <u>Id</u>.  The Plaintiff had no reason to doubt MacLeod's representation given the ease with which MacLeod had gained access to Plaintiff and was able to sexually abuse her.  <u>Id</u>.  When asked why she did not report the sexual abuse right away, the Plaintiff responded: "I was scared.  Like he's in charge of me, he is in power over me."  <u>See</u> d/e 163-1, at 42.  The Plaintiff also feared retaliation for reporting MacLeod's sexual abuse by someone coming after her while she was in prison.  <u>See</u> d/e 182-1, at 56.  Based on the foregoing, there is a factual issue concerning whether Burke and Sexton had a duty to further investigate the allegations against MacLeod or at least restrict MacLeod's access to the Plaintiff and other inmates after learning of the abuse.  For these reasons, the Court finds that there is a genuine issue of material fact regarding whether Burke and Sexton were deliberately indifferent which caused the Plaintiff's harm.

## (2) Other Defendants

Defendants claim that most individual Defendants are entitled to summary judgment because those individuals had no personal involvement with the Plaintiff's injury.    Certain Defendants— Atchison, Funk, Keane, and Zavala—never worked at Logan.  See d/e 156-1, at 22.  Defendants Brannon, Charron, Eddy, Gibbons, Locke, Pasley, and Roberson worked at Logan at times other than when MacLeod's misconduct occurred.  Id.  The Defendants allege Reavis and Willis were investigators at Logan who were not authorized to investigate allegations of sexual staff on inmate abuse or harassment. Id. at 22-23.  Defendant Klassen was an administrator responsible for the computer network and telephones.  Id. at 23.  Defendant Pollock was the warden's secretary.  Id.  The Defendants contend these individual Defendants are entitled to summary judgment because the Plaintiff is unable to show that those Defendants were personally involved in any constitutional deprivation.

The Plaintiff responds by claiming these Defendants had the responsibility to prevent sexual assaults at Logan.    Defendant Atchison was the IDOC Director of Operations at the time MacLeod

was sexually abusing the Plaintiff.  See d/e 162, at 152.  In that role, Atchison was responsible for ensuring the safety of women.  Id.  That type of general allegation is not enough for liability to attach.  The Plaintiff points to no evidence which suggests that Atchison was aware of MacLeod's abuse of Plaintiff.  Absent some indication that Atchison "acquiesced in some demonstrable way in the alleged constitutional violation," see Gonzalez, 40 F.4th at 828, Atchison is entitled to summary judgment on Plaintiff's deliberate indifference claims.

The Plaintiff notes that Defendants Pasley, Funk, Keane, and Zavala were IDOC PREA coordinators before and during MacLeod's abuse of Plaintiff, and in that role those Defendants were responsible for (a) implementing Logan's "zero tolerance" policy, (b) training IDOC staff, and (c) ensuring prisoners are screened for sexual assault risk.  See d/e 162, at 152.  The Logan Warden and Logan PREA compliance managers reported to the IDOC PREA coordinator.  Id.  None of those allegations are probative of whether the PREA coordinators "acquiesced in some demonstrable way" in MacLeod's sexual abuse of Plaintiff.

The Plaintiff notes that Defendants Brannon, Roberson, and Locke were the wardens of Logan before MacLeod's sexual abuse of the Plaintiff.  <u>See</u> d/e 162, at 152.  In that role, Brannon, Roberson, and Locke were responsible for, among other things, (a) implementing Logan's "zero tolerance" policy, (b) training Logan staff, (c) ensuring suspected abuse was reported, (d) overseeing investigations, (e) disciplining offending staff, and (f) implementing any necessary policy changes.  <u>Id</u>.  Because Defendants Brannon, Roberson, and Locke were wardens prior to MacLeod's sexual abuse of Plaintiff, there is no indication these Defendants "acquiesced in some demonstrable way in the alleged constitutional violation."

The Plaintiff notes that Defendants Mibbs, Eddy, Meaker, Pollock, Klassen, Johnson, Browne, and Charron were Logan PREA compliance managers before and during MacLeod's abuse of Plaintiff. <u>See</u> d/e 162, at 152.  In that role, Defendants Mibbs, Eddy, Meaker, Pollock, Klassen, Johnson, Browne, and Charron were responsible for (a) developing and maintaining a program for the evaluation of victims and predators of sexual abuse or harassment; (b) training Logan staff; (c) screening prisoners for potential vulnerability to

40

sexual abuse; (d) identifying any necessary policy changes; (e) ensuring Logan complied with the "zero tolerance" policy; and (f) developing, planning, and overseeing efforts to address the problem of custodial sexual assault at Logan and for ensuring compliance with PREA regulations and standards.  Id.  None of those allegations are probative of whether the PREA compliance managers "acquiesced in some demonstrable way" in MacLeod's sexual abuse of Plaintiff.

The Plaintiff notes that Defendants Browne, Sexton, Johnson, Meaker, Blanco, Klassen, Mibbs, Willis, Reavis, Pasley, and Gibbons were Logan PREA "incident review team" members before and during MacLeod's abuse of Plaintiff.  See d/e 162, at 152.  In that role, these Defendants were responsible for reviewing investigations into sexual abuse at Logan, for evaluating and reporting on those incidents, and for recommending policy changes to address the problem of sexual assault at the facility.  Id.  Absent some evidence that these Defendants were aware of Macleod's sexual abuse of the Plaintiff, the allegations are not probative of whether the incident review team members "acquiesced in some demonstrable way" in MacLeod's sexual abuse of Plaintiff.

The Plaintiff contends that most of these Defendants were on notice of the threat posed by MacLeod, and all were on notice of the obvious risk of staff-on-inmate abuse at Logan. See d/e 162, at 152-53. The Plaintiff acknowledges that certain Defendants—Brannon, Roberson, Locke, Keane, Zavala, Browne, Charron, and Gibbons—were not on notice of MacLeod's abuse of Plaintiff. Id. at 153 n.5. However, that does not mean those Defendants were not otherwise on notice of an obvious risk of staff-on-inmate sexual assault at Logan. Id. The Plaintiff alleges the Defendants turned a blind eye to those risks and did not take reasonable steps to protect Logan prisoners. Id. at 153. The Plaintiff contends there are factual disputes as to whether (1) Defendants were on notice that MacLeod was a sexual predator; and/or (2) there was an obvious risk of staff-on-inmate sexual abuse at Logan. Id.

### (i)    Notice of MacLeod as a Likely Sexual Predator

The Plaintiff first suggests that a reasonable jury might not believe that Defendants Burke and Sexton kept the information they learned in December 2016 about MacLeod's sexual abuse of Plaintiff to themselves. Id. According to the Plaintiffs, Defendants Burke and

Sexton might have told other Defendants about MacLeod's abuse. Absent some evidence that actually occurred, however, the Plaintiffs' claim is speculative and not enough to create a factual dispute on a summary judgment motion.  See Harper, 687 F.3d at 306.

The Plaintiff further contends that MacLeod was a known problem at Logan.  See d/e 162, at 153.  MacLeod was aggressive and insubordinate with his supervisor and sexually harassed some of his female colleagues.  Id.  Those are factors that are sometimes demonstrated by sexual predators according to IDOC training materials, which are received by all IDOC employees.  Id.  The Plaintiff alleges there were rumors about the frequency with which prisoners would visit MacLeod in the vocational building.  Id.  MacLeod even sexually abused Doe while other staff were present in the office with his desk turned sideways to avoid detection.  Id. at 153-54.  ISP Agent Monica Strandberg testified, "Everybody kn[ew] that MacLeod [was] having sex at prison."  See d/e 164-2, at 178.  Strandberg goes on to talk about the rumors and speculation and the culture in prison to keep quiet among prison employees and inmates.  Id.  When Strandberg told MacLeod's supervisor, Sherrin Fitzer, that MacLeod was alleged to have had sex with inmates in her office, Fitzer

43

responded, "I don't doubt it. I've heard rumors. . . . I'm sure it happened." Id. at 190. Strandberg noted that Fitzer further stated that, unless an inmate told her about the abuse, it was all just hearsay and rumors. Id. However, a plaintiff cannot defeat summary judgment by "asking a court to make inferences based on . . . speculations as to the defendant's state of mind, hunches, intuitions or rumors." Kodish v. Oakbrook Terrace Fire Protection Dist., 604 F.3d 490, 507-08 (7th Cir. 2010).

The Plaintiff further alleges that MacLeod was "verbally abusive and a bully" and a "problematic employee" who "had no respect for authority." See d/e 162, at 124-25. Additionally, the Plaintiff asserts MacLeod was a well-known womanizer who sexually harassed his female colleagues and, according to Sherrin Fitzer, MacLeod told one female correctional officer that "any time he walked by her or was around her he would get an erection." Id. at 125. Moreover, MacLeod authored emails to work colleagues that contained sexual innuendos and stories about sex. Id. at 126. As an example, Fitzer testified that MacLeod sent out an email to other counselors stating that the women that another counselor was bringing home from a local bar "needed to have bags put over their head because they were

44

unattractive." Id.  MacLeod also emailed a female co-worker with the subject line "your [sic] beautiful" and made similar comments to the same co-worker in person at work.  Id.  MacLeod sent sexually harassing messages to a female colleague on Facebook.  Id.  Fitzer wrote an incident report addressing MacLeod's unprofessionalism on the computer system and failure to follow orders, but MacLeod was never disciplined.  Id.  Fitzer testified she would have turned the incident report over to the lieutenant on duty.  See d/e 163-10, at 44.  The Plaintiff does not indicate whether any Defendant had access to the incident report.

Monica Strandberg testified that Fitzer was contacted by a lawyer at Cabrini Green Legal Aid who reported that MacLeod was sexually abusing inmates at Logan.  See d/e 162, at 126.  The lawyer learned this information from the Plaintiff after the Plaintiff reported the abuse in August 2017 and had been released on parole.  See d/e 164-2, at 91.

The Plaintiff further notes that her expert, Brenda Smith, concluded that Defendants were deliberately indifferent to the risk that MacLeod posed to Doe.  See d/e 162, at 154.  However, Smith does not point to any acts or omissions by Defendants relating to

45

subjective awareness that MacLeod was a sexual predator prior to
August 2017.

Actual knowledge by prison officials of the risk to the prisoner
is critical. See Farmer, 511 U.S. at 844. More specifically, the
question of what each individual IDOC Defendant knew is the key
inquiry:

> [S]howing mere negligence is not enough. Even objective
> recklessness—failing to act in the face of an unjustifiably high
> risk that is so obvious that it *should* be known—is insufficient
> to make out a claim. Instead, the Supreme Court has
> instructed us that a plaintiff must provide evidence that an
> official *actually* knew of and disregarded a substantial risk of
> harm. Officials can avoid liability by proving they were unaware
> of an obvious risk to inmate health or safety.

Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (citations
omitted). Rumors and speculation do not equate to actual
knowledge. See Ellis v. United Parcel Service, Inc., 523 F.3d 823,
827 (7th Cir. 2008) (noting that rumor and conjecture are not enough
to create a factual dispute about a defendant's knowledge). The
Plaintiff points to no acts or omissions concerning most Defendants'
knowledge of MacLeod's sexual abuse of Plaintiff. Even when the
facts are viewed in a light most favorable to the Plaintiff, no
reasonable jury could charge Defendants other than Burke and

Sexton with knowledge of a substantial risk of harm that Plaintiff was subject to sexual abuse by MacLeod.

### (ii)    Risk of Staff-on-Inmate Sexual Abuse

The Plaintiff then cites the general risk of sexual assault to women in custody when supervised by male staff.  See d/e 162, at 154.  All Defendants were aware of that risk through their IDOC training.  Id.  While that general risk is known by all prison employees, that cannot be enough for liability to attach without an individual's actual knowledge of a particular staff member's misconduct.  See Tesch v. Cnty. of Green Lake, 157 F.3d 465, 476 (7th Cir. 1998) (noting that plaintiff must show defendant had actual knowledge of harm).

The Plaintiff next claims that, after Logan transitioned from an all-male to an all-female facility in 2013, the staff who remained were overwhelmingly white males who were accustomed to supervising men.  Id.  Between 2014 and 2017, there were numerous reported instances of staff-on-inmate sexual abuse.  Id. at 156.  However, few of these instances that were investigated by Logan staff were substantiated.  The Plaintiff notes that, prior to 2016, the ISP investigated numerous incidents of staff-on-inmate assaults at

Logan, and between February 2016 and 2020, ISP investigated approximately 20 more. Id. at 155  Almost all of those instances were substantiated. Id.  Given that ISP investigations were much more likely than Logan investigations to lead to substantiated cases of abuse, the Plaintiff alleges a jury might find that Logan investigators simply took the staff member's word over the inmate's word. Id. at 156-57.  Moreover, the sexual assault problem at Logan has led to a number of civil lawsuits. Id. at 155.  However, the Plaintiff presents no evidence regarding which Defendants, if any, were aware of these sexual assault investigations or civil lawsuits.

As the Defendants note, the Plaintiff has filed a suit against 20 individuals, not a prison or state agency.  "[Section] 1983 does not establish a system of vicarious liability; a public employee's liability is premised on her own knowledge and actions, and therefore requires evidence that each defendant, through her own actions, violated the Constitution." Aguilar v. Gaston-Camara, 861 F.3d 626, 630 (7th Cir. 2017).  The Plaintiff simply alleges that Defendants should have been aware of these instances of abuse because of their positions at IDOC and/or Logan.  The Plaintiff claims that Defendants' training, Defendants' job responsibilities, the recent

male-to-female transition, the failure to swap out or train the legacy staff members, the fact that reported instances of staff-on-inmate sexual abuse at Logan were up to 16 times higher than Decatur, and the fact that ISP was routinely investigating staff at Logan for criminal prosecution means that Defendants were on notice of the risk of staff-on-inmate sexual abuse. <u>See</u> d/e 162, at 155-156. The Plaintiff does not say precisely what any Defendant knew or should have known about sexual abuse reports or criminal investigations. Nor does Plaintiff connect these general allegations to specific acts or omissions by Defendants. Rather, the Plaintiff appears to allege that, because of the Defendants' employment or roles at Logan, Defendants caused, condoned, or turned a blind eye to a substantial risk of sexual abuse. To the extent that Plaintiff suggests that certain Defendants are liable because of their status as PREA coordinators, PREA compliance managers, or PREA incident review team members, Plaintiff cites no support for that assertion. Moreover, an independent auditor found Logan compliant on all PREA-requirements in 2016 and 2019. While the Plaintiff questions the accuracy of these audits, the Plaintiff provides no evidence that any Defendant had reason to question the audits.

The Plaintiff next cites the expert testimony of Brenda Smith that the risk of staff-on-inmate sexual abuse at Logan was pervasive and well-known, and Defendants were deliberately indifferent to that risk. See d/e 162, at 156. According to Smith, IDOC and Logan staff knew or should have known of the pervasive risk of staff-on-inmate sexual assault at Logan, but failed to address that risk through appropriate supervision, surveillance, investigation, and discipline. Id. at 146. Smith also stated that the practices and culture at Logan facilitated MacLeod's assault of Plaintiff. Id. Moreover, Smith states that IDOC and Logan staff knew that MacLeod had a history of sexually inappropriate behavior, and therefore allowing MacLeod unfettered access to Plaintiff was contrary to the best correctional practices and common sense. Id.

Although Smith's opinion supports the Plaintiff's allegations of a generalized risk of harm, Smith does not point to any specific acts or omissions by the individual Defendants. Rather, Smith states that the individual Defendants had a responsibility to take action, institute policies, enforce policies, and protect individuals in custody from sexual abuse. See d/e 171-12, at 38. These are general principles for prison officials that would appear to apply in any prison

setting.   For individual liability to attach under section 1983, the
Plaintiff must establish there was personal involvement by the
Defendants.  <u>See</u> <u>Gonzalez</u>, 40 F.4th at 828.  Smith does not identify
any specific acts or omissions by Defendants Atchison, Blanco,
Browne, Charron, Eddy, Gibbons, Johnson, Keane, Klassen, Locke,
Meaker, Mibbs, Pollock, Roberson, Willis, or Zavala.  <u>See</u> d/e 171-12,
at 13-40.  When asked if she was aware that section 1983 claims
require personal involvement, Smith responded:

> I am not – I guess what I would say is that institutions are – you
> know, agencies are held liable.  And to the extent that the
> Defendants were representing the agency, the Illinois
> Department of Corrections or its agents, then that would be
> what I am – my opinion at this point.

<u>See</u> d/e 171-12, at 157-58.  Smith's opinion appears to be that
Defendants must have known about the risk of sexual abuse because
of Defendants' positions at Logan or IDOC.  However, that suggests
Smith is claiming Defendants were aware of a generalized risk of
harm rather than personal involvement on the part of Defendants.
The individual Defendants cannot be held personally liable under
section 1983 for a collective or cultural failure by Logan or IDOC.  <u>See</u>
<u>Soto v. White</u>, Case No. 19-3135, 2022 WL 2115299, at *3 (7th Cir.

June 13, 2022) (noting that collective failures of care are not enough to prevail against a defendant on a deliberate indifference claim).

The Plaintiff next alleges that each Defendant was part and parcel of a system to prevent, monitor, and respond to sexual abuse at Logan. <u>See</u> d/e 162, at 157. Moreover, each Defendant was supposed to play an important role in implementing Logan's "zero tolerance" policy. <u>Id</u>. The Plaintiff further asserts one of Defendants' most egregious shortcomings was the dual failure of (1) failing to install working cameras in sexual abuse hotspots; and (2) simultaneously maintaining an "unusual" policy under which the male corrections staff could summon female prisoners to unmonitored areas at the staff's leisure. <u>Id</u>. The Plaintiff does not discuss the individual Defendants' roles related to these shortcomings. The Plaintiff further states that, when Logan finally obtained additional cameras to address the sexual abuse problem, Logan tasked Milo Ziemer with installing the cameras. <u>Id</u>. at 158. Ziemer was one of the staff members who was sexually abusing inmates. <u>Id</u>. However, the Plaintiff does not say which, if any, of the Defendants assigned Ziemer with installing the cameras or whether that individual or individuals knew Ziemer was abusing inmates.

The Plaintiff makes a number of claims concerning the failure of PREA coordinators, PREA compliance managers, or members of the PREA incident review team to implement or follow practices required by Logan policies or recommend any policy changes. See d/e 162, at 158-59. However, "PREA is not a constitutional standard." J.K.J., 960 F.3d at 384 (analyzing Monell claim against municipality). Deviations from internal policies do not amount to constitutional violations. See Estate of Biegert v. Molitor, 968 F.3d 693, 698-99 (7th Cir. 2020). "As we have previously stated, § 1983 'protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.'" Id. at 699 (7th Cir. 2020) (quoting Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003)); see also Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2004) (noting that a violation of internal policies or even a state law "is completely immaterial as to the question of whether a violation of the federal constitution has been established").

At most, the Plaintiff has shown that Defendants other than Burke and Sexton were aware of the general risk of sexual assault to women in custody who are supervised by male staff. The Plaintiff has

not presented evidence that any of those Defendants were aware that MacLeod was sexually abusing Plaintiff or other inmates at Logan. The record is devoid of evidence that any of the Defendants had actual knowledge and disregarded a substantial risk of harm to the Plaintiff.   Therefore, these Defendants are entitled to summary judgment on Plaintiff's deliberate indifference claims.

### C. **Qualified immunity**

Defendants allege that, assuming there is a factual dispute concerning whether Defendants violated the Plaintiff's constitutional rights, the Defendants are shielded from liability based on the doctrine of qualified immunity.  <u>See</u> d/e 156-1, at 28.  Because the Court has found there is a genuine issue of material fact regarding whether Defendants Burke and Sexton violated the Plaintiff's constitutional rights, the Court will focus the qualified immunity inquiry on those Defendants.

Qualified immunity protects public officials from liability for money damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Van den Bosch v. Raemisch</u>, 658 F.3d 778, 786 (7th

Cir. 2011) (citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).  To

defeat a qualified immunity defense by a state official, a plaintiff must

show "(1) that the official violated a statutory or constitutional right;

and (2) that the right was 'clearly established' at the time of the

challenged conduct."  <u>Kemp v. Liebel</u>, 877 F.3d 346, 350 (7th Cir.

2017) (citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011)).  Courts

are permitted to analyze the "clearly established" prong without first

considering whether the alleged constitutional right was violated.  <u>Id</u>.

at 351.

Certainly, a prison inmate has a clearly established right to be

free from sexual abuse.  "When the State takes a person into its

custody and holds her there against her will, the Constitution

imposes upon it a corresponding duty to assume some responsibility

for her safety and general well-being."  <u>J.K.J.</u>, 960 F.3d at 381

(quoting <u>DeShaney v. Winnebago County Dep't of Soc. Servs.</u>, 489

U.S. 189, 199-200 (1989)).  "Just as the healthcare contractor in

<u>Woodward</u> shouldered a constitutional duty to protect inmates from

suicide, Polk County bore the constitutional responsibility to protect

its inmates from sexual assault."  <u>Id</u>.  The Seventh Circuit noted this

requirement is derived from the Eighth Amendment because prison assaults are not part of the penalty that inmates pay for their law violations.  See id.  While the county's liability is at issue in J.K.J., a prison official would have the same responsibility to protect inmates from sexual assault.  See Locke v. Haessig, 788 F.3d 662, 667 (7th Cir. 2015) ("It was also clear that a supervisor could be held liable for a subordinate's sexual harassment if the plaintiff could show . . . a conscious failure to protect the plaintiff from abusive conditions created by subordinates amounting to intentional discrimination.").

To defeat the Defendants' qualified immunity defense, the Plaintiff has the burden of demonstrating that the alleged violation of her Eighth Amendment right was "clearly established."  Id.  "To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Id. The key inquiry involves whether the official acted reasonably based on the particular circumstances he or she faced.  Id.  The Court previously found that there was a factual dispute as to whether Defendants Burke and Sexton actually knew of and disregarded a

substantial risk of harm to the Plaintiff. The issue in considering whether qualified immunity protects the Defendants concerns whether Defendants Burke and Sexton would have understood that their response upon learning of the sexual abuse violated the Plaintiff's Eighth Amendment rights.

While a plaintiff need not point to an identical case that finds the alleged violation unlawful, the statutory or constitutional question must be beyond debate due to controlling Supreme Court or Seventh Circuit precedent. Id. In the absence of controlling authority or persuasive authority that is based on a clear trend in the caselaw, a plaintiff can show that a law was clearly established by proving that defendant's conduct was "so egregious and unreasonable that . . . no reasonable official could have thought he was acting lawfully." Id. (quoting Abbott v. Sangamon County, Illinois, 705 F.3d 706, 724 (7th Cir. 2013)). In such instances, a plaintiff may not be required to present the Court with an analogous case. See Reed v. Palmer, 906 F.3d 540, 547 (7th Cir. 2018).

In determining if a law was clearly established, the Court must ensure that the right allegedly violated is defined at the appropriate

level of specificity. <u>Id</u>. at 351. A court should not define "clearly established law at a high level of generality." <u>Id</u>. (quoting <u>al-Kidd</u>, 563 U.S. at 742). The crucial question is "whether the violative nature of *particular* conduct is clearly established." <u>Id</u>. (quoting <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015)). "[T]he clearly established law must be "particularized" to the facts of the case." <u>Id</u>. (quoting <u>White v. Pauley</u>, 137 S. Ct. 548, 552 (2017)).

As the Court previously noted, Defendant Burke approved an investigation whereby Sexton conducted surveillance on three separate occasions during which Sexton attempted to catch MacLeod in the act of engaging in sexual misconduct with the Plaintiff. <u>See</u> d/e 182-1, at 60. When these three attempts at catching MacLeod in the act proved unsuccessful, Sexton discontinued his surveillance efforts in January 2017. <u>Id</u>. at 61. The Plaintiff was sexually assaulted by MacLeod again the following month. <u>Id</u>. Given these circumstances, the Court previously determined that there are factual issues concerning whether Burke and Sexton failed to take appropriate action upon first learning of MacLeod's sexual abuse of Plaintiff, thereby allowing the abuse to continue.

There does not appear to be any controlling authority which holds that Defendants' actions were unlawful. The Court thus will consider whether Burke's and Sexton's conduct was "so egregious and unreasonable" that it violates clearly established law. The Court recognizes the advantages of attempting to catch MacLeod in the act of engaging in sexual misconduct. If those efforts were successful, it would have been easier for IDOC to rid itself of a rogue employee. It also would have provided strong evidence in a potential criminal case against MacLeod. However, the surveillance efforts failed and the sexual abuse continued for several months. Burke's and Sexton's failure to take any additional measures for several months—like questioning MacLeod or restricting MacLeod's access to Plaintiff-- made it very likely that the sexual abuse would continue, which did in fact occur. This is the rare case in which a jury could find that Defendants' failure to take additional measures was "so egregious and unreasonable" that Plaintiff's Eighth Amendment rights were violated. Therefore, Defendants Burke and Sexton are not entitled to qualified immunity as to Count I.

## D. **First Amendment retaliation claim**

In Count II, the Plaintiff alleges a First Amendment retaliation claim under section 1983.  See d/e 37, at 13.  The Plaintiff claims that Defendants Sexton and Burke retaliated against her for engaging in First Amendment activity by reporting MacLeod's misconduct.  Id. The Plaintiff alleges that the transfer would make family visits more difficult, and she would be denied the ability to complete certain programs that were instrumental in securing her early release.  See d/e 162, at 163.

To prevail on a First Amendment retaliation claim, a plaintiff must show (1) she engaged in First Amendment activity; (2) she "suffered a deprivation that would likely deter First Amendment activity in the future;" and (3) causation—"specifically, the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action."  FKFJ, Inv. v. Village of Worth, 11 F.4th 574, 585 (7th Cir. 2021).  A prison transfer can be retaliatory if it "deter[s] a person of ordinary firmness from engaging in protected activity."  Holleman v. Zatecky, 951 F.3d 873, 881 (7th Cir. 2020).  "[A] transfer initiated to punish a prisoner for engaging in protected activity would satisfy the causation element of retaliation, but a transfer initiated as a rational, justifiable response

to the substance of the prisoner's complaint would not." Id. at 879.

The court in Holleman further explained:

> Establishing the causation element of retaliation requires a showing that the *fact* of the plaintiff's engagement in protected activity was a motivating factor of the alleged adverse action, not merely that the *substance* of the plaintiff's complaint motivated a response the plaintiff did not particularly like. To hold otherwise would absurdly result in requiring prison officials to respond to every grievance by enacting the prisoner's preferred solution, rather than allowing officials to exercise their own judgment. Holleman must show a reasonable factfinder could conclude his transfer was motivated by the fact that he engaged in protected activity, and not merely motivated by the substance of his complaint.

Id. In deciding Holleman, the Seventh Circuit was mindful of the Supreme Court's "express disapproval of excessive judicial involvement in day-to-day prison management." Id. at 880 (citing Sandlin, 515 U.S. 472, 482 (1995)). Therefore, courts owe "deference to prison officials' decisions when responding to grievances and maintaining order in a volatile environment, and the justifications offered for those decisions." Id. (citing Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

The Plaintiff alleges that Logan had a policy to automatically transfer victims of staff-on-inmate sexual assault to Decatur Correctional Center. See d/e 162, at 119. Several Defendants were

aware of the policy.  Id.  Moreover, Logan's warden is involved in the process of transferring sexual assault victims out of Logan.  Id. at 120.  The Defendants cite the testimony of non-party assistant warden Angel Wilson, who stated she made the decision to transfer Plaintiff to Decatur.  See d/e 159-1, at 152-53.  Defendant Marcia Mibbs also testified she was directed by Wilson to do an administrative transfer of Plaintiff from Logan to Decatur.  See d/e 159-16, at 123, 133.

Even assuming Burke, Sexton, and/or other Defendants had a role in transferring the Plaintiff from Logan to Decatur, the transfer was pursuant to a policy that applied in the case of any inmate who was the victim when there was a substantiated allegation of staff-on-inmate sexual abuse.  Undoubtedly, there are legitimate penological reasons for such a policy.  Angel Wilson testified the policy exists to protect the inmate from the abuser, other employees, or other inmates.  See d/e 164-4, at 170-74.  While it is unfortunate that Plaintiff suffered negative consequences from the transfer to Decatur, a transfer that was pursuant to policy cannot be said to have been designed to punish Plaintiff or other inmates for engaging in protected activity.  Rather, it is an example of a transfer that is "a

rational, justifiable response" to a sexual abuse complaint that would not satisfy the causation requirement of <u>Holleman</u>, 951 F.3d at 879. It is also a case in which "the *substance* of the plaintiff's complaint motivated a response the plaintiff did not particularly like," which is not enough to establish the causation element of a retaliation claim.

Because the Plaintiff cannot satisfy the causation element, the Defendants are entitled to summary judgment on the Plaintiff's First Amendment retaliation claim.

## IV.   CONCLUSION

Because there are genuine issues of material fact as to the Eighth Amendment claims asserted against Defendants Burke and Sexton, the Court will deny the Defendants' motion for summary judgment as to those claims.  The Court finds that Defendants are entitled to summary judgment in all other respects.

The Defendants' Motion for Summary Judgment [d/e 156] is GRANTED IN PART and DENIED IN PART.

The Motion for Summary Judgment is DENIED on Count I as to Defendants Warden Margaret Burke and Todd Sexton.

The Motion for Summary Judgment is GRANTED on Count I as to the other Defendants except for Richard MacLeod.

The Motion for Summary Judgment is GRANTED on Count II.

The Clerk will terminate as parties Mike Atchison, Angela Locke, Kess Roberson, Christine Brannon, Patrick Keane, Felipe Zavala, Michael Funk, Alan Pasley, Clara Charron, Shari Klassen, Jennifer Meaker, Marcia Mibbs, Heidi Browne, Lisa Johnson, Debra Pollock, Melinda Eddy, Grant Willis, Charles Gibbons, Bobbie LeDuc, and Brent Blanco.

ENTER: March 29, 2023

/s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE