UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

**JANE DOE,**                            )
                                         )
            Plaintiff,          )
                                         )
        vs.                     )   **Docket No.** 18-cv-3191
                                         )
**RICHARD MACLEOD, et al.,**    )
                                         )
            Defendants.         )   September 22, 2023

### JURY TRIAL

**BEFORE THE HONORABLE SUE E. MYERSCOUGH**
UNITED STATES DISTRICT JUDGE

Court Reporter:

KAILEY OSBORNE FENWICK, RPR
U.S. District Court
600 Monroe Street
Springfield, IL 62701

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

A P P E A R A N C E S :

| For the Plaintiff: | Brittany Cramer |
| | Kirkland & Ellis LLP |
| | 24th Floor |
| | 300 N LaSalle Street |
| | Chicago, IL 60654 |
| | 312-862-3778 |

                                 Jenna Marie Stupar
                                 Kirkland & Ellis LLP
                                 300 N LaSalle
                                 Chicago, IL 60654
                                 312-862-2000

                                 Christina Elaine Sharkey
                                 Quinn Emanuel Urquhart &
                                 Sullivan, LLP
                                 Suite 2700
                                 191 N. Wacker Drive
                                 Chicago, IL 60606
                                 312-705-7400

Jennifer Mancini
Kirkland & Ellis LLP
24th Floor
300 N LaSalle Street
Chicago, IL 60654
312-862-2824

Jessica Giulitto
Kirkland & Ellis LLP
24th Floor
300 N LaSalle Street
Chicago, IL 60654
312-862-3685

Evelyn Cai
Kirkland & Ellis LLP
24th Floor
300 N LaSalle Street
Chicago, IL 60654
312-862-3859

Reid McEllrath
Kirkland & Ellis LLP
24th Floor
300 N LaSalle Street
Chicago, IL 60654
312-862-4662

```
                              Nicole Rae Schult
                              Uptown People's Law Center
                              4413 North Sheridan
                              Chicago, IL 60640
                              773-769-1411

For the Defendants:           Christopher L Higgerson
                              Office of the Attorney
                              General
                              500 South Second Street
                              Springfield, IL 62701
                              217-557-7081

                              Jennifer R Powell
                              Office of the Attorney
                              General
                              Suite 7
                              201 West Pointe Drive
                              Swansea, IL 62226
                              618-236-8781
```

**INDEX**

**WITNESS:**                                                                **PAGE:**


   ANDREA NIELSEN, PLAINTIFF HEREIN
       DIRECT EXAMINATION                                    15
         BY MS. SCHULT
       CROSS-EXAMINATION                                     50
         BY MR. HIGGERSON
       REDIRECT EXAMINATION                                  56
         BY MS. SCHULT
   ANN BURGESS, PLAINTIFF'S WITNESS
       DIRECT EXAMINATION                                    58
         BY MS. CAI
       CROSS-EXAMINATION                                     94
         BY MS. POWELL
       REDIRECT EXAMINATION                                 105
         BY MS. CAI
       OFFER OF PROOF                                       108
         BY MS POWELL
       OFFER OF PROOF                                       110
         BY MS. CAI
   ANDREA NIELSEN, PLAINTIFF HEREIN
       OFFER OF PROOF                                       117
         BY MR. HIGGERSON
       OFFER OF PROOF                                       120
         BY MS. STUPAR


**EXHIBITS:**


   Plaintiff's Exhibit No. 237 admitted                   16
   Plaintiff's Exhibit No. 237-1 admitted                 17
   Plaintiff's Exhibit No. 237-2                          18
   Plaintiff's Exhibit No. 240 admitted                   27
   Plaintiff's Group Exhibit No. 240 admitted             30
   Plaintiff's Exhibit Nos. 238 and 210 admitted          83
   Plaintiff's Exhibit No. 272 admitted                  134

1              *(In open court; jury absent.)*

2         THE COURT:  Court is reconvened.

3         How's our jury in there?

4         THE OFFICER:  We're missing one.

5         THE COURT:  Did they say anything about parking?

6         So I have Defendants' 11 elements.  For some

7    reason, *Defendant sexually assaulted Plaintiff* is

8    underlined.

9         MR. HIGGERSON:  Your Honor, that's the

10   additional element, but we objected to the Court's

11   instruction.  And I originally had talked about

12   submitting our original elements instruction.

13        THE COURT:  Right.

14        MR. HIGGERSON:  But I think it's faster if I

15   just took the Court's and added the element we thought

16   was missing.

17        THE COURT:  I thought you said the element you

18   thought was missing is the harm.

19        MR. HIGGERSON:  And that is the harm, the sexual

20   assault actually happened.

21        THE COURT:  Oh, I see.  You're just not calling

22   it the usual language.

23        What is your position?

24        MS. SCHULT:  Well, we object that this is an

25   issue for the jury.  It's in the stipulated facts.  But I

1  also don't see any harm or foul in adding this, as it's

2  in the stipulated facts.

3      MR. HIGGERSON:  Your Honor, it's not in the

4  stipulated facts as to our clients.  It's in the

5  stipulated facts only as to MacLeod.

6      MS. CRAMER:  Right.  The person who conducted

7  the acts.

8      MR. HIGGERSON:  But this instruction is about

9  our two defendants.

10     THE COURT:  Right.  Well, I don't want it

11 underlined to give it to the jury.  The elements actually

12 says, paragraph four, "Plaintiff would not have been

13 harmed in," brackets, or, brackets, "would have suffered

14 less harm if Defendant had taken reasonable measures."

15     MR. HIGGERSON:  Right.  That's the causation

16 element, but you first have to have the actual finding of

17 harm and then they find the causation.  It's two separate

18 elements.

19     THE COURT:  Let's do a pattern and see what we

20 think about that.

21     MR. HIGGERSON:  Your Honor, in addition to that,

22 we had previously submitted Defendants' 9, which was a

23 deliberate indifference definition, and it was denied by

24 the Court.  I would just like to bring up that now that

25 we have the record and most of the evidence that's coming

1    in.  There's been quite a bit of questioning and

2    testimony on how good a job that the defendants did, and

3    it's important to explain to the jury that negligence is

4    not sufficient and, in fact, gross negligence is not

5    sufficient.  And so we'd ask for reconsideration of our

6    exhibit -- or our Jury Instruction 9.

7              THE COURT:  So nine was a non-pattern, correct?

8              MR. HIGGERSON:  That's correct.

9              MS. SCHULT:  Your Honor, the same objection we

10   had when they originally submitted this instruction.  The

11   IPI specifically say not to use deliberate indifference

12   because it is a confusing term of legal art and that

13   this, the Pattern Instruction 4, failure to protect,

14   includes all of the elements of deliberate indifference

15   and, therefore, including an additional jury instruction

16   on that issue is unnecessary and overly confusing.

17             THE COURT:  As you said, the pattern committee

18   comments say it should not be given, so I'm going to

19   refuse it one more time.

20             MS. CRAMER:  Your Honor, we have one more issue,

21   if that's okay.  I know the jury is trying to get in.  Do

22   you have a minute?

23             THE COURT:  No, but, go ahead.

24             MS. CRAMER:  Okay.  So we finally received the

25   file, last night, two-and-a-half hours after court ended

1    and after Your Honor raised this issue sua sponte because

2    we didn't think we could raise it again because they told

3    us that they didn't know where this file was and they

4    didn't have it.

5              So, this is it.  We got it last night while we

6    were trying to prepare for closing arguments in this

7    case.  We requested this file.

8              Sorry, Nikki, you looked up the -- we've been

9    busy; we're going to have to tag-team on this one.

10             MS. SCHULT:  Their interrogatory responses were

11   returned to us in 2019, signed April 26, 2019.

12             MS. CRAMER:  And we asked for all documents

13   related to Ms. Nielsen and they didn't object.  They

14   listed the documents that they had available.  This file

15   wasn't one of the -- we never got a bait stamp version of

16   this document, and now we know they had it the whole

17   time.

18             Now, we intend to file a sanctions motion.

19   Well, we don't, but Uptown Law Group counsel do, seeking

20   sanctions against co-counsel.  But we would like a

21   spoliation adverse inference here, and we also would beg

22   the Court's indulgence to the extent we are able to

23   review any of this, put this in evidence right now, and

24   just show a couple of the limited things in here that we

25   think are obviously relevant to the jury in closing.

1              THE COURT:  So what are they?  What's the

2      evidence?

3              MS. CRAMER:  Yeah.  There's logs of when she was

4      being called over to -- the calls with her daughter,

5      suspiciously, those logs.  They disappear for a very

6      understandable and important period in this case that

7      start August 2016.  That's when she became subjected to

8      Counselor MacLeod.

9              There are date records of her calls to her

10     daughter -- not going to get all the facts exactly right

11     -- again, I was pretty busy yesterday, but that's

12     information we would have liked to know.

13             We also see in these records that Julie Keck

14     became her new counselor when she got transferred to

15     Decatur.  We have, in these records, all of the classes

16     she was taking.

17             I'm sorry.  I'm going to calm down for a second.

18     Can I have a second?

19             Jenna, can you come up?

20             MS. STUPAR:  Yes, Your Honor.  We also were able

21     to see all of her records and certificates that were

22     stopped immediately and taken away from her at the time

23     of the transfer as well.  The classes she was working

24     towards, her college credits, those kinds of things would

25     have been very valuable to know and could've led to

1  additional discovery because, of course, Ms. Nielsen

2  isn't able to remember every single thing that was going

3  on.  It's like a list of ten.

4       MS. CRAMER:  I'm sorry.  One thing we can't

5  forget -- I'm sorry.  I'm going to go clean up before the

6  jury comes, but Your Honor granted summary judgment on a

7  retaliation claim.

8       MS. STUPAR:  Oh, yeah.  I got it.  I know.

9       You granted summary judgment on a retaliation

10 claim.  We saw records after she was transferred to

11 Decatur.  She had to, once again, ask and advocate for

12 calls with her daughter to start up again because they

13 had been taken away, and she hadn't been able to get them

14 since she got to Decatur.  That's a note in the call log

15 by a different counselor.

16      And so these are just a couple of things that we

17 were able to pull together from this massive file last

18 night while preparing for closing.

19      Obviously, there are different routes we would

20 have pursued in discovery.  Summary judgment could look a

21 lot differently here.  You'll hear from her testimony

22 today about how the retaliation impacted her as a

23 separate claim; we would have loved to have been able to

24 bring it.  And so we are considering options here in

25 terms of a renewed motion to reconsider summary judgment

1   on a retaliation claim, but we're just a little low on

2   sleep and a little high on pages here in order to be able

3   to get through.  So that is why we would like to request,

4   a spoliation instruction and adverse inference at

5   closing.

6           THE COURT:  What is the response?

7           MR. HIGGERSON:  Yes.  First, as they said, this

8   file, the existence of this file, was disclosed in the

9   interrogatory responses, but it was in the possession of

10  the Department of Corrections.  So Plaintiff sent a

11  subpoena to the Department of Corrections, which was

12  objected to.  They never followed up on that.

13          THE COURT:  What was the objection?

14          MR. HIGGERSON:  Relevance, that it was not a

15  relevant document.  They never followed up on that.  They

16  never moved to compel.

17          Certainly, it's not timely at this point, but we

18  did not have this file.  We obtained it when the Court

19  told us to this week.  And at this point, their lack of

20  due diligence in pursuing this information if they wanted

21  it should not impact what we're doing here this week.

22          There certainly is not justification for a

23  spoliation instruction.  I pulled the Seventh Circuit's

24  pattern instruction.  It has two elements that the

25  defendants destroyed some object of evidence and that

1  they did so wrongfully, and there's absolutely no

2  evidence whatsoever that our two defendants had

3  possession of this file, that they did anything to it,

4  that they did anything wrongfully.  This is something in

5  the custody of the Department of Corrections.

6          And, in fact, when she moved to Decatur, it

7  moved to Decatur, and that's -- our two clients did not

8  work in Decatur.  So there's absolutely nothing to

9  support any wrongdoing by our clients.

10          MS. STUPAR:  Your Honor, if I could also just

11  say that, one of the notes that has been made throughout,

12  one of the points that defense counsel has made the

13  entire time, is kind of an empty-chair defense pointing

14  at the Illinois Department of Corrections.  They make the

15  decisions.  They're the bad guys here.  As we know, they

16  are involved in this case from a distance.  And so we

17  still feel that, particularly, given Mr. Higgerson's

18  statements and admissions, that the spoliation adverse

19  inference instruction is warranted here.

20          Also, as you recall, Officer Strandberg

21  testified that she, herself, had been pursuing these

22  files and was told that they did not exist.  And so we

23  relied on those representations, and it was our

24  understanding that those files were completely gone.

25          THE COURT:  I'm not going to give a spoliation

 1    instruction.  I have no evidence that these defendants

 2    did anything.

 3            However, I am going to allow the use of the

 4    exhibits.  I assume we can have a stipulation that these

 5    are the IDOC records and the master file?

 6            MR. HIGGERSON:  Yes.  Certainly to the

 7    authenticity of these, yes.

 8            THE COURT:  All right.

 9            MS. STUPAR:  Thank you, Your Honor.

10            MR. HIGGERSON:  And, I'm sorry, I don't

11    understand.  When we say, *the use of these* --

12            THE COURT:  They indicated they wanted to use

13    these in closing.

14            And you will share the specific items that you

15    wish to use.

16            MS. STUPAR:  We can do that.

17            MR. HIGGERSON:  It still needs to be admitted.

18    I mean, just authenticity isn't enough.

19            MS. STUPAR:  I know.  I agree.

20            MR. HIGGERSON:  Okay.

21            MS. STUPAR:  Yeah.  So we'll plan to move them

22    into evidence.

23            THE COURT:  All right.  Is the rest of the jury

24    here?

25            THE OFFICER:  Yes.

1          THE COURT:  Bring them in.

2               *(In open court; jury present.)*

3          THE COURT:  How many of you are as wet as I am?

4   I do have some couple of tablecloths in the back that are

5   clean.  Would you like any of those to keep you warm?

6   We're trying to keep the heat up so that we're not going

7   to freeze.

8          Can I get anybody anything?  No.

9          All right.  Please continue.

10         MS. SCHULT:  May it please the Court.  Plaintiff

11  would like to call Plaintiff Andrea Nielsen to the stand.

12         THE COURT:  Step up and be sworn, please.

13              *(Witness sworn.)*

14         THE COURT:  If you'll take the stand, please.

15         MS. SCHULT:  May I approach, Your Honor, with

16  some exhibits that we're going to be using today?

17         THE COURT:  You may and you need not ask every

18  time.

19         MS. SCHULT:  Good morning, members of the jury.

20  We haven't been able to meet before, but my name is

21  Nicole Schult and I'm one of the attorneys representing

22  Ms. Nielsen today.  Thank you for coming.

23

24

25

1          ANDREA NIELSEN, PLAINTIFF HEREIN, SWORN

2                    DIRECT EXAMINATION

3    BY MS. SCHULT:

4        Q.  Can you please introduce yourself for the jury?

5        **A.  Andrea Nielsen.**

6        Q.  And in our time together this morning, is it all

7    right if I call you Andrea?

8        **A.  Yeah.**

9        Q.  Okay.  So, you know, I know this is going to be

10   an understandably difficult time for you right now.  So

11   if you need to take any time, just let me know and we'll

12   take a little pause.  Okay?

13       **A.  Okay.**

14       Q.  Okay.  So --

15           THE COURT:  Do you have a water over there?

16           **THE WITNESS:  I do.  Thank you.**

17   BY MS. SCHULT:

18       Q.  Throughout the past couple of days, the jury has

19   heard a lot about your daughter.  I just want to give you

20   a chance to tell them a little bit about her.  So what is

21   her name?

22       **A.  Brianna (phonetic).**

23       Q.  And how old is she now?

24       **A.  Fourteen.**

25       Q.  All right.  And I'm going to have you look in

1    your document folder there at what we've marked as

2    Plaintiff's Exhibit 237.  And what is that top document?

3         **A.   A picture of my daughter.**

4              MS. SCHULT:  Your Honor, we move to admit this

5    exhibit.

6              THE COURT:  Any objection to 237?

7              MR. HIGGERSON:  There's no objection.

8              THE COURT:  237's admitted.

9                   *(Plaintiff's Exhibit No. 237 admitted into*

10                  *evidence.)*

11             MS. SCHULT:  May we publish to the jury,

12   Your Honor?

13             THE COURT:  You may.

14   BY MS. SCHULT:

15        Q.  So, Andrea, can you tell the Court what this

16   picture is of?

17        **A.   A picture of me and my daughter at her Eighth**

18   **Grade graduation, which was a few months ago.**

19        Q.  How old is she now?

20        **A.   Fourteen.  She just started high school.**

21        Q.  Can you tell us a little bit about Brianna?

22        **A.   She is a good kid, really good kid.  She's very**

23   **articulate and smart.  She likes to draw.  She likes**

24   **Anime.  She likes to hang out with her friends, as all**

25   **high schoolers do.**

1          THE COURT:  For those of us who are old, what is

2     Anime?

3          **THE WITNESS:  Anime.  It's, like, cartoon, I**

4     **guess.  But she, like, draws it, cartoons and stuff like**

5     **that.  She likes to make TikToks.**

6     BY MS. SCHULT:

7          Q.  And how old was Brianna when you went to prison?

8          **A.  Four.**

9          Q.  Can you look at the next photo in your packet of

10    information?

11         **A.  Yeah.**

12         Q.  Do you recognize that photo?

13         **A.  Yeah.  Yes.**

14         MS. SCHULT:  Your Honor, we move to admit this

15    exhibit, Plaintiff's Exhibit 237-1.

16         THE COURT:  Any objection?

17         MR. HIGGERSON:  No objection.

18         THE COURT:  237-1 is admitted.

19              *(Plaintiff's Exhibit No. 237-1 admitted*

20              *into evidence.)*

21         MS. SCHULT:  May we publish to the jury?

22         THE COURT:  You may.

23    BY MS. SCHULT:

24         Q.  How old is Brianna in this photo?

25         **A.  About four.**

1    Q.  Is this about when you went to prison?

2    **A.  Uh-huh.**

3    Q.  Does she live with you right now?

4    **A.  No.**

5    Q.  But are you able to talk to her?

6    **A.  Every day.**

7    Q.  Every day?

8    **A.  Yeah.  We talk all the time.  I was just at her**

9  **high school orientation a few weeks ago.**

10    Q.  That's great.

11        And do you have any other family that you're

12  close to?

13    **A.  Yeah, my mom.**

14    Q.  I'm going to have you look at the next photo in

15  your packet there.  Do you recognize that photo?

16    **A.  Yes.**

17        MS. SCHULT:  Your Honor, I move to admit what

18  we've marked as Plaintiff's Exhibit 237-2.

19        THE COURT:  Any objection?

20        MR. HIGGERSON:  There's no objection.

21        THE COURT:  237-2 is admitted.

22              *(Plaintiff's Exhibit No. 237-2 admitted*

23              *into evidence.)*

24        MS. SCHULT:  May we publish to the jury?

25        THE COURT:  You may.

1  BY MS. SCHULT:

2       Q.  What is this photo of?

3       **A.  Me and my mom and my daughter at her gymnastics**

4  **recital.**

5       Q.  Recently?

6       **A.  Yes.**

7       Q.  What does your mom do for you?

8       **A.  Everything.  She's always there for me.**

9       Q.  Is she here in court today?

10      **A.  She is.**

11      Q.  Can you point her out to the jury for us?

12      **A.  (Indicating)**

13      Q.  And you have some friends that you're close to?

14      **A.  Yes.  I have a few supportive people, actually,**

15  **that I met in Logan.**

16      Q.  So, speaking of Logan, let's talk a little

17  generally about your time there.  So, first of all,

18  Andrea, I know it's been five years since you've been

19  there, and the events that we'll be talking about have

20  taken place in some time in history.  So the specific

21  dates and whatnot might be difficult to remember, but I

22  just ask you to do the best you can.  Okay?

23           All right.  So, at Logan, were there rules for

24  how you would move from place to place on the grounds?

25      **A.  Yeah.  There's supposed to be a call-pass**

1   **system.  I guess, like, the CO or the counselors or**

2   **whoever, like, puts it in a computer and you're supposed**

3   **to get it at, like, mail time at night, and then you go**

4   **the next day, whenever your pass is.**

5        Q.   And did you always receive a pass in that

6   manner?

7        **A.   No.**

8        Q.   What were the other ways that would happen?

9        **A.   They called you down and then the CO's supposed**

10  **to do a written pass.  Or they can just call you down,**

11  **like, anytime, if they need something or, like, a nurse**

12  **or if -- wherever they needed you.**

13       Q.   So while you were at Logan, did you ever find

14  yourself moving around the grounds without a pass at all?

15       **A.   Yes.**

16       Q.   And if a staff person called you, but you didn't

17  have a pass, did you still have to go where they called

18  you to?

19       **A.   Yes.**

20       Q.   And why was that?

21       **A.   Because they're staff and you could get in**

22  **trouble if you didn't.**

23       Q.   So what types of activities or programs would

24  you be going to with these passes?  For example, it's my

25  understanding that the women at Logan were able to have

1    jobs.

2         **A.   Yes.**

3         Q.   Did you have a job while you were at Logan?

4         **A.   Yeah, I had a few.**

5         Q.   Which jobs did you have?

6         **A.   I worked in the kitchen, I worked in laundry,**

7    **and the garden crew.**

8         Q.   And any particular job you enjoyed?

9         **A.   The garden crew.**

10        Q.   And why did you like that job?

11        **A.   Well, one, I got to be outside.  And I got to**

12   **learn about plants and vegetables and growing them.  It's**

13   **something that I enjoy.**

14        Q.   And when did you hold that job at Logan?

15        **A.   Towards the end of my stay at Logan.**

16        Q.   Were there any educational programs for you at

17   Logan?

18        **A.   Yes.**

19        Q.   And which ones did you participate in?

20        **A.   Cosmetology school.**

21        Q.   And why did you get involved in the cosmetology

22   school?

23        **A.   Because I wanted to make good use of my time**

24   **there.  I wanted to learn and I also wanted to have a**

25   **strong foundation when I got out for me and my daughter.**

1     Q.   And did Logan provide any other types of

2    programming for the women in the facilities?

3         **A.   Yes.**

4     Q.   What types of programming, other programming,

5    did they provide?

6         **A.   They had other classes.  I'm not quite sure of**

7    **all the names of them, but, like, Healthy Relationships**

8    **class, a boundaries class.  They had quite a few.**

9     Q.   And did you participate in any of those?

10        **A.   As many as I could get into, yes.**

11        Q.   Why did you try to get into all these classes?

12        **A.   Because I wanted to learn and I just wanted to,**

13   **like I said, make good use of my time and make myself**

14   **better.**

15        Q.   I know we've been talking about this programming

16   at Logan.  Where did most of these classes or your

17   vocational school take place?

18        **A.   In the Vocational Building.**

19        Q.   Okay.  So the jury has heard quite a bit about

20   the Vocational Building this week.  Before we talk about

21   what happened there, I want to spend some time for you to

22   describe that building to the jury.

23        **A.   Okay.**

24        Q.   So can you give the jury a sense of how big the

25   Vocational Building is?

1      **A.   Well, there's, like, four classrooms, two**

2  **offices, two -- I think, two bathrooms.   And then**

3  **there's, like, the center, like right when you walk in**

4  **where the CO's desk is.**

5      Q.   And what happened at the CO's desk at the

6  entryway?

7      **A.   That's where they're supposed to sign you in and**

8  **out.**

9      Q.   And was there always a guard stationed there?

10     **A.   School times, yes, for the most part.   After**

11 **school or, like, weekends, nights, no.   Not all the time,**

12 **no.**

13     Q.   And when you were going into the Vocational

14 Building, were you always required or did someone always

15 sign you in and out?

16     **A.   They were supposed to, but, no.**

17     Q.   So in addition to the job opportunities and

18 programming at the Vocational Building, I understand from

19 the testimony that's been presented this week that this

20 is also the location where you had your phone calls with

21 your daughter, Brianna?

22     **A.   Yes.**

23     Q.   So I'm going to ask you some questions about how

24 you went about getting those calls.   So can you explain

25 to the jury what you had to do to make sure you were able

1  to regularly have calls with your daughter?

2      A.   I dropped a slip and I asked to speak with -- I

3  guess, Ray Midlay (phonetic) was there at the time.  And

4  the counselors have to, like, put you on a list or

5  something, and they came and talked to all the prisoners

6  or the mothers that wanted to get in touch with their

7  children.  And they put you on, like, a list and you get

8  chosen or you don't.

9          So I got really lucky to be chosen to at least

10  have contact with my daughter while I was there.  And

11  then I had to go to court over video and I got awarded

12  phone calls.

13      Q.   And the Court awarded those phone calls; is that

14  my understanding?

15      A.   Yes.

16      Q.   Okay.  And how long did that process take?

17      A.   About six to nine months.

18      Q.   So why go through all of that to get some phone

19  calls?

20      A.   Because it's my daughter and I want to talk to

21  her and be involved in her life as much as possible.

22      Q.   And what did it mean to you to finally be able

23  to talk to Brianna on a regular basis?

24      A.   Everything, everything.

25      Q.   And could you just make these calls whenever you

1    wanted to?

2        **A.   No.**

3        Q.   How did you know -- how did you make the calls?

4        **A.   I had to coordinate them with my counselor.**

5        Q.   And who coordinated your calls?

6        **A.   Mr. MacLeod.**

7        Q.   All right, Andrea.  Now we're going to talk

8    about Richard MacLeod.  Could you please describe for the

9    jury the first time you recall meeting Defendant MacLeod?

10       **A.   I might have had a few classes with him, but the**

11   **first time I actually remember, like, August 2016, I'm**

12   **pretty sure, when he became my counselor.**

13       Q.   And he was in the Women and Family Services

14   Department; is that correct?

15       **A.   Yes.**

16       Q.   And why did Defendant MacLeod get assigned to be

17   your counselor then?

18       **A.   I'm not -- well, for the phone calls, but I'm**

19   **not sure exactly, like, how they go about it.**

20       Q.   But he was the one who administered your phone

21   calls with Brianna?

22       **A.   Yes.**

23       Q.   Okay.  Were there other people at Logan who

24   acted as counselors in the Women and Family Services

25   Department?

1    **A.   Yes.**

2    Q.   And did you take any classes with

3  Defendant MacLeod around this time?

4    **A.   I'm not sure.   Not that I can recall around that**

5  **time.   After he became by counselor -- after he became my**

6  **counselor, I did have a class, a Healthy Relationships**

7  **class.**

8    Q.   What was your understanding of the Healthy

9  Relationships class?

10    **A.   That they would help teach you what a healthy**

11  **relationship looks like and how to achieve that.**

12    Q.   All right.   And why did you want to be in this

13  Healthy Relationships class?

14    **A.   So I can strengthen relationships in my life and**

15  **the relationship with my daughter.**

16    Q.   All right.   And where were those classes held?

17    **A.   In the Vocational Building.**

18    Q.   And where in the Vocational Building?

19    **A.   In one of the back classrooms.**

20    Q.   And where in the Vocational Building would the

21  phone calls with Brianna generally take place?

22    **A.   In the counselor's office.   Mr. MacLeod's**

23  **office.**

24    Q.   Okay.   So, Andrea, we're going to talk about

25  Mr. MacLeod's office, what it looked like, for the jury.

1    Okay?

2         **A.   Okay.**

3         Q.   So I'm going to -- if you can look in your

4    packet there, there is another set of photos, which has

5    been previously marked as Plaintiff's Exhibit 240, which

6    we would move to admit at this time.

7              THE COURT:  Any objection?

8              MR. HIGGERSON:  No objection.

9              THE COURT:  Plaintiff's 240 is admitted.

10                   *(Plaintiff's Exhibit No. 240 admitted into*

11                   *evidence.)*

12             MS. SCHULT:  May we publish, Your Honor?

13             THE COURT:  You may.

14   BY MS. SCHULT:

15        Q.   Can you please tell the jury what this is a

16   picture -- well, first of all, Andrea, I know this maybe

17   doesn't look the same way as when you were at Logan.

18   These photos were not taken until 2020.  But if you know

19   what this photo is, can you please tell the jury?

20        **A.   That's Mr. MacLeod's office.**

21        Q.   And you helped us prepare a demonstrative of

22   what this office looked like, the layout of this office

23   when you were there; is that correct?

24        **A.   Yes.**

25        Q.   All right.  We're going to put that on the

1    screen here.  Is this the demonstrative we put together?

2         **A.  Yes.**

3         Q.  Okay.  Can you walk the jury through what we're

4    seeing here?  For example, where would you enter the

5    office?

6         **A.  Right here.  This open space.**

7         Q.  Okay.  And then --

8              THE COURT:  You can actually mark, I think --

9    can we mark on these screens now?

10             **THE WITNESS:  It's pink.**  That's cool.

11             MS. SCHULT:  All right.  Well, that's wonderful.

12   BY MS. SCHULT:

13        Q.  So where's Mr. MacLeod's desk?

14        **A.  (Indicating)**

15        Q.  Right there.  And I see a black line beside his

16   desk.  What does that represent?

17        **A.  Like a partition.  Not like one that goes all**

18   **the way to the ceiling, but just one that was in between**

19   **the desks.**

20        Q.  About how tall was that partition?

21        **A.  About to your shoulder, maybe, because the desk**

22   **went up that high.**

23        Q.  Okay.  And we've got a wall of windows back

24   here, correct?

25        **A.  Yes.**

1      Q.  Can you go to the next photo?  I've got what is

2  marked as Plaintiff's Exhibit 240-1.

3          THE COURT:  I'm sorry.  Did you capture that?

4          COURTROOM DEPUTY:  I did not.

5          THE COURT:  Oh.  Can you put that back up?

6          Can you circle that partition again?  Thank you.

7          That's all right.  We can erase it.  Go ahead

8  and erase it and do it again.  Thank you.  We want it

9  printed and then we'll have it for the record.

10          MS. SCHULT:  All right.  Do you have any

11  objection to the next photo?

12          MR. HIGGERSON:  No.  No objection.

13          MS. SCHULT:  Move to enter into evidence,

14  Your Honor.

15          THE COURT:  What is it called?

16          MS. SCHULT:  Plaintiff's Exhibit 240-1.

17          THE COURT:  So we have two pictures.  We have

18  the one where she did the entrance.

19          MS. SCHULT:  Right.

20          THE COURT:  And we have the one with the

21  partition.

22          MS. SCHULT:  Are we at the one -- what dash are

23  we on?

24          COURTROOM DEPUTY:  So these were already

25  entered, Judge, these four, 240, on the previous day.

 1   And now we have -- some of these we're talking about now,

 2   I have duplicates.  And I have -- the only new one I have

 3   is this one.

 4             THE COURT:  What about what you just captured?

 5   Isn't that what you're referring to?

 6             MS. SCHULT:  No.  That is just the

 7   demonstrative.

 8             THE COURT:  Okay.  So I'm still not clear

 9   which --

10             COURTROOM DEPUTY:  It would be --

11             MS. SCHULT:  So our Exhibit 240 had multiple --

12   had about 100 photos in it, and we have just taken

13   excerpts out to put into the record.

14             THE COURT:  So can we just call them all Group

15   240?  Any objection?

16             MR. HIGGERSON:  I don't have an objection.  I

17   don't know that they're marked with a bait stamp.  Do

18   they have a bait stamp so we know which one's which?

19   Which one's being talked about on the record?

20             MS. SCHULT:  Yeah, they do.

21             THE COURT:  Okay.  So Group 240 is admitted and

22   you'll identify them with a bait stamp.

23                      *(Plaintiff's Group Exhibit No. 240 admitted*

24                      *into evidence.)*

25             MS. SCHULT:  Yes.

 1   BY MS. SCHULT:

 2        Q.  So, Andrea, we're looking --

 3            Can you go to the next one?

 4            We're looking at what is marked with a bait

 5   stamp of 28.  And what is this picture of?

 6        **A.  Mr. MacLeod's office.**

 7        Q.  Right.

 8            And were these -- are these -- in the

 9   background, what are those?  Windows?

10        **A.  The windows?**

11        Q.  Yes.

12        **A.  Yes.**

13            **And this is where his desk was.**

14        Q.  So am I understanding you correctly that this

15   desk was facing out from those windows?

16        **A.  Yes.  So he would be facing the door.**

17        Q.  Okay.  And then there's the wall there.  Was

18   that there when you were there?

19        **A.  Yes.**

20        Q.  Okay.  And then so he'd sit between his desk and

21   the windows, correct?

22        **A.  Yes.**

23        Q.  And then there was a -- you mentioned a

24   partition on the side?

25        **A.  Yes.**

1     Q.   Okay.  Can we move on to the next photo, please?

2          This is what has been marked as IDOC

3  Photograph 38.  And what are we seeing in this photo,

4  Andrea?

5          **A.   The type of desk that Mr. MacLeod had.**

6          Q.   So this desk here that we see is the desk he

7  had?

8          **A.   I don't know if it's the exact one, but, yeah.**

9          Q.   With that -- the partition on top?

10         **A.   Yes.**

11         Q.   All right.  So that desk had a partition on the

12 one side that faced the room, with a partition in the

13 front and then a wall on the one side; is that right?

14         **A.   Yes.**

15         Q.   Okay.  So it seems like -- we heard from

16 Ms. Fitzer a couple days ago.  She described that he was

17 in a little cubby.  Would you agree with her description

18 of how Mr. MacLeod's desk was placed?

19         **A.   Yes.**

20         Q.   Okay.  And did you make all your phone calls in

21 his office near his desk?

22         **A.   Most of them, yeah.**

23         Q.   Where else would you make phone calls?

24         **A.   Ms. Fitzer's office.**

25         Q.   Were you ever alone in those offices with

1  Defendant MacLeod?

2      **A.  Yes.**

3      Q.  Okay.  So you mentioned that you were in a

4  Healthy Relationships class that Defendant MacLeod was

5  teaching.  How did you come to be in that class?

6      **A.  Well, I asked for any and all information on**

7  **classes.  And when I got there, I dropped slips to every**

8  **class I heard about.  So Mr. MacLeod asked me if I wanted**

9  **to join a Healthy Relationships class.  So I said, yes,**

10  **and he said that I needed to be interviewed or screened**

11  **for it.**

12      Q.  Had you ever been interviewed or screened for

13  the previous classes you'd taken at Logan?

14      **A.  No.**

15      Q.  And what happened when you went to that

16  interview?

17      **A.  He went to -- he took me in the back classroom**

18  **and we sat down and started -- he started talking about,**

19  **like, relationships and his relationships and then he**

20  **kissed me.**

21      Q.  What were you feeling when that happened?

22      **A.  Shocked, confused.**

23      Q.  Did he say anything to you after he kissed you?

24      **A.  He asked me if I was going to tell anyone.**

25      Q.  And how did you respond?

1      **A.   I don't know.   I just said, I don't know.   I**
2  **don't know how to respond to that.**

3      Q.   And why did you respond that way?

4      **A.   I think I might have said no, actually.**

5      Q.   And why did you respond that way?

6      **A.   I didn't know how else to respond.   I was**
7  **scared, nervous.**

8      Q.   And why were you scared?

9      **A.   Because -- I don't know.   I was confused.   It**
10 **was somebody that's in power over you, that you don't**
11 **really have a choice or you don't really get to say -- I**
12 **couldn't really think at the time.   So, I mean,**
13 **afterwards, I could think about it.   But when it's**
14 **happening, you don't really know what to do.**

15     Q.   And when was the next time that you can remember
16 Defendant MacLeod acting inappropriately with you?

17     **A.   A few weeks later.**

18     Q.   Can you just, high level, tell the jury what
19 happened?

20     **A.   He took me into the back classroom and he pulled**
21 **his pants down and turned me around and had sex with me**
22 **from behind.**

23     Q.   Now, Andrea, the jury has already heard the
24 assaults that Mr. MacLeod perpetrated described several
25 times.   Defendant MacLeod has admitted that they happened

1  and what happened.  So I don't think we need to make you

2  describe the details of those assaults for very obvious

3  reasons.  So I'm going to skip those details and,

4  instead, I'd like to focus on a few other things, okay?

5            I want to focus on how they made you feel, the

6  choices you made as a result of those feelings, and the

7  long-term impact it has had on you.

8            So throughout these assaults, what did

9  Defendant MacLeod tell you would happen if he reported --

10  if you reported that he was assaulting you?

11       **A.   He told me that I would get a year across the**

12  **board.**

13       Q.   And what does *a year across the board* mean to

14  you?

15       **A.   That's a year of segregation and a year of**

16  **C Grade.**

17       Q.   Can you describe for the jury what segregation

18  was like at Logan?

19       **A.   Segregation is where they pack all your stuff**

20  **and they take you out of your unit and put you in a**

21  **different unit, put you in a cell by yourself with**

22  **nothing.  They take away all your pictures.  They take**

23  **away all your letters.  They take away -- the only thing**

24  **you can have in there is some hygiene.  Not that you**

25  **bought, but, like, State hygiene and legal mail.**

 1          **And you don't get to come out for phone calls.**
 2  **You don't get to come out -- maybe once in a while they**
 3  **let you do that, but you don't get to come out for**
 4  **anything, but a shower, if that.**
 5          Q.  And are you alone in that room?
 6          **A.  Yes.**
 7          Q.  And you only go out for showers?
 8          **A.  Yes.**
 9          **And then C Grade is -- so it would be a year of**
10  **segregation and then a year after that, of C Grade, which**
11  **would be to where you don't get to use the phone, you**
12  **don't get to order commissary.  I don't think you can do,**
13  **like, programs and stuff and I'm pretty sure you lose**
14  **your job.**
15          Q.  So how did that threat make you feel in terms of
16  whether you could or should report his assaults?
17          **A.  There was no doubt in my mind that I couldn't.**
18          Q.  Beyond the threat that you would be put in
19  segregation if you reported the assaults, what else did
20  Defendant MacLeod say would happen if you reported him?
21          **A.  He said that he was friends with Mr. Sexton and**
22  **that he would protect him and let him know if anybody was**
23  **on his trail.**
24          Q.  And why did you believe that statement from
25  Defendant MacLeod?

1      **A.   Because I had seen them together, conversating,**
2   **a couple times on grounds and I'd also heard from other**
3   **inmates that they were friends.**
4      Q.   So why didn't you report Defendant MacLeod to
5   any of the other prison officials at Logan?
6      **A.   Because I would get in trouble.  I would lose**
7   **everything I worked so hard for.  And I was scared.  I**
8   **didn't know who was, like, friends and who wasn't.  And**
9   **if they were, you know, you don't know how far back their**
10  **relationships go or any of that stuff.  And it's the**
11  **whole, like, prisoners look out for prisoners and**
12  **officers look out for officers.**
13     Q.   And outside of being placed in segregation, what
14  was your understanding of what typically happened when a
15  prisoner reported staff for sexual harassment or assault
16  at Logan?
17     **A.   That the prisoner would get in trouble, and I**
18  **had never seen anything really done.**
19     Q.   And what was your understanding of how staff at
20  Logan treated or responded to reports of sexual
21  misconduct from prisoners about staff?
22     **A.   That it didn't hold any weight.  That we, our**
23  **opinion, didn't matter.**
24     Q.   And, Andrea, I know this is difficult to talk
25  about, but can you please tell the jury whether

1  Defendant MacLeod ever did anything sexual to you while

2  you were on the phone with your daughter?

3      **A.   Yeah.   He was masturbating while I was on the**

4  **phone with my daughter.**

5      Q.   And where were you when this happened?

6      **A.   In his office.**

7      Q.   And where was MacLeod when he was doing this to

8  you?

9      **A.   Behind his desk.**

10     Q.   Were there other people in the office while he

11  was doing this?

12     **A.   Yes.**

13     Q.   Could they see what he was doing?

14     **A.   I don't know.   I hoped somebody would see and**

15  **say something, but I don't know.**

16     Q.   And how did you feel when he was doing that to

17  you?

18     **A.   Gross.   I felt -- I felt bad for my daughter**

19  **because my attention was being taken away from her.   I**

20  **don't know.   Just weird, uncomfortable.**

21     Q.   And what did it tell you that Defendant MacLeod

22  was masturbating in an office with other people around?

23     **A.   That he felt comfortable to be able to do that,**

24  **especially with coworkers in the office.   That he didn't**

25  **care or that he just -- I don't -- I honestly don't know,**

1    **but just that -- I don't know who would feel comfortable**

2    **doing that at work.**

3         Q.   And after Defendant MacLeod's assaults started,

4    did you feel like you were in danger at Logan?

5         **A.   Yes.**

6         Q.   Did you feel like you were able to be called

7    into a dangerous, sexual situation at any moment?

8         **A.   I was, yes.**

9         Q.   And even though you felt like you couldn't tell

10   any of the staff at Logan, did you tell anyone else about

11   Defendant MacLeod's assaults?

12        **A.   I told some of my roommates and my mom.**

13        Q.   Do you remember around when you told your mom?

14        **A.   Around October, November 2016, I think.**

15        Q.   And what -- can you tell the jury about that

16   interaction?

17        **A.   Yeah.  My mom came to visit me and I had got a**

18   **phone call to the CO's desk.**

19        Q.   Was it in the Visiting Room?

20        **A.   Yes.**

21             **The CO called me to the desk and put me on the**

22   **phone and it was Mr. MacLeod.  And he was like, *Come to***

23   ***my office*.  And then I told him no, that my mom was**

24   **visiting me, and I hung up the phone on him.**

25             **And when I got back to the table, my mom was**

1  like, what was that about?  And I told her everything

2  that was going on and she stood up and tried to go say

3  something.  She was livid and upset, and I made her sit

4  down and I made her promise not to tell anyone.

5      Q.  And why did you tell her not to tell anyone?

6      A.  Because I told her that I was scared and I lived

7  there and I was stuck there.  And I couldn't do anything

8  about it, if they would do anything back to me,

9  retaliation or anything.  So I made her not say anything.

10     Q.  So you've told us all the reasons why you felt

11 you couldn't report these assaults to Logan staff.  Did

12 you take any steps on your own to try to protect yourself

13 from Defendant MacLeod?

14     A.  Yes.  Well, I moved housing units and he was

15 still my counselor somehow.  So I got in a program unit

16 and the counselor there was the counselor for, like, the

17 program unit, and I asked him if he would be my counselor

18 instead.

19     Q.  And he was in the Women and Family Services

20 Department as well?

21     A.  Yes.

22     Q.  And how did he respond to you?

23     A.  He kind of asked me, like, why, and I just told

24 him that people were making comments about Mr. MacLeod

25 and I and, like, making fun of me.  So I needed him to be

1    **my counselor.**

2        Q.  And did he?  He did that?

3        **A.  He did.**

4        Q.  So, Andrea, we've talked a lot about PREA during

5    the course of this trial.  And when you got to Logan,

6    what was your understanding of what PREA was?

7        **A.  I had no idea at all what PREA was when I got to**

8    **Logan.  I didn't even know there was such a thing as**

9    **PREA.**

10           **But when you, like, get out of intake -- we call**

11   **it the *X House*.  So I'm trying to, like, figure out a way**

12   **where everybody will know what I'm talking about.**

13           **So, intake, when you got out of intake -- I'm**

14   **sorry.  I lost my train of thought.**

15       Q.  What was your -- you're telling us about how you

16   kind of came to understand what PREA was.

17       **A.  So there is, like, papers on the wall, or**

18   **there's, like, spray-painted numbers of a phone number on**

19   **the wall that you can call.  It tells you, like, what to**

20   **do.  It doesn't tell you what's going to happen if you do**

21   **it.  It doesn't tell you if you can on staff.  It doesn't**

22   **tell you, like, stuff like that.  It just pretty much was**

23   **a phone number.**

24       Q.  So did anyone at Logan tell you what would

25   happen if you made a PREA report on a staff member?

1      **A.   No.**

2      Q.   But while at Logan, you did make a sexual

3  misconduct report at one point; is that correct?

4      **A.   Yes.**

5      Q.   Can you tell us about that?

6      **A.   My roommate, one of my roommates, was making**

7  **sexual comments to me and my other roommate and we**

8  **dropped a slip and just said that she was making sexual**

9  **comments.**

10     Q.   Okay.  Did you talk to anyone about that issue?

11     **A.   I'm not sure exactly -- specifically, who, yes.**

12 **But, yes, I did.  I talked to IA.**

13     Q.   Okay.  And why did you report that incident with

14 your roommate, but not what Defendant MacLeod was doing

15 to you?

16     **A.   Because that's another inmate and I feel like**

17 **staff is more likely to do something with -- when it's**

18 **inmate-on-inmate because our -- I guess our words are,**

19 **like, in their mind, the same and the CO's words aren't**

20 **the same.  So in order to feel safe, I didn't want to say**

21 **anything about that and I felt like my roommate was,**

22 **like, on the same level of me, if that makes sense.**

23     Q.   It makes complete sense, yeah.

24          So we've heard from the defendants over the

25 course of the trial about the environment at Logan, and

 1   I'd just like to get your take on the atmosphere there.

 2   So did you feel like you were in a dangerous, overly

 3   sexualized environment at Logan?

 4        **A.   Yes.**

 5        Q.   Did you feel like sexual abuse was tolerated at

 6   Logan?

 7        **A.   It was.**

 8        Q.   And did you feel like sexual abuse ran rampant

 9   and nothing was ever done at Logan?

10        **A.   Yeah.   Probably still is.**

11        Q.   Can you speak up?

12        **A.   Probably still is.**

13        Q.   So before August 2017, had any staff ever asked

14   you directly about whether Mr. MacLeod was a problem for

15   you?

16        **A.   Not that I can recall.**

17        Q.   But in August 2017, someone finally did,

18   correct?

19        **A.   Yes.**

20        Q.   And what happened?

21        **A.   I had gotten called down to IA.**

22   **Lieutenant Sexton asked me what was going on between**

23   **MacLeod and I, and I told him nothing.   And he asked me**

24   **again and I told him nothing.**

25        Q.   Why did you tell him nothing?

1      A.   Because I was scared to say what was going on.

2      Q.   And what happened next?

3      A.   I started crying and I asked if I could call my

4    mom.  So he let me call my mom.

5           I called my mom and I said, mom, you know where

6    I'm at.  I said, *I'm in IA's office.  What do I do?*

7           And she told me that she was looking it up and

8    researching to see what would happen to me if I told.

9    And she said, *Tell them everything.  You need to tell*

10   *them everything now.  You're not going to get in any*

11   *trouble.*  So I told them everything that was going on.

12     Q.   And after you told Defendant Sexton what was

13   happening, what happened next?

14     A.   They packed my stuff while I was in the office

15   with Lieutenant Sexton and put it in a car and took me to

16   Decatur.

17     Q.   And how dud you feel about being transferred to

18   Decatur?

19     A.   I did not want to go at all.  I was really upset

20   about it.  I didn't want to be taken out of where I was,

21   like, the program unit that I was on.  The friends that I

22   had met there, I didn't want to be taken away from them.

23          No phone calls with my daughter.  I didn't want

24   those to be ruined.

25          All the classes that I was taking, they don't

1  **offer at Decatur.  They did not offer college courses, so**

2  **my cosmetology would have been taken away and I was about**

3  **to take my State board test.**

4      Q.  Were you able to complete your cosmetology

5  program and certificate once you got to Decatur?

6      **A.  No.**

7      Q.  And losing the chance to finish that program

8  that you'd worked so hard on and were almost completed,

9  how did that impact you?

10      **A.  Greatly.  I feel like I could have had a career**

11  **when I got out.  I could have had a strong foundation for**

12  **me and my daughter.  That's what I was -- that was the**

13  **goal.**

14      Q.  So you've been pursuing this case for five years

15  against Defendants MacLeod, Sexton, and Burke.  Over the

16  course of this case, did you come to learn whether anyone

17  reported that MacLeod was assaulting you to Defendants

18  Sexton and Burke?

19      **A.  Recently.  Recently, I just learned that, yeah.**

20  **I learned that my roommates did report it.**

21      Q.  And I'll represent to you that that report

22  happened in December of 2016.  Did Defendant MacLeod

23  assault you after December 2016?

24      **A.  Yes.**

25      Q.  How does it make you feel today that

1  Defendant MacLeod assaulted you after Defendant Sexton

2  and Burke had a direct, credible report about what

3  MacLeod was doing to you?

4       **A.  Angry.  Like I'm nothing.  Like I don't mean**

5  **anything.  Like I'm not a person to them.  I don't even**

6  **know.  Just sad, confused.**

7       Q.  It's a lot to process.

8            We've also heard at this trial that in

9  August 2017, a female officer at Logan reported that

10 Defendant MacLeod was sexually harassing her.  How does

11 it make you feel today that it took a Logan female

12 employee reporting MacLeod to finally trigger a real

13 investigation into him?

14      **A.  That I was right the entire time by not saying**

15 **anything because nothing would have been done.  And that**

16 **it shouldn't take an employee to say something about what**

17 **was going on with her for them to -- for anybody to**

18 **believe it or to investigate further into it.**

19      Q.  So while you were at Logan, can you describe for

20 us what it felt like to know that Defendant MacLeod could

21 sexually assault you at any time and that no one would do

22 anything to protect you?

23      **A.  Hopeless, helpless.  Like I said before, it made**

24 **me feel like nothing.  Like I don't matter to anyone or**

25 **anything.  Like I'm not valued.  Confusing.**

1     Q.  And I want to unpack a couple of these things,

2  okay?  So bear with me.

3         You mentioned *confusing*.  Can you kind of

4  describe that feeling, what you were feeling, for the

5  jury?

6     **A.  Like, a constant battle in my mind of whether --**

7  **what I should do or whether I should do something or not**

8  **or how it would turn out.**

9     Q.  And you mentioned feeling like nothing.  Can you

10  kind of tell us a little bit more about that feeling?

11    **A.  Well, I already felt alone there.  So I don't**

12  **know who you're supposed to turn to, but staff.  And to**

13  **find out that they don't care is -- it's scary.**

14    Q.  Can you tell us a little bit more about you

15  feeling scared?

16    **A.  You don't have any control over anything that**

17  **happens to you or anything that goes on in your daily**

18  **life at all.  And it's -- I don't really know another**

19  **word, but scary and -- I don't really know another word.**

20    Q.  And the first thing you mentioned here was

21  *hopeless*?

22    **A.  Yes.**

23    Q.  Can you tell us just a little bit more about

24  that feeling?

25    **A.  That, I guess, goes along with the battle in my**

 1  **mind of hopelessness because you don't know what you**

 2  **should do, so then you -- don't have anything to do.  You**

 3  **don't think that you can do anything.  So then you're**

 4  **kind of hopeless because you don't have an option.**

 5       Q.  And so while you were at Logan, it sounds to me

 6  like you were in a survival mode; is that fair?

 7       **A.  Yes.**

 8       Q.  So since you've left Logan, have you felt an

 9  additional impact from what happened?

10       **A.  Yes.**

11          **A lot of the stuff, I don't even know yet that's**

12  **happened to me because it's still coming out.  I'm still**

13  **dealing with it.  I have panic attacks a lot.  I have**

14  **nightmares, flashbacks.  I have a hard time sleeping.**

15          **My panic attacks keep me from working sometimes.**

16  **I've had anxiety, like, my entire life, but these panic**

17  **attacks are way worse than anxiety.**

18       Q.  Can you describe for us what it feels like to

19  have a panic attack?

20       **A.  Like the world is closing in on you.  Like your**

21  **throat closes up and you can't breathe.  Just panic.**

22       Q.  And you mentioned problems sleeping.  Is that

23  related to the nightmares?

24       **A.  Yes.**

25       Q.  And what --

1      **A.   Just racing thoughts and just can't get it out**

2  **of my mind.**

3      Q.   And you mentioned some flashbacks.  Can you tell

4  us just a little bit about that?

5      **A.   Just random times, I just get flashbacks.  Or,**

6  **like, when -- I don't know when, but it just happens.**

7      Q.   Anything -- any other feelings you'd like to

8  share with the jury?

9      **A.   Um.**

10      Q.   We covered them all?  Most of them you can

11  remember right now?

12      **A.   Yeah.**

13      Q.   Okay.  I'm sure that there's others,

14  potentially, than what you're thinking about right now.

15          So I know it's been really difficult for you to

16  come here.  It takes a lot of strength to do what you're

17  doing and relive all of this and talk about some of these

18  experiences in front of some strangers.  But why did you

19  think it was important to come here and do that?

20      **A.    I feel like it was important for me to be here**

21  **today to stand up for myself and to bring light to the**

22  **people -- to the things people don't like to talk about,**

23  **to show my daughter that you need to stand up for**

24  **yourself and be a strong woman.  And to help hold**

25  **accountable the people that failed to protect me.**

1        Q.   Thank you, Andrea.  No further questions.

2             THE COURT:  Cross?

3                      CROSS-EXAMINATION

4   BY MR. HIGGERSON:

5        Q.   Morning.

6        **A.   Good morning.**

7        Q.   After the first sexual encounter where

8   Mr. MacLeod kissed you, you said you did not report that

9   to any staff; is that right?

10       **A.   That's correct.**

11       Q.   And there were two more sexual assaults in --

12  somewhere in August through October.  One in the

13  vocational -- I'm sorry.  One in the classroom and one in

14  Ms. Fitzer's office; is that right?

15       **A.   I don't know the timing, but, yes.**

16       Q.   And you didn't tell anybody who worked at the

17  prison about those assaults either, did you?

18       **A.   No.**

19       Q.   You were in Internal Affairs reporting the

20  problem with your roommate, correct?

21       **A.   Yes.**

22       Q.   And at that time, didn't Lieutenant Sexton talk

23  to you when you were in there?

24       **A.   Not that I -- I don't really know who I talked**

25  **to, but I did talk to somebody, yes.**

1     Q.  Did you talk to two people, one about the

2  problem with your roommate and one who just came in and

3  asked you some general questions?

4     **A.  Not that I recall, no.**

5     Q.  But at that time, when you were in the Internal

6  Affairs Office, you didn't make any reports of what was

7  going on with MacLeod, right?

8     **A.  I did not, no.**

9     Q.  Just to make sure we're clear on one thing, when

10 you went to court to get the court-ordered phone calls

11 with your daughter, that was because of resistance from

12 your daughter's father and his family, correct?

13    **A.  Yes.**

14    Q.  You didn't have to compel the Department of

15 Corrections to let you make those phone calls, did you?

16    **A.  No.**

17    Q.  And while you were at Logan, you don't remember

18 any other inmates making PREA complaints, do you?

19    **A.  Yes, there were several.**

20    Q.  Okay.

21    **A.  Not that I know specifically, no.  But...**

22    Q.  Okay.  I'm looking at -- do you remember being

23 deposed in this case?

24    **A.  Yes.**

25    Q.  And that's where you're under oath and answering

1    questions just like today?

2         **A.  Yes.**

3         Q.  And your deposition was on October 19th of 2020.

4    You probably don't remember the date, but --

5         **A.  I do not.**

6         Q.  But 2020 sounds right?

7         **A.  Sure.  Yes.**

8         Q.  A few years ago?

9         **A.  Yeah.**

10        Q.  Okay.  I'm looking at page 28 of your deposition

11   and starting at Line 21:

12            "QUESTION:  Do you recall any instances where

13   you became aware that another inmate reported a PREA

14   violation or allegation?"

15            You asked for that to be repeated and then your

16   answer was, "I did not."

17            Do you remember being asked that and giving that

18   answer?

19        **A.  Are you specifically asking about staff-on-staff**

20   **or staff -- or inmate-on-staff or inmate-on-inmate, or --**

21   **I don't --**

22        Q.  The question, as was asked at that time, was did

23   you remember another inmate making a PREA report?

24        **A.  Okay.**

25        Q.  It didn't specify as to staff or to another

 1  inmate.

 2          MS. SCHULT:  Chris, are you at Line 4?  Which

 3  line are you on on this page?

 4          MR. HIGGERSON:  No.  I'm at -- I'm sorry.  I was

 5  on -- starting on Line 21.

 6          MS. SCHULT:  Okay.  Thank you.

 7  BY MR. HIGGERSON:

 8      Q.  And then, again, on page 90, starting at

 9  Line 20:

10          "QUESTION:  Had you -- were you aware of any

11  other prisoners making PREA complaints regarding staff

12  sexual misconduct while you were at Logan?"

13          And the answer was, "Not to my knowledge."

14      **A.  Yes.  Staff, no.**

15      Q.  And you had not seen any of the other prisoners

16  being subjected to retaliation, had you?

17      **A.  Not to my knowledge, no.**

18      Q.  You discussed a time when your mother was

19  visiting and you told her what was going on?

20      **A.  Yes.**

21      Q.  She wanted to call the police, didn't she?

22      **A.  Yes.**

23      Q.  And you told her not to?

24      **A.  Yes.**

25      Q.  And the police are outside of Logan Correctional

1    Center, aren't they?

2         **A.   Yes.**

3         Q.   And even though you didn't want to go to

4    Decatur, you did feel safe there, didn't you?

5         **A.   No, not necessarily.**

6         Q.   Turning to page 68 of the same deposition on

7    Line 3:

8              "QUESTION:  Did you feel safe at Decatur?

9              "Answer:  I did."

10             Were you asked that question and did you give

11   that answer?

12        **A.   Yes.  I have a hard time remembering things**

13   **sometimes, so -- dates and stuff.**

14        Q.   While you were at Logan Correctional Center, you

15   were aware of officers getting *wapped*; is that right?

16        **A.   I don't know what that means.  I don't think**

17   **I've ever heard that terminology before.**

18        Q.   Turning to page 77 of your deposition, starting

19   on Line 12:

20             "QUESTION:  While you were at Logan, were you

21   ever aware of inmates having sex with other employees

22   besides Mr. MacLeod?

23             "Answer:  Not specifically, no.  But I've heard

24   of people getting wapped and getting arrested and other

25   inmates bragging about stuff?

1      "QUESTION:  When you say an employee getting

2  wapped --

3      "ANSWER:  They have to leave the premises,

4  either under investigation or I guess they lose their

5  job?"

6     **A.   Oh, it's walked.  It's supposed to be *walked*.**

7     Q.   Supposed to be *walked*?

8     **A.   Yes, sir.  I was like, I don't know what that**

9  **is.**

10    Q.   Okay.  But, walked, you were aware of other

11  employees being walked out of the institution because of

12  sexual allegations, right?

13    **A.   Yes.**

14    Q.   When you moved housing units and you asked the

15  other counselor to become your counselor, you said you

16  told him that people were making comments about you and

17  MacLeod?

18    **A.   Yes.**

19    Q.   But you didn't tell him anything that was

20  actually going on, did you?

21    **A.   No.**

22       **I was hoping that he -- he never really asked**

23  **me, and I was hoping that he would ask something because**

24  **I was too scared to say.  And I didn't know how to, like,**

25  **go about bringing that up, especially to another male.  I**

1  **was scared and unsure of who I should tell or what I**

2  **should say.**

3      Q.  And you mentioned that when you were in -- in

4  August of 2017, when you were called to Internal Affairs,

5  that you called your mother.  And it was

6  Lieutenant Sexton who let you call your mother, correct?

7      **A.  Yes.**

8      Q.  And did you say your mother had been researching

9  whether you would get in trouble for making a PREA

10  report?

11     **A.  She -- I'm pretty sure that she did it while I**

12  **was on the phone.**

13     Q.  And that's when she told you you'd be okay?

14     **A.  Yes.**

15     Q.  And that's the first time then that you told

16  anybody what was going on with Mr. MacLeod?

17     **A.  Yes, sir.**

18         MR. HIGGERSON:  Okay.  That's all I have.  Thank

19  you.

20         THE COURT:  Redirect?

21         MS. SCHULT:  Yes.  Just a couple questions,

22  Your Honor.

23                  REDIRECT EXAMINATION

24  BY MS. SCHULT:

25     Q.  Andrea, have any of the defendants in this case

1  ever apologized for what happened to you?

2       **A.   No.**

3       Q.   And even though all of this was taking place

4  with Defendant MacLeod and you were not protected by

5  anyone at Logan, did you still look forward to your calls

6  with your daughter?

7       **A.   Absolutely.**

8            MS. SCHULT:  No further questions, Your Honor.

9            THE COURT:  Anything further, Mr. Higgerson?

10           MR. HIGGERSON:  Only that we would reserve for

11  an offer, but nothing at this time.

12           THE COURT:  Okay.  Thank you.

13           .  May this witness step down?

14           MS. SCHULT:  Yes.

15           THE COURT:  Thank you, ma'am.

16                *(Witness excused.)*

17           THE COURT:  Your next witness?

18           MS. CAI:  Your Honor, the plaintiff calls

19  Dr. Ann Burgess to the stand.

20           THE COURT:  If you'll step up and be sworn,

21  ma'am?

22                *(Witness sworn.)*

23           THE COURT:  If you'll take the stand?

24           MS. CAI:  As Dr. Burgess gets situated, I'd just

25  like to take a moment to introduce myself to the members

1    of the jury.  My name is Evelyn Cai, and I'm one of the

2    individuals representing Ms. Nielsen in this case.

3               ANN BURGESS, PLAINTIFF'S WITNESS, SWORN

4                         DIRECT EXAMINATION

5    BY MS. CAI:

6         Q.  Good morning, Ms. Burgess.

7         **A.  Good morning.**

8         Q.  Before we dive in, could you take a moment to

9    introduce yourself and tell the jury why you're here

10   today?

11        **A.  Yes, I will.**

12             **My name is Ann Burgess.  I am a Psychiatric**

13   **Nurse.  I have a Doctorate of Nursing Science Degree, and**

14   **I have been working with victims of sexual assault for**

15   **almost 50 years.**

16        Q.  What testimony are you here to provide today?

17        **A.  Yes.  The testimony that I will provide today as**

18   **to -- really are answering two questions.  One is what is**

19   **the impact that the sexual assaults have had on**

20   **Ms. Nielsen and the second is on the treatment that is**

21   **needed for her recovery at this particular time.**

22        Q.  And, Dr. Burgess, did you prepare some slides to

23   aid in your testimony today?

24        **A.  I did.**

25        Q.  And will walking through those slides help aid

1  that testimony?

2      **A.  I think they will, yes.**

3      Q.  Mr. Young, could you please pull up the

4  presentation?

5          Were these the two questions that you just

6  mentioned?

7      **A.  Yes.**

8          **The question is how has the defendants' conduct**

9  **affected Andrea Nielsen, and the second is what treatment**

10 **was necessary going forward.**

11     Q.  Dr. Burgess, did you reach any opinions related

12 to these two questions?

13     **A.  I did.**

14     Q.  And what were those opinions?

15     **A.  My opinion on the first is that there were**

16 **significant and serious injury to Ms. Nielsen from the**

17 **conduct of the defendants in this case.  And, second,**

18 **that there is a plan, treatment plan, needed to be put in**

19 **place.**

20     Q.  Before we dive into those opinions further,

21 Dr. Burgess, I'd like to start by having you tell the

22 jury about your background.  Could you walk the jury

23 through your education?

24     **A.  Yes.**

25          **My education, I got my Bachelors of Science**

1  Degree at Boston University and my Registered Nurse

2  Degree.

3          And then, in nursing, you specialize at the

4  graduate level.  I specialized in Psychiatric Nursing at

5  the University of Maryland.  And then I went back to get

6  my Doctorate in Nursing Science at Boston University.

7          I also have an Honorary Degree for my work with

8  sexual trauma from the University of San Diego.  It's an

9  Honorary Doctorate, a Doctorate of Human Letters.

10      Q.  And shifting to your career, Dr. Burgess, how

11 would you categorize, at a high level, the types of work

12 that you've done?

13      A.  My work has really been in three areas.  One,

14 I've always been an academic.  So I've been in, actually,

15 three separate universities.

16          Second of all is my research.  My research has

17 been starting with sexual abuse of victims and

18 continuing, not only the victim, but the offender.

19          And then the third is I have a clinical

20 practice.  I always have tried to keep up with patients.

21      Q.  Let's start with the first, your academic

22 positions.  Could you walk the jury through just a few of

23 the highlights?

24      A.  My first academic position was at Boston

25 University, where I was Professor of Nursing and also

1    **Director of Nursing Research.  Then I went to the**

2    **University of Pennsylvania in Philadelphia, and I was in**

3    **the first chair in my field, which is the van Ameringen**

4    **Chair of Psychiatric Nursing.  And then I returned to**

5    **Boston College in the year 2001.**

6         Q.   Are you still teaching at Boston College today?

7         **A.   I am.**

8         Q.   The second aspect of your career that you

9    testified to was your research work.

10        **A.   Yes.**

11        Q.   Where did your research start?

12        **A.   My research started when I was at Boston**

13   **College.  I had met at the same grant.  I was an**

14   **assistant professor with Lynda Lytle Holmstrom, who was a**

15   **sociologist.  She was looking for a new research project**

16   **and had approached me to see if I'd be interested in**

17   **working with her.  And, together, we did a one-year study**

18   **of rape victims coming into a large urban hospital, which**

19   **is Boston City Hospital, and we followed them, both,**

20   **whether they went to court or whether they -- just in**

21   **terms of counseling.**

22             **Also, at that time, we established one of the**

23   **first hospital-based programs for the treatment of sexual**

24   **assault victims.**

25        Q.   How long have you been conducting research in

 1  your field?

 2       **A.   Started mid-'70s.  So quite a few years.**

 3       Q.   For those of us -- that's the general public --

 4  unfamiliar with your field, is there any chance that we

 5  would be familiar with your work?

 6       **A.   Yes.**

 7       Q.   And how so?

 8       **A.   The Netflix series, Mindhunter, is about the**

 9  **work that was done at -- in the beginning, on profiling**

10  **by the special agents down at the FBI Academy at**

11  **Quantico.  And I was brought in as a consultant to do the**

12  **methodology there.**

13       **So, the series of Mindhunter, my part is played**

14  **by -- in the series, it's called Doctor Wendy Clark.  So**

15  **the three of us, Bob Ressler, John Douglas, and myself**

16  **are featured in that series.**

17       Q.   Fair to say you're pretty well-known in your

18  field, Dr. Burgess?

19       **A.   That would be fair to say, yes.**

20       Q.   In addition to your academic teaching positions,

21  your research, and you testified that you'd also done

22  direct clinical patient work, how long have you been

23  doing direct clinical work?

24       **A.   I've been doing direct clinical work since I got**

25  **my degree in Psychiatric Nursing.  So that's late '60s.**

1    Q.   Do you still see patients to this very day?

2    **A.   I do.**

3    Q.   Have you worked with any patients who

4  experienced a sexual assault in a confined setting like a

5  prison?

6    **A.   Yes, I have.**

7    Q.   How many of these patients have you worked with?

8    **A.   Probably, over the course of my career, I've**

9  **seen probably at least 100.**

10    Q.   Are there any unique challenges you've observed

11  while you're working with victims who have been assaulted

12  in prison?

13    **A.   Yes.  There are several concerns and unique**

14  **situations, if you will.**

15    Q.   What are those concerns?

16    **A.   The current concerns have to do with the -- if**

17  **you will, the control that is held over somebody in a**

18  **controlled setting such as a prison and other situations**

19  **to which are done, and athletic situations and religious**

20  **situations.  But the corrupt control is the big issue and**

21  **the person not feeling that they have any reverse or any**

22  **way to get out of the situation.  And, more important, or**

23  **at least equally important, is the role that the**

24  **institution plays and how they react to what is going on.**

25            MS. CAI:  At this time, Your Honor, the

 1  plaintiff tenders Dr. Burgess as an expert in Psychiatric

 2  Nursing, in the assessment of trauma and sexual assault

 3  victims.

 4          THE COURT:  Do you wish to cross-examine?

 5          MS. POWELL:  No, Your Honor.  We have no

 6  objection.

 7          THE COURT:  She is so designated.

 8  BY MS. CAI:

 9      Q.  Dr. Burgess, I'd like to return to the two

10  questions you mentioned at the outset of your testimony.

11  Let's start with the first, how Defendant MacLeod,

12  Defendant Sexton and Defendant Burke's behavior, conduct,

13  impacted Ms. Nielsen.

14          What did you conclude about the types of trauma

15  that Ms. Nielsen suffered?

16      **A.  Well, I concluded that there was serious trauma**

17  **that evolved from that type of conduct that occurred at**

18  **Logan.**

19      Q.  Were there levels to the trauma that Ms. Nielsen

20  endured?

21      **A.  Yes.**

22          **.  You can address trauma in terms of mild,**

23  **moderate, and severe.  And, in my opinion, this was**

24  **severe.**

25          Q.  And were there different buckets, or categories,

1    of trauma that you considered?

2          **A.  Yes.**

3                **We have two styles of attack, if you will, when**

4    **looking at any type of sexual assault.  One is a *blitz***

5    ***style*; that, out of the blue, a person's just grabbed and**

6    **put into the assault.**

7                **But the second is what we call a *confident-style***

8    ***attack*, and that's where different tactics are used,**

9    **where there is interaction, the verbal of a relationship,**

10   **a false relationship, is attempted to be made.**

11         Q.   We'll talk about the styles of attacks in a

12   moment, but just returning to the buckets of harm that

13   Ms. Nielsen suffered, how many buckets of harm did you

14   identify associated with Ms. Nielsen?

15         **A.  Yes.**

16               **In looking at all the data that I had, there**

17   **were six.  I felt that there were six important types of**

18   **impact that had occurred to Ms. Nielsen.**

19         Q.   And what were -- would you walk the jury through

20   the six buckets that they're seeing on the screen?

21         **A.  Yes.**

22               **The first is the physical assault, what actually**

23   **happened, and, more importantly, the tactics that were**

24   **used to gain access to the victim.**

25               **The second would be in fear of retaliation that**

1   might occur that the victim would experience.

2           The third has to do with the relationship

3   between the victim and, in this case, her family, her

4   daughter, her mother.

5           The fourth is the institutional reaction, the

6   trauma.  We call it *institutional betrayal*.

7           The fifth is the -- the lost opportunities that

8   have occurred because of the assault.

9           And then the last is putting it all together to

10  describe the various impacts.

11      Q.  We'll walk through each of these buckets, but,

12  first, I'd like to talk to you about your methodology.

13          What methodology did you apply in this case?

14      A.  The methodology that I used in this case -- that

15  I use in most cases and many other clinicians do -- is to

16  look at the records, what records exist in terms of this

17  case.  The second is to do an in-person interview.  The

18  third is to look at testing.  Sometimes testing, or I

19  always try to do testing.  And then, the fourth, of

20  course, is putting it all together and mold the three

21  into what is the psychological impact.

22      Q.  Did you follow this exact methodology in

23  evaluating Ms. Nielsen?

24      A.  I did.

25      Q.  Let's start with the first step of your method;

1   that's record review.  What types of records do you

2   typically gather?

3       **A.   I typically gather whatever is available.  A lot**

4   **depends on how old the person is and things like that.**

5   **So the records give me -- that's important to look at.**

6   **And then the actual -- what happened, the incident,**

7   **whatever it was called.  And then, after the fact, after**

8   **the incident's complete.**

9       Q.   Why is a record review important to you?

10      **A.   Well, the records give you a snapshot, if you**

11  **will, of the person prior to getting into whatever the**

12  **situation is that you're trying to evaluate.  And it**

13  **gives you an opportunity to see what types of care she**

14  **might have gotten.  These are usually health records,**

15  **psychological records, and it's all very important in**

16  **terms of where the person has been prior to the incident**

17  **that you're examining.**

18      Q.   I'd like to turn your attention to the second

19  step of your methodology, interviews.  Could you tell the

20  jury why interviews are important?

21      **A.   Well, interviews are very important because you**

22  **actually get to see the person.  You can watch and see**

23  **how they react, how they answer questions, or don't**

24  **answer questions, what their movements are, how anxious**

25  **or sad or depressed or whatever the mood state is.  Mood**

1   **state is quite important.**

2          **And, demeanor, how they appear when you're**

3   **talking to them.  That gives you a lot of information,**

4   **especially if you're going to -- what you get into,**

5   **which, of course, is, we have some description of what**

6   **has happened.**

7          Q.   Were you able to interview Ms. Nielsen in

8   connection with this case?

9          **A.   I was.**

10         Q.   How many times did you interview Ms. Nielsen?

11         **A.   I interviewed her twice.  I interviewed her in**

12  **December of 2020, and then I interviewed her in July of**

13  **2023.  So almost a three-year interval.**

14         Q.   Could you explain to the members of the jury why

15  you interviewed Ms. Nielsen twice?

16         **A.   I felt it was important because how much time**

17  **had elapsed between when I first saw her, and I wanted to**

18  **know if anything had influenced her since then, or what**

19  **had happened, anything that could influence, if you will,**

20  **my opinion as to any injury that she had experienced.**

21         Q.   We'll talk about the details in a moment,

22  Dr. Burgess, but could you just preview for the jury

23  right now whether you saw any improvement of Ms. Nielsen

24  between your 2020 interview and your 2023 interview?

25         **A.   I did not see any improvement, no.**

1    Q.  I'd like to turn your attention to the third

2  step of your methodology and that's testing.  What tests

3  do you typically conduct?

4    **A.  I typically use three.  Just briefly, they are a**

5  **depression score, the Beck Depression scores.  I do**

6  **what's called an *impact-of-events scale*.  That's where**

7  **you actually go into the event.**

8    **And then I do a computer-scored test, which is**

9  **just called *Symptom Checklist*.  SCL-90 is the**

10  **abbreviation, which is 90 items.**

11    Q.  Are those tests reliable and standard in your

12  field?

13    **A.  They are standard in the field.  They have what**

14  **we call *good psychometrics*, that they have been used in**

15  **various populations, and you can -- especially on the**

16  **computer-scored one.  It compares it with other**

17  **population groups, age groups.**

18    Q.  Last, Dr. Burgess, I'd like to turn your

19  attention to the final step, evaluating the impact.

20  Could you describe for the jury at a high level what you

21  learned about the harm that Ms. Nielsen suffered

22  following your review of the records, your interview of

23  Ms. Nielsen, and the tests you performed?

24    **A.  Well, what I learned was the impact that this**

25  **had on Ms. Nielsen and that it was severe.  There was**

1  **lasting psychological impact that needed, in my opinion,**

2  **to be addressed.**

3       Q.  I'd like to turn back to the slide where you

4  talked about the six buckets of harm that Ms. Nielsen

5  endured and I want to walk through each and every one of

6  these buckets.  Let's start with the first; that's

7  physical assault and tactics.

8           In your field, Dr. Burgess, do professionals

9  categorize sexual assaults differently, depending on how

10  they happen and who the perpetrator is?

11      **A.  Yes, they very much do.**

12      Q.  And would that be the confident style of attack

13  or the blitz style of attack you were talking about

14  earlier?

15      **A.  Yes.**

16      Q.  And what -- in your professional opinion, what

17  type of assault did Ms. Nielsen suffer?

18      **A.  In my opinion, she suffered from what's called**

19  *confident style* **and it was custodial misconduct.**

20      Q.  Does the fact that Ms. Nielsen suffered a

21  confident-style type of attack matter in terms of

22  evaluating the psychological impact?

23      **A.  It certainly did because then you get into how;**

24  **well, how did this happen and what are the tactics that**

25  **were used between the victim and the offender.  That**

1  **relationship is very important to look at in any type of**

2  **sexual assault and especially in this type.**

3      Q.  The jury has heard that the assaults took place

4  inside of a prison.  How does that fact impact your

5  assessment to the harm here?

6      **A.  Well, that impacts greatly in terms of how this**

7  **has happened, that it's in such a confined or controlled**

8  **setting.  And we find that the tactics that are used are**

9  **very important.  They're called *grooming*.  That the**

10  **relationship was set up, if you will, by the offender.**

11      Q.  You mentioned that prisons are a controlled

12  setting.  Could you give the jury a sense of the degree

13  of control?

14      **A.  Total control.  In a prison setting, you don't**

15  **have any room for any individual or independent -- I**

16  **guess is a better term -- decisions, that you have to do**

17  **what the rules say.**

18      Q.  The jury has also heard testimony that

19  Defendant MacLeod started his contact with Ms. Nielsen

20  via a Healthy Relationships class.  Does that impact your

21  assessment of the harm here?

22      **A.  Yes, it does.**

23      Q.  How so?

24      **A.  Because he is using a healthy relationship,**

25  **what's supposed to be very positive and it's something**

1  that's growth-producing and so forth, and then he betrays

2  this with the confident-style assault.  And so you have

3  here, if you will, both a positive with a negative and

4  that's very demoralizing for the victim.

5      Q.  Why does that matter for assessing the harm that

6  Ms. Nielsen suffered?

7      A.  Because it has to do with how that all came

8  about, that this is in the confident style:  Deceit,

9  betrayal, and aggression is used.  It's a false

10  relationship that's set up that is designed to manipulate

11  and deceive a person.

12        So, on one hand, she thinks, well, this is

13  supposed to be positive, that she's going to learn

14  something about healthy relationships, and then she gets

15  into a very negative, destructive relationship.

16      Q.  During your interview with Ms. Nielsen, did you

17  learn anything about whether Defendant MacLeod wore a

18  condom when he was assaulting Ms. Nielsen?

19      A.  I did.

20      Q.  What did you learn?

21      A.  I learned that the assault that was going on was

22  ongoing; that, in terms of when we're looking at the

23  physical assault, it's what we call *prolonged*.  It wasn't

24  just one time -- that one time can be very serious -- but

25  with multiple times and that it went on about over a

1   **six-month period.**

2       Q.   And, specifically, about the fact of whether

3   Defendant MacLeod wore a condom, did you learn anything

4   about whether he did or did not?

5       **A.   I did.**

6       Q.   And what did you learn about that?

7       **A.   I learned that he did not wear a condom.**

8       Q.   And how does that fact impact your assessment of

9   Ms. Nielsen's harm?

10      **A.   That added trauma to her.  She had to now worry**

11  **about the possibility of pregnancy, the possibility of**

12  **sexually-transmitted disease.  These are added anxieties**

13  **and worries for someone that is -- that he deliberately**

14  **did not wear a condom or any protection.**

15      Q.   The jury has also heard that defendants'

16  policies allowed Defendant MacLeod to issue a pass to

17  call Ms. Nielsen to his office at any time.  How does

18  that impact your assessment of Ms. Nielsen's harm?

19      **A.   Well, that only increased her anxiety because**

20  **it's very -- she doesn't know when she's going to get the**

21  **call, so she's always anxious.  That would just increase**

22  **anxiety and make her much more worried.  All of the**

23  **feelings that she was having would just aggravate it**

24  **more.**

25      Q.   I'd like to turn your attention to the second

1    bucket.  It's the fear of retaliation.  Did Ms. Nielsen

2    share with you whether she personally reported

3    Defendant MacLeod's abuse when it started in 2016?

4        **A.  She did.**

5        Q.  What did you learn?

6        **A.  She did not report it to any authority within**

7    **the prison, but she did tell her mother.**

8        Q.  Is it common for victims of sexual assault to

9    not report their abuse to the authorities?

10       **A.  Very common.  Most victims do not.**

11           **The most current statistics is only four out of**

12   **ten victims will report in any type of situation.  There**

13   **are many reasons for it, but it's the fact that it's very**

14   **hard to get victims to report.**

15       Q.  You mentioned any type of situation.  Does the

16   fact that this incident occurred in an institution or

17   prison impact the likelihood of reporting?

18       **A.  It did.**

19       Q.  How so?

20       **A.  It did because the -- again, the research is**

21   **very clear that it's about 70 percent of any female**

22   **entering prison has some history of trauma or abuse.**

23       Q.  Is there a culture in prisons that specifically

24   increases the fear of reporting?

25       **A.  Yes, it does.**

1          Q.   What's that?   Could you describe that culture?

2          **A.   It's a culture of abuse.   The most important**

3    **thing to know is that it is sanctioned, that people go**

4    **along with it and no way is it challenged.   So that it**

5    **is -- it's ongoing in a prison situation.**

6          Q.   And what specifically did Ms. Nielsen fear if

7    she were to report the assaults?

8          **A.   She had a verity of reactions, but the fear, she**

9    **had multiple fears.   She certainly had the fear of the**

10   **relationship with her daughter being broken.   That was**

11   **important that she not lose that relationship and make**

12   **the phone calls.**

13        **She also had a fear that the -- in fact, the**

14   **Counselor had told her that he had friends and that they**

15   **would protect him and that he would -- he threatened**

16   **that, if she told, certain things would happen.   So she**

17   **had that fear.**

18        **She also had the fear of what we call**

19   **segregation, that she could be placed -- whatever the**

20   **rules were, she could be placed and segregated in another**

21   **setting.**

22        **And then, the other, of course, was the fear of**

23   **transfer, that she might lose the progress that she felt**

24   **she had made there and be transferred to another**

25   **location, another prison.**

1    Q.  The jury has heard testimony that

2   Defendant Sexton, the investigator in this case, asked

3   her in December of 2016, whether she had anything she

4   wanted to tell him.  How do you assess the fact that

5   Ms. Nielsen did not report her assault in response to

6   that question?

7       **A.  First of all, that's a very unusual question to**

8   **ask.  It's just kind of out of the blue.  It doesn't give**

9   **any context or anything.  So it was a very unusual**

10  **question, I think, to ask to try to get some information.**

11   Q.  What kind of questions would be appropriate when

12  approaching someone who's been subjected to sexual

13  assault to make them feel secure to report?

14      **A.  Right.  And there are -- which training in how**

15  **you ask in trauma-type situations, how you get**

16  **information.  It has to do with having some privacy,**

17  **having some kind of a relationship, and then moving from**

18  **a very general question of what happened kind of thing to**

19  **a more specific question to move into.**

20          **Oftentimes, you can say, have you noticed any**

21  **concern here?  Want your help, if there's been any kind**

22  **of abuse that you've seen.  That often will get some**

23  **information.  And then move to, has this been a problem**

24  **for you?  Has anything happened to you?  So you move very**

25  **much from general to specific.**

1        Q.   Can you sum up for the members of the jury how

2   Ms. Nielsen's fear of retaliation has impacted her?

3        **A.   The fear of retaliation has been severe.   That**

4   **is what prevented her from reporting anything.   She was**

5   **scared.   She was -- felt very powerless.   Certainly, very**

6   **depressed that she wasn't making progress.   A myriad of**

7   **reactions she had.**

8        Q.   I'd like to turn your attention to the third

9   bucket and that's Ms. Nielsen's relationship with her

10  daughter and her family.   To start, Dr. Burgess, could

11  you tell the jury how Ms. Nielsen described her

12  relationship with her daughter to you?

13       **A.   She described a very important relationship.**

14  **Again, she was young at this time, the daughter was**

15  **young, and she wanted to stay very involved as possible**

16  **with her.   So phone calls were really her lifeline to her**

17  **daughter.   This was very, very important.   And, also, to**

18  **her mother.   This was her family at that time and for her**

19  **to be able to continue that was paramour.**

20       Q.   What role did Defendant MacLeod have in

21  Ms. Nielsen's access to her daughter and her mother?

22       **A.   Well, he was a gatekeeper.   He had the control**

23  **over it.   He could say whether she could call or not.**

24  **These phone calls, whatever they call them, the pass**

25  **call, he was in total control of this.**

1      Q.  The members of the jury have heard testimony

2  that Defendant MacLeod's assaults included multiple

3  instances of both penetrative sex and oral sex.  Did you

4  also learn whether any assaults occurred while

5  Ms. Nielsen was speaking on the phone with her young

6  daughter?

7      **A.  I did.**

8      Q.  What did you learn?

9      **A.  What I learned is, while she's on a phone call**

10 **with the daughter, the Counselor is pleasuring himself,**

11 **exposing his genitals, masturbating, and even to the**

12 **point of ejaculating on the floor of the office.**

13     Q.  Could you describe, in your opinion, what impact

14 that had on Ms. Nielsen?

15     **A.  A very serious impact because it not only is**

16 **what she sees, it's really what we call a *visual memory*.**

17 **And we have a concept in the field where, if you pair a**

18 **positive experience -- i.e., talking on the phone with**

19 **her daughter -- with a negative -- which, of course, is**

20 **what I just described -- that can leave a visual memory**

21 **so that she may think of her conversations with her**

22 **daughter and get this visual memory that pops into her**

23 **mind involuntarily.**

24          **So that's very serious.  And to try to get over**

25 **that is not easy.  To get yourself out of an unpleasant**

1    **memory is something we work with, of course, in trauma**

2    **work, but it's very, very hard.**

3        Q.  The next bucket you mentioned is institutional

4    betrayal and institutional trauma.  When you consider

5    institutional betrayal and trauma, do you look at the

6    individuals who make up that institution?

7        **A.  Yes.  That's very important because they are**

8    **also part of the assault, if you will, the environment.**

9    **It's very important.  Not just one person, but everybody**

10   **within and who makes -- certainly, who makes rules and**

11   **carries them out.**

12       Q.  So in this case, did you focus on

13   Defendant MacLeod, Defendant Sexton, and Defendant Burke?

14       **A.  Yes.  The three defendants, yes.**

15       Q.  I'd like to just talk about Defendants Burke and

16   Sexton, the warden and the investigator at Logan.  What's

17   your understanding of their role in the assaults that

18   Ms. Nielsen endured?

19       **A.  Well, my understanding of the role that they**

20   **played is they had the power to stop this, that this is**

21   **something that is -- they're responsible.  Certainly,**

22   **PREA is a concept that's -- it's a law that's been on the**

23   **books for over 20 years.  So it's very important that**

24   **they follow the rules and regulations of PREA.**

25       Q.  The jury has heard a lot about PREA, Prison Rape

1    Elimination Act.  One of the requirements the jury heard

2    about this week was a requirement of separating the

3    inmate from the abuser.  What is the psychological impact

4    on Ms. Nielsen that Defendant Burke and Sexton failed to

5    follow the requirement in separating Ms. Nielsen from

6    Defendant MacLeod?

7         **A.   It's very serious because it would have stopped**

8    **the abuse that was ongoing, at least between the two**

9    **parties.**

10        Q.   The jury has also heard about the requirement

11   related to the receipt of mental and physical health

12   evaluations and the fact that Ms. Nielsen did not receive

13   those evaluations.  How does that impact your assessment

14   of Ms. Nielsen's harm?

15        **A.   The failure to have that, which is a**

16   **requirement, really robbed her of the opportunity to,**

17   **perhaps, talk more about what happened.  She might have**

18   **opened up.**

19        **But, even more important, her own mental health**

20   **and her own physical health.  That is so important when**

21   **there's been any type of statement that -- allegation has**

22   **been made of sexual abuse.  That's number one priority,**

23   **is to get mental health and physical health evaluation.**

24        Q.   You were here when Ms. Nielsen was testifying,

25   right?  You were here in this courtroom?

1     **A.  Yes.**

2     Q.  And did you hear Ms. Nielsen testify about the

3  dangerous, overly-sexualized behavior by guards at Logan?

4     **A.  Yes.**

5     Q.  Did you hear her testify about the sexual abuse

6  that ran rampant at Logan?

7     **A.  Yes.**

8     Q.  And did you hear her testify about the culture

9  at Logan where guards were permitted to assault prisoners

10  without recourse?

11     **A.  I did, yes.**

12     Q.  And what impact would that have on Ms. Nielsen

13  psychologically?

14     **A.  Well, that impact, certainly, would be extremely**

15  **depressing because everything that she's trying to do**

16  **is -- it is hindered.  There's no recourse for her, no**

17  **way to escape.  She is in a very dangerous situation of**

18  **all of the sexualized abuse issues.**

19     Q.  Let's turn to the next bucket, the loss of

20  opportunity after transfer.  What types of opportunities

21  did Ms. Nielsen lose?

22     **A.  Well, she lost her job.  She lost her education.**

23  **She was getting some courses in something that she hoped**

24  **to get a certificate in that would prepare her for**

25  **release.  So she lost those.**

1          So, certainly, the transfer put her in a

2    position of, perhaps, losing the contact that she had

3    with visitors.  So all of those things she was improving

4    herself for was a great consideration in terms of loss.

5          Q.  Why is the loss of those opportunities

6    significant?

7          A.  Well, the loss of opportunity is significant

8    because the -- she doesn't have anything to rely on when

9    she is released, and that's, I think, a very important

10   part of any of the prison inmate's progress to be made.

11   And the reactions that she had would just be very

12   depressing, that it would make her feel very powerless

13   and that she would feel very despondent.

14         Q.  Let's take a look at the last bucket and that's

15   lasting psychological trauma.  You noted earlier that you

16   interviewed Ms. Nielsen in December of 2020, so four

17   years after the abuse, as well as December -- as well as

18   July 2023, seven years after the abuse.

19         Could you describe for the jury what you learned

20   during those interviews with respect to the long-lasting

21   psychological impact the abuse had on Ms. Nielsen?

22         A.  Well, I certainly learned that there was lost

23   opportunity in terms of stopping the abuse.  I think that

24   was most important.  Not only would it stop for her, but,

25   hopefully, for others.  But, also, the testing gave some

1  **important direction for my evaluation of how had she been**

2  **from point one to point two, from 2020 to 2023.**

3      Q.  I want to talk about the tests that you just

4  mentioned.

5      **A.  Okay.**

6      Q.  I'm approaching you with what has previously

7  been marked as Plaintiff's Exhibit 238 and Plaintiff's

8  Exhibit 210.

9      **A.  Thank you.**

10      Q.  Dr. Burgess, would you describe what I just

11  handed to you?

12      **A.  These are the results of the three tests that I**

13  **gave that I identified before and it has the -- her**

14  **reaction and the filling out of the three forms.**

15      Q.  Did you rely on these documents to reach your

16  conclusions today?

17      **A.  I did.**

18          MS. CAI:  At this time, Your Honor, the

19  plaintiff moves to enter Exhibits 210 and 238 into

20  evidence.

21          THE COURT:  Any objection?

22          MS. POWELL:  No objection, Your Honor.

23          THE COURT:  238 and 210 are admitted.

24              *(Plaintiff's Exhibit Nos. 238 and 210*

25              *admitted into evidence.)*

1  BY MS. CAI:

2      Q.  Rather than walk through all of these tests one

3  by one, did you put together a slide summarizing

4  Ms. Nielsen's results?

5      **A.  I did.**

6      Q.  Let's take a look at some of Ms. Nielsen's

7  results, and I'd like to start with the impact-of-event

8  scale.

9          Before we get to Ms. Nielsen's results, could

10  you walk us through how that test works?

11      **A.  Yes.  That is a test that is actually measuring**

12  **the specific event and any -- within a week -- your**

13  **instructions are, within the last week, please complete**

14  **the items on this form, and it is on a scale of zero to**

15  **three -- I'm sorry -- zero to four, where the person can**

16  **answer, not at all a problem, little bit, moderate, and**

17  **all the way up to extremely.**

18          **And one example of this would be, I tried to**

19  **remove it from my memory; meaning, I tried to remove the**

20  **memory from my memory.  And she would answer that way.**

21  **So she'd go through each one of the items and then you**

22  **score it.  You just add up the numbers.**

23          **And what we find is what we call a *nonclinical***

24  ***range*, the range that, ideally, all of us would go, that**

25  **there's no serious symptoms, is going to be less than**

1  ten.  And then, on symptoms, where you begin to get

2  symptoms of the post-trauma, of the trauma symptoms, 33

3  to 36.

4         And then there have been studies done on the

5  immune system, that trauma can affect your immune system.

6  And one of the studies is lowering your immune system,

7  which is suppressing, which is very serious.  You don't

8  want to have a suppressed immune system.  So that is

9  greater than 37.  So those are your possibilities when

10  you add up the scores.

11     Q.  And is this Horowitz impact-of-events scale

12  testing for PTSD?

13     A.  It's testing for any type of trauma symptom,

14  yes.  After the fact, yes.

15     Q.  I've put Ms. Nielsen's test results on the

16  screen.  Could you explain to the jury Ms. Nielsen's test

17  results at a high level?

18     A.  Well, you can see that, in 2020, she had 63.

19  That's certainly well above 37.  And in 2023, she had 52.

20  So she had 63 and then 52.

21     Q.  We see, on this screen, some acronyms.  The

22  first one I'm seeing is INT.  Could you explain to the

23  jury what "INT" means?

24     A.  That's called the intrusive memory.  That's the

25  thought of the traumatic event and it's involuntary.  In

1    our involuntary nervous system, you can't stop it.  It

2    just comes into the head of the person.

3        Q.  I also see the acronym "AVD."  Go ahead,

4    Dr. Burgess.

5        A.  AVD has to do with how good the person can put

6    it out of their mind because you get an unpleasant

7    thought and then you try to put it out of your mind.  So

8    that's an important one and it should be higher.

9            In other words, the higher that is, the easier

10   you are able to put an unpleasant thought out of your

11   mind.  And, of course, what you see here is you see her

12   in 2020 getting 24, and only 15 over in most recent

13   testing.

14       Q.  I also see the abbreviation "HYP".  What does

15   that stand for?

16       A.  That's the third area of PTSD that we look at

17   and it's called the *hyperarousal*.  How anxious, how

18   agitated the person is in general because of a traumatic

19   event.  So that's an important one.  And as you see, she

20   had 17 in both testings over the almost three years.

21       Q.  Given that Ms. Nielsen scored, in total, 63 and

22   52, what does that indicate in terms of the level of PTSD

23   that Ms. Nielsen has?

24       A.  Well, it was my opinion that this implies a

25   pretty serious level because it's well over the 37, which

1    is what you know that trauma can be repressing the

2    person's immune system.

3         Q.   I'd like to talk about the next test that you

4    did, the Beck Depression Test.  Could you tell the jury

5    what the Beck Depression index measures and how it works?

6         A.   Right.  This measured depression.  This measures

7    how the person is reacting to just every day activities.

8    And it asks, again, about 20-some questions.  Again, you

9    could put it on a scale of zero-to-three, where zero is

10   no problem, all the way up to three, where it is.

11          And an example is, I don't feel sad.  And you

12   give it a zero; whereas, I'm so sad and unhappy that I

13   can't stand it.  That would give a three.  And, again,

14   what you do is add up all of the numbers.  The symptoms

15   to give you either a nonclinical range, which, again, is

16   under ten, or a clinical range, which means you certainly

17   have either low, moderate, or high degrees of depression.

18        Q.   I've put Ms. Nielsen's test results here on the

19   screen.  Could you walk the jury through these test

20   results at a high level?

21        A.   In these test results, they actually tell you

22   the levels, which is very nice, so you don't have to look

23   it up.  So, in her 2020, you see that she has a 23,

24   which, between 21 and 30 is what's called *moderate*

25   *depression*.

1        When you go to 2023, she has -- she increases to

2   35 symptoms and that is severe depression.  So you can

3   interpret from this test that she has a higher degree of

4   depression at the second level of testing in 2023.

5        Q.  I'd like to move on to the third test that you

6   performed, the Symptom Checklist-90-R.  How does this

7   test work?

8        A.  We have nine items.  It is computer-scored, so

9   it takes out any type of bias that you hope that you

10  wouldn't have and it gives you nine clinical scales.

11  Some of those are depression, anxiety, phobic fear,

12  psychoticism; a wide, obviously, nine separate scales.

13        And, again, you score the item either no

14  problem; zero; or up to four, being an extremely

15  distressing symptom.  And one example is:  For the past

16  week, how much were you bothered by unwanted thoughts,

17  words, or ideas that won't leave your mind?  So the

18  person would either respond not at all or extremely.

19        And in this survey, the nonclinical range is

20  under 50.  So anybody that scores -- that's within the

21  norm.

22        Obviously, if it's over 50, it already starts

23  into what we call the *clinical range*.  They give you a

24  subclinical level from 50 to 60.  And then anything above

25  60 is really considered pretty high.

1     Q.   Placed Ms. Nielsen's test results on the screen,

2   and we can see that she scored an 83 and 87.  What does

3   that mean?

4       **A.   That tells you she's well over the 60 level.**

5   **She's well into the severe level of testing.**

6       Q.   Earlier, you mentioned that you reviewed

7   Ms. Nielsen's records.  What mental health diagnoses did

8   she have according to these records?

9       **A.   The records indicated four separate diagnoses:**

10  **Depression; anxiety; PTSD, which stands for**

11  **post-traumatic stress; and then insomnia was also a**

12  **serious symptom, diagnosis.**

13      Q.   Do these diagnoses align with your evaluation of

14  Ms. Nielsen, both from the tests you administered as well

15  as the interviews that you conducted?

16      **A.   They do.  They match with mine, yes.**

17      Q.   We're now more than seven years from when

18  Defendant MacLeod first assaulted Ms. Nielsen.  What do

19  these test results indicate to you about the impact that

20  this has had on Ms. Nielsen?

21      **A.   Well, they indicate that it's had a severe**

22  **impact on her.  You can see the depression is high.  All**

23  **the kinds of scales, post-trauma, all of those are high.**

24  **And, also, anxiety and also insomnia is a terrible**

25  **symptom to have if you're also experiencing other**

 1  diagnoses.

 2      Q.  Let's turn to the second question you were asked

 3  to answer, your testimony today, Dr. Burgess, what

 4  treatment is necessary going forward?

 5      **A.  There are a verity of treatments that are**

 6  **available that I would certainly recommend for her that**

 7  **we recommend in general for trauma victims.**

 8      Q.  I'd like to place and orient the members of the

 9  jury to the periods of treatment that you would recommend

10  here.  Could you just explain this timeline to the

11  members of the jury?

12      **A.  Yes.  This is a sematic, if you will.  It helps**

13  **us see the six areas that we've talked about that are**

14  **included in when this starts, which is in 2016.**

15          **And you have the pre-assault period, obviously,**

16  **here, and then you have when it starts and the various**

17  **impact areas, all the way up to where we are today, which**

18  **is in September of 2023.  And the important thing is it**

19  **goes forward, is that it doesn't stop today.  It's going**

20  **to go forward in terms of her need to have some type of**

21  **treatment to reduce all of the symptoms that she has.**

22      Q.  To moving forward and to reduce the symptoms

23  that Ms. Nielsen suffers from, what specific treatment

24  plans would you recommend?

25      **A.  I would recommend a variety of counseling.  I**

 1    think counseling is very important.  That's the

 2    individual counseling where she can talk with one person

 3    one-on-one.  Hopefully, get some, what we call,

 4    *neutralizing* of the symptoms, reduce those symptoms.

 5            But, also, family treatment is important.  We

 6    have the daughter, we have the mom, and to get that unit

 7    in better alignment, very helpful to have somebody who is

 8    specialized in family work.

 9            And then the third area is what we call *group*

10    *counseling*.  This is an area where we try to get people

11    that have experienced a very similar type of experience

12    together, and we do this by Internet, telehealth.  That's

13    where you can get people from various parts of the

14    country to talk about it and that allows a person to

15    share and talk with people that have gone through a

16    similar thing so they feel some degree of relationship,

17    even though it's usually by telehealth.  But that's

18    really, really important.

19            And then the other important thing is what I

20    call *physical activity* because action is an antidote for

21    anxiety.  She's got great anxiety.  So people who -- and

22    it can be a variety of things.  She might like to run or

23    she may like to play tennis or play some kind of sports

24    activity that gets the whole body moving.  That's really,

25    really important to have some type of physical activity.

1          And then, of course, **very important to have**

2    **vocational counseling, to have something that she can**

3    **learn, that she can develop some kind of a career-type of**

4    **activity and feel some success, if you will, in her,**

5    **whatever her future will be.  She has a young teenage**

6    **daughter and her mom, certainly, at this point.**

7          Q.  Are there any particular symptoms where ongoing

8    therapy is especially important?

9          **A.  Well, I think that it's really important in**

10   **terms of the individual counseling.  I think that is**

11   **really, really important.  But all of those have their**

12   **role.  You don't do them all at once.  You can scatter**

13   **them overtime.  So she's getting different things.  So**

14   **it's ongoing.  I think the important thing is that it's**

15   **ongoing for her.**

16         Q.  In your opinion, Dr. Burgess, what should this

17   jury consider in evaluating the harm --

18              THE COURT:  Excuse me.  I have a question from

19   the jury.  That is, may we have a bathroom break?  So I

20   apologize.  Ten minutes.

21                   *(Recess at 10:18 a.m.)*

22                   *(In open court; jury present.)*

23              THE COURT:  Please continue.

24   BY MS. CAI:

25         Q.  Before the break, Dr. Burgess, I believe you

1  were walking the members of the jury through different

2  aspects of your treatment plan.  Could you remind us

3  which diagnoses you're intending to address with this

4  treatment plan?

5      **A.   Intending to address both the -- obviously, the**

6  **post-trauma, but also the depression and the anxiety.**

7  **Those three in particular.  And then, hopefully, that**

8  **will then help her insomnia.**

9      Q.   Are any of those three particular diagnoses you

10  just mentioned especially relevant in terms of your

11  recommendation for ongoing treatment?

12      **A.   Well, the ones that I'm most concerned about**

13  **would be the trauma symptoms.**

14      Q.   And in your opinion, Dr. Burgess, what key

15  considerations should the members of the jury keep in

16  mind in evaluating the harm that defendants have caused

17  to Ms. Nielsen?

18      **A.   They should keep in mind that it isn't just one**

19  **person, but it's the institution.  Very concerned about**

20  **institutional betrayal, if they don't protect the person**

21  **that they're supposed to so that no further harm comes.**

22  **So that is very important, the institutional-trauma**

23  **issue, as well as the direct assault and tactics.**

24          MS. CAI:  No further questions.

25          THE COURT:  Cross, Ms. Powell?

```
 1                     CROSS-EXAMINATION
 2   BY MS. POWELL:
 3       Q.  Good morning, Ms. Burgess.
 4       A.  Good morning.
 5       Q.  Dr. Burgess, I apologize.  My name is
 6   Jennifer Powell.  I want to introduce myself to you.  I
 7   represent Defendant Burke and Defendant Sexton.  I do not
 8   represent Defendant MacLeod.  Okay?
 9       A.  Yes.
10       Q.  I am not going to belabor through all of the
11   things that you already discussed and go through them one
12   by one, so I'm going to address some of the them
13   piecemeal to just kind of clarify a few of the things
14   that you testified about.
15           Would you agree that, when assessing someone in
16   a situation like this, when you're trying to assess their
17   trauma and the effects of that trauma, that it's
18   important to have access to their past mental health
19   treatment and records of that nature, both prior to the
20   trauma event, as well as after the trauma event?
21       A.  Yes.
22       Q.  But in this case, you didn't have any prior
23   medical records or mental health records before the
24   traumatic event to review; is that correct?
25       A.  No, I did.  I had the records.
```

1      Q.  What records did you review?

2      **A.  I had her -- I'm sorry.**

3      Q.  What records did you review from before her

4  incarceration?

5      **A.  Any health records that she had, anything that**

6  **related to the issues that she -- of stresses that she**

7  **had had before.**

8      Q.  Do you remember giving a deposition in this

9  matter?

10      **A.  Yes.**

11      Q.  And that was in April of 2021, April 15th,

12  correct?

13      **A.  Yes, yes.**

14      Q.  And you swore to tell the truth under oath at

15  that point in time, correct?

16      **A.  I did, yes.**

17      Q.  And you would agree that, in gathering their

18  history, it's important to gather their full detailed

19  history of traumas and not just the one trauma that

20  you're focusing on, correct?

21      **A.  That's true, yes.**

22      Q.  And that's either through records or speaking

23  with previous treatment providers or current treatment

24  providers?

25      **A.  That is sometimes done, yes.**

1      Q.   Okay.  And just to be clear, in this case, you

2  have not treated Ms. Nielsen; you have just assessed her

3  and completed the testing, correct?

4      **A.   That's correct, yes.**

5      Q.   And you did so for the expressed purposes of

6  this litigation; is that correct?

7      **A.   That's correct.**

8      Q.   And you're being paid for your participation in

9  this case, correct?

10      **A.   I am.**

11      Q.   Can you tell us, the jury, your rate of pay?

12      **A.   My rate?**

13      Q.   For your expert testimony.

14      **A.   My rate is $250 an hour to review materials and**

15  **write reports and depositions and so forth.**

16      Q.   And can you tell us how much you have already

17  been paid in this case?

18      **A.   I can't give you a precise number, but I think**

19  **it's been about 30 hours, possibly, prior to writing the**

20  **report.  Obviously, I haven't -- I think it's around 30,**

21  **possibly 40 hours.**

22      Q.   Prior to writing the report?

23      **A.   To write the report was 30.**

24      Q.   Okay.  And then since writing the report, you've

25  given a deposition?

1      **A.   I've given a deposition, correct.**

2      Q.   And you've prepared for trial?

3      **A.   I did.**

4      Q.   And you, obviously, are testifying in trial, so

5   do you have an estimate of how many hours you will be

6   billing in this matter?

7      **A.   I can estimate that the preparation for here,**

8   **probably is around 10, 15, maybe, hours today.**

9      Q.   Okay.  So you don't have a way to tell us how

10  much you expect to be compensated for your participation

11  in this case?

12     **A.   No, I haven't figured that out yet.**

13     Q.   You utilized a series of three tests, correct?

14     **A.   Yes.**

15     Q.   In assessing Ms. Nielsen?

16     **A.   Yes, three tests.**

17     Q.   But you would agree there are hundreds of tests

18  that can be used to assess these types of --

19     **A.   There are.**

20     Q.   -- mental states?

21     **A.   There are a lot of tests, yes.**

22     Q.   I believe, in the past, you said over 400

23  different types of tests?

24     **A.   Yes, I think there are.**

25     Q.   And you choose the ones that you prefer,

 1   correct?

 2       **A.  I do.**

 3       Q.  Okay.  And you would agree that all of your

 4   tests are subjective tests, based largely on

 5   self-reporting; is that correct?

 6       **A.  That's correct.**

 7       Q.  You don't utilize any objective testing

 8   techniques?

 9       **A.  No, I don't.**

10       Q.  Would you agree that a person's mental state at

11   any given moment is affected by the cumulative trauma and

12   experiences they've had in their life?

13       **A.  Well, it can be affected by that, but I also**

14   **have to take into consideration if they've had any**

15   **resolution of any of the issues.  So it isn't just a list**

16   **of prior stressors, but how they have handled them in the**

17   **past is important to look at, too.**

18       Q.  Okay.  And the testing that you did, the

19   Horowitz Test, the Beck Depression, and then the Symptom

20   Checklist; the Horowitz Test does specifically hone in on

21   one source of trauma, correct?

22       **A.  Correct.**

23       Q.  The impact of that specific event?

24       **A.  Correct.**

25       Q.  But the other two don't, correct?

1      **A.   That's correct.**

2      Q.   And, in fact, in those cases, you asked them to

3  look back at a seven-to-ten-day period and tell you how

4  they're feeling in relation to certain mental states?

5      **A.   Yes.   It's at one point in time and that's what**

6  **the instructions say, just think in the past week.**

7      Q.   Okay.   So you aren't able to say that the

8  results of those tests specifically corollate to the

9  events and the trauma at issue in this case, can you?

10     **A.   Well, yes, I can.   I can say, especially in the**

11  **Horowitz Test, that asks you specifically about the**

12  **intrusion of thinking, the avoidance, and the**

13  **hyperarousal.**

14     Q.   Right.   I'm sorry.   I'm speaking of the other

15  two tests that aren't specifically related to that

16  trauma.

17          You're unable to assess whether or not that

18  mental state that she is in at that time is specifically

19  attributable to the one trauma you are addressing,

20  correct?

21     **A.   Well, actually, the SCL-90 has a scale that**

22  **looks at something that now is being interpreted as that**

23  **could be the event.   That's the scale nine on the**

24  **psychoticism.   And that will say, in the instruction,**

25  **that this is just to see whether the person is psychotic,**

1  **but it may have something preop in their mind.  So, in a**

2  **way, it does discuss that.**

3      Q.  But if you're looking at the last seven to ten

4  days and the event wasn't in the last seven to ten days,

5  that event wouldn't be specifically taken into account in

6  those test results; would it?

7      **A.  Not specific.  Not like the Horowitz.  That's**

8  **correct.**

9      Q.  Okay.  And in this case, you first spoke with

10  Ms. Nielsen years after the trauma that's at issue in

11  this case, correct?

12     **A.  That's correct, yes.**

13     Q.  And then your second interview was even years

14  later?

15     **A.  Yes.**

16     Q.  I found my note about the records.  Do you

17  remember giving your deposition testimony back in 2021?

18     **A.  Yes.**

19     Q.  Counsel, I'm at page 28, 18 -- I'm sorry, 14,

20  not 18.

21         Do you recall being asked these questions and

22  giving these answers:

23         "QUESTION:  Okay.  And so I want to kind of move

24  specifically then into your interview with Ms. Nielsen.

25  Did you review any records of her prior to incarceration?

1        "ANSWER:  I had records.  And do you want me to

2    read the records that I saw, I reviewed?

3        "QUESTION:  Sure.

4        "ANSWER:  Okay.  I did have her Wellpath

5    records.  I did have investigative reports.  I did have a

6    transfer e-mail.  I had a MacLeod summary.  I had a

7    reportable event of Ms. Nielsen and I had subpoenas.

8        "QUESTION:  Okay.  So it sounds like all the

9    records you reviewed were from her incarceration forward

10   and not anything prior to her incarceration?

11       "ANSWER:  I believe that's correct, yes."

12       **A.   Well, that's not what I would say.  Her Wellpath**

13   **record, which are counseling, they often go into them.  I**

14   **think that's where that's stated, with her prior**

15   **stressors.  So it wasn't specifically that it happened**

16   **back then, but it was a history.**

17       Q.   Okay.  But you didn't look at any mental health

18   or medical records expressly from before her

19   incarceration, correct?

20       **A.   Not except for the counseling records, that's**

21   **correct.**

22       Q.   But that was a history, you said, right?  It

23   wasn't records that were created prior to her

24   incarceration?

25       **A.   No.  But it would have been history, yes.  So I**

1  **would say it was history that they had talked about in**

2  **the report.**

3       Q.   Okay.  And, again, that history would be

4  self-reported by Ms. Nielsen, correct?

5       **A.   It usually is, yes.**

6       Q.   During the course of your assessment, you talked

7  to Ms. Nielsen about her history of trauma and history of

8  treatment, correct?

9       **A.   I did.**

10      Q.   And is it fair to say that Ms. Nielsen has

11  experienced multiple traumas in her life, outside of the

12  ones at issue in this case?

13      **A.   That's true.**

14      Q.   Can you tell the jury some of those traumas?

15      **A.   Yes.**

16           **There was a period of homelessness as a child.**

17  **There was the father that she never met that was dead.**

18  **That she had a stepfather that had some aggression, some**

19  **type of aggression.  And there was a prior incident as a**

20  **teenager of sexual abuse.**

21      Q.   Okay.  And then, of course, there was the period

22  of time when she was incarcerated, correct?

23      **A.   Yes.**

24      Q.   And would you agree that incarceration itself

25  can be a traumatic event for people?

1      **A.   Yes.**

2      Q.   You noted that she has suffered significant

3   trauma from the incident, and it's noted in her increased

4   mental health symptoms upon her release; is that correct?

5      **A.   Yes.**

6      Q.   And that her -- things like retraumatization and

7   that her dual-diagnosis all came back, correct?

8      **A.   It could be, yes.**

9      Q.   Do you remember also saying that she had not

10  dealt with those issues before she was incarcerated?

11     **A.   I said that on my deposition, that's correct.**

12     Q.   Okay.  So a situation where she has had these

13  diagnoses, potentially, before she was incarcerated and

14  never dealt with them at any point in time, correct?

15     **A.   At that point in time, that's correct.**

16     Q.   And we looked at, now, according to your tests,

17  your opinion would be that her mental state is even lower

18  than it was when you did your initial assessment?

19     **A.   Correct, I would.**

20     Q.   So, again, when you have a situation where the

21  traumatic event at issue here is part of a larger

22  traumatic event, being her incarceration, you can't tell

23  if the sexual assault by Mr. MacLeod is the one thing

24  that's causing her mental state, can you?

25     **A.   Well, you can because you look at the specific**

1    context of what has happened and what is going on.  And

2    so there is a way to try to separate, if you will, prior

3    traumas with current traumas.

4        Q.  And that's in the Horowitz Test, correct?

5        A.  It's not just in the Horowitz.  It's looking at

6    the facts of what had happened.  You can do that.  You

7    can say, this is what's happened in this particular abuse

8    and then this is what happened prior and see if there's

9    any similarity.

10           You can also ask how you would rank them.  I

11   usually ask people who have had a prior incident, or

12   incidents, how they rank themselves mentally or

13   psychologically between the two.  So you can do it that

14   way also.

15       Q.  And that's all, again, based on self-reports by

16   Ms. Nielsen, correct?

17       A.  Well, yes, according to your --

18       Q.  That she provided in preparation for this

19   litigation, correct?

20       A.  Well, this was back in 2020.  My deposition, of

21   course, was in 2021.

22       Q.  Correct.  But all of your assessments of

23   Ms. Nielsen have been for purposes of this litigation,

24   correct?

25       A.  Well, it was for purposes for what happened to

1  her, yes.  I would agree.

2          MS. POWELL:  I have nothing further, but I would

3  like to reserve for offer of proof.

4          MS. CAI:  Redirect, Your Honor?

5          THE COURT:  Mm-hmm.

6                    REDIRECT EXAMINATION

7  BY MS. CAI:

8      Q.  Dr. Burgess, you spoke during your

9  cross-examination about the fact that you interviewed

10  Ms. Nielsen years after she suffered the assaults by

11  Defendant MacLeod, right?

12      A.  Yes.

13      Q.  Do you recall that?

14      A.  Yes, I do.

15      Q.  Does speaking with Ms. Nielsen years after the

16  trauma occurred help you better assess the long-lasting

17  psychological trauma that Ms. Nielsen suffers to this

18  very day?

19      A.  Yes, it did.

20      Q.  Dr. Burgess, Counsel also commented on the fact

21  that you used subjective tests here.

22      A.  Yes.

23      Q.  And I believe you walked through -- or you

24  mentioned that there were 400 or so tests that could have

25  been performed on Ms. Nielsen?

1      **A.   Yes.**

2      Q.   Are you aware of whether defendants ever asked

3   for Ms. Nielsen to sit for any of those 400 or so other

4   tests?

5      **A.   Well, I know that she hadn't.  I'm trying to**

6   **think if I had asked her, but I know that she hadn't.**

7      Q.   Are you aware of whether defendants retained an

8   expert to perform any of those tests on Ms. Nielsen?

9      **A.   My understanding is they did not.**

10     Q.   Are you aware of any expert from defendants that

11  would disagree with the opinions you've offered here

12  today?

13     **A.   I'm not aware of anyone.**

14     Q.   Are you aware of any defense expert offering a

15  competing psychological assessment of the harm to the

16  treatment plan that you recommend for Ms. Nielsen?

17     **A.   No, I'm not aware of anyone.**

18     Q.   So did anything that counsel just asked you or

19  suggested change any of the opinions you testified to

20  this morning?

21     **A.   They did not.**

22          MS. CAI:  No further questions.

23          THE COURT:  Anything further, Ms. Powell?

24          MS. POWELL:  No, Your Honor.

25          THE COURT:  Does the jury have any questions for

1  Dr. Burgess?

2          No questions.

3          May she be excused now?

4          MS. POWELL:  I would like to do an offer of

5  proof, Your Honor.

6          THE COURT:  All right.  Question is whether to

7  do it now or wait and do it over the lunch hour.  Can --

8  yes?

9          MS. STUPAR:  I think we were trying to get

10  Dr. Burgess out as soon as we can so that she can catch

11  her flight.

12          THE COURT:  Let me ask the jury:  Did you have

13  any follow-up questions you wish to ask of Ms. Nielsen?

14      The answer to that is no.

15          All right.  We're going to take a short break,

16  ten minutes.

17                 *(In open court; jury absent.)*

18          THE COURT:  Court has reconvened outside the

19  presence of the jury.

20          It's beginning to look like they will not

21  receive this until five o'clock.  I do not like to have

22  juries instructed at five o'clock.  So keep that in mind

23  in terms of time.

24          Your offer of proof, Ms. Powell?

25          MS. POWELL:  Yes, Your Honor.  I will be very

1    brief.

2                          OFFER OF PROOF

3    BY MS POWELL:

4        Q.  Dr. Burgess, I'm just going to ask you a few

5    more questions and I'm primarily focusing in on the

6    questioning that I had of Ms. Nielsen's other sources of

7    trauma, okay?

8             You're aware that Ms. Nielsen had a history of

9    substance abuse; is that correct?

10       **A.  Yes.**

11       Q.  And she had that history prior to her

12   incarceration?

13       **A.  She did.**

14       Q.  Her substance abuse was actually involved in the

15   events that led to her first period of incarceration; is

16   that correct?

17       **A.  Yes.**

18       Q.  And then, after she was released from custody,

19   she relapsed again, correct?

20       **A.  Correct.**

21       Q.  And, ultimately, was re-incarcerated?

22       **A.  She was.**

23       Q.  And all of these things are additional sources

24   of trauma in Ms. Nielsen's case; is that correct?

25       **A.  That's correct.**

1    Q.  And those events that had happened, some had

2    happened when you first interviewed her and then the

3    remainders had happened by the time you had interviewed

4    her the second time, correct?

5        **A.  That's correct.**

6    Q.  So when -- I'm sorry.  So when we're looking at

7    the accumulative trauma that she has experienced, those

8    are the additional things that could be a source of

9    trauma in her life?

10       **A.  Yes.**

11   Q.  And you are also aware that Ms. Nielsen had a

12   dysfunctional relationship with her child's father,

13   correct?

14       **A.  Right.**

15   Q.  And it was her substance abuse that led to her

16   child's father gaining custody of her child?

17       **A.  Yes.**

18   Q.  And in your assessment of Ms. Nielsen, she made

19   indications that he was controlling and aggressive and

20   there was physical abuse in that relationship as well,

21   correct?

22       **A.  Correct.**

23   Q.  And all of those are additional sources of

24   trauma in someone's life, correct?

25       **A.  They could be, yes.**

1          MS. POWELL:  I have nothing further.

2          THE COURT:  Ms. Cai, I think Ms. Cramer has

3     something for you.

4               *(Off-the-record discussion had.)*

5                    OFFER OF PROOF

6     BY MS. CAI:

7          Q.  Dr. Burgess, you took into consideration every

8     single point that defense counsel just asked you about

9     during this, her last examination, right?

10         **A.  Yes.**

11         Q.  You took into consideration every single point

12    in rendering the conclusions you offered to the jury; is

13    that right?

14         **A.  I did, yes.**

15         Q.  Now, defense counsel spoke about Plaintiff's

16    prior traumas.

17              Mr. Young, could you cue up Slide 38 from the

18    presentation, please?

19              Is there an analogy that you would use to

20    describe how a prior stressor and the stressors at Logan

21    interact?

22         **A.  Yes.**

23         Q.  And what analogy is that?

24         **A.  I like to use the analogy of a broken leg, that**

25    **a person can break a leg once, they become vulnerable,**

1    and it can break again at another point in time.

2         Q.  Just walking that through piece by piece, you

3    see the second break on the slide, and you said that will

4    leave the individual vulnerable to a new trauma?

5         A.  Correct.

6         Q.  And then you went on to talk about how that

7    impacted the first break.  Would you elaborate on that?

8         A.  I can.

9             The second break, as you can see, is on the

10   right-hand slide, and that is the vulnerability to a new

11   trauma.  And then you can see where the -- with the first

12   break, when you add the second one, you have a much

13   deeper injury.  It really becomes more compounded.

14        Q.  I'd just like to back up and go to Andrea's

15   case.  Could you explain how Ms. Nielsen's case and prior

16   abuse history maps onto the analogy that you just

17   presented?

18        A.  Yes.

19            If we go to Ms. Nielsen, you can see where the

20   trauma that has been identified at the first break, you

21   consider that.  And then by the -- that would be in 2020.

22            And then I think the second break was,

23   obviously, in that period of time, that she's at Logan

24   when that occurs, and that could cause the vulnerability

25   and create the additional trauma to that and have a

1  **deeper, compounded part of the reaction.**

2      Q.  Despite all of her prior stressors, are you

3  still able to tie Ms. Nielsen's trauma that she suffered

4  at Logan and at the hands of the defendants, are you

5  still able to tie that to the harm you testified about

6  earlier today?

7      **A.  Yes, I am.**

8          MS. CAI:  No further questions.

9          THE COURT:  Anything further, Ms. Powell?

10          MS. POWELL:  No further questions, Your Honor.

11          THE COURT:  I want to review my ruling on the

12  motion in limine before I respond to the offer of proof.

13  So let's take a couple minutes.

14          Doctor, what time do you have to catch your

15  plane?

16          MS. CAI:  I believe her car will be arriving

17  around noon.  So she would like to be out of here by

18  noon, if at all possible.

19          THE COURT:  All right.  I'll be very quick, I

20  hope.

21          Court is in recess.

22                *(Recess at 10:55 a.m.)*

23          THE COURT:  Court has reconvened outside the

24  presence of the jury.

25          Doctor, you don't need to retake the stand.

1          I'm standing by my prior rulings.  Thank you for

2     the offer of proof.

3          So, next, we'll have your deposition, which will

4     take about an hour; is that right?

5          MR. HIGGERSON:  Fifty-four minutes, yes.

6          THE COURT:  Have you rested at this time?

7          MS. CAI:  Yes, Your Honor.  The plaintiff rests.

8                    PLAINTIFF RESTS

9          THE COURT:  All right.

10          MR. HIGGERSON:  We have a motion at the close of

11     Plaintiff's evidence.

12          MS. CRAMER:  I'm sorry.  Can Dr. Burgess go?

13          THE COURT:  Yes.  Thank you, Doctor.

14               *(Witness excused.)*

15          MR. HIGGERSON:  Your Honor, we would move for

16     judgment as a matter of law pursuant to Rule 50 at this

17     time.

18          I mean, having been heard on all the issues,

19     this is a deliberate indifference case, starting with

20     *Farmer v. Brennan* and down through all the cases that

21     follow.  That negligence is not sufficient for a finding

22     of deliberate indifference, neither is gross negligence.

23          The record in this case is not that the two

24     defendants did not try to protect the plaintiff, but the

25     repeated testimony has been that everybody is critical of

1    the job they did and the efforts they took, but nobody

2    has alleged that they did nothing.

3          There's certainly been no testimony to

4    contradict the steps that Lieutenant Sexton took, that he

5    described where he did talk to people who were in the

6    area, where he did try to conduct surveillance, which is

7    consistent with what the plaintiff's witness say is one

8    thing that should be done, is trying to be in the area to

9    break this type of thing up.  He talked to the plaintiff

10   herself and received information.

11         The plaintiff has made an argument that this was

12   not a, you know, an ideal investigation by any means.

13   But, again, many cases -- and I think I already cited

14   *Peate v. McCann*, which is 294 F.3d 879, which says that

15   just because the harm was not averted doesn't mean that

16   the defendant's deliberately indifferent, and there's no

17   requirement that they choose the best course of action.

18   Failing to choose the best course of action is not

19   deliberate indifference.

20         So the fact that they did take steps with,

21   maybe, steps that could be criticized, it is not

22   sufficient for deliberate indifference.  So we would ask

23   for finding of a matter of law on that issue.

24         And we would ask for a finding on the issue of

25   punitive damages.  The Court is going to instruct the

 1   jury that there has to be a finding of maliciousness or

 2   complete abandonment, you know, caring about the

 3   plaintiff.  There's no evidence -- the evidence is that

 4   they did take steps to try to address the situation.

 5          And then, finally, qualified immunity, because

 6   the case law says that attempting to take steps to remedy

 7   the situation, even if you're unsuccessful and even if it

 8   shows that you did not take the best course of action,

 9   is -- is not deliberate indifference.  If we hold them to

10   a standard now, where there is no specific example that

11   says exactly what investigation has to be done not to be

12   deliberately indifferent, that he had qualified immunity.

13          THE COURT:  Thank you, Mr. Higgerson.

14          The motion is denied.

15          Bring the jury in.

16          Is the deposition cued up?

17          MR. YOUNG:  Yes, ma'am.

18          THE COURT:  All right.

19          Did you receive the additional jury

20   instructions?

21          MS. STUPAR:  We did, Your Honor.  Yes.

22                *(In open court; jury present.)*

23          THE COURT:  Please be seated.  The Court has

24   reconvened.

25          Mr. Higgerson, your evidence?

1      MR. HIGGERSON:  We would call Angel Wilson by

2    deposition.

3           THE COURT:  Can we bring the TV out here?

4                *(Video deposition of Angel Wilson playing.)*

5           THE COURT:  Does that complete the deposition?

6           MR. HIGGERSON:  Yes, Your Honor.

7           THE COURT:  All right.  Could you move the

8    television, please?

9           Does that complete your evidence, Mr. Higgerson?

10          MR. HIGGERSON:  We have a remaining offer to

11   make, but that does complete our evidence otherwise.

12                      DEFENDANTS REST

13          THE COURT:  So we're going to excuse you.  I'm

14   going to ask -- and this may not be possible for you --

15   to return by one o'clock.  We will reconvene at that time

16   and we'll have jury instructions and closing arguments.

17   That may mean you'll be late tonight.

18          We'll get you dinner, of course.  But in case

19   you need to make arrangements, now would be the time.

20   Court is in recess.

21                *(In open court; jury absent.)*

22          THE COURT:  Five-minute recess and we'll be back

23   to discuss jury instructions and the offer of proof.

24          MS. CRAMER:  We have a couple of administrative

25   things, Your Honor.

1           THE COURT:  We'll do it when we get back.

2           MS. CRAMER:  Okay.  But we want to do them over

3   lunch because it relates to our closing next.

4           Oh, I'm sorry.  I thought that they were going

5   to lunch right now.

6           MS. STUPAR:  We'll be back.

7           MS. CRAMER:  I'm sorry.  I'm having a hard time

8   this morning.

9           THE COURT:  That's all right.

10                    *(Recess at 12:03 p.m.)*

11          THE COURT:  The offer of proof?

12          MR. HIGGERSON:  Yes.

13          MS. SCHULT:  Let me go get my client.  I'm

14  sorry.

15          MR. HIGGERSON:  I can make this without her.  I

16  was just going to make representations as to what we

17  would ask her.  If she wants to be in the room, that's

18  fine.

19          MS. SCHULT:  That's fine.

20            ANDREA NIELSEN, PLAINTIFF HEREIN,

21                       OFFER OF PROOF

22  BY MR. HIGGERSON:

23          Your Honor, during the plaintiff's testimony, if

24  we had been allowed and not barred by the ruling on the

25  plaintiff's motions in limine, we would have asked her

1    about her convictions, including the one she was

2    incarcerated for at the time of these events, which was a

3    drug-related homicide.  And we would also ask about her

4    convictions since being released, which was another

5    drug-related felony.  We believe, under 609, those are

6    both relevant to impeaching her as a witness to going to

7    her credibility.

8              We would have asked her about her statement in

9    her deposition, that when --

10             THE COURT:  Let's make sure nobody's in the jury

11   room.

12             THE OFFICER:  Clear.

13             THE COURT:  Thank you.

14             Go ahead, Mr. Higgerson.  I apologize.

15             MR. HIGGERSON:  We would have asked her about

16   her statement in her deposition, that when Mr. MacLeod

17   ejaculated on the floor, she advised him to clean it up

18   so he would not get in trouble.

19             We would have asked her about her statements to

20   ISP, which we discussed in our offer of proof with

21   Monica Strandberg, from -- who conducted the

22   investigation, as far as that she consented to these

23   acts, that she did them -- that she was never forced to

24   do them and that she did them in exchange for benefits

25   that she would not otherwise been able to obtain.

1          We believe all of this is relevant for the

2   reasons we've argued in our other offers of proof and,

3   also, now that Plaintiff has testified, in order to give

4   a complete picture of what happened at that time and to

5   the extent that she's testifying inconsistent with that,

6   to impeach her testimony.

7          In addition, I have marked as Defendant's

8   Exhibits, the unredacted copies.  We've been discussing

9   these in all our offers of proof.  I just want to make

10  sure that they're on the record.  So if there's review,

11  they are marked as 17 and 18.  Those are the -- those are

12  the statement to ISP and also the Hicks statement without

13  redactions.

14          THE COURT:  Okay.  Thank you.  They will be put

15  in the record.  They will not be admitted at this time.

16          MR. HIGGERSON:  And, Your Honor, I need to renew

17  our motion pursuant to Rule 50 now that all evidence is

18  closed.  I would move on the same grounds that we moved

19  on at the close of Plaintiff's evidence, that the

20  evidence only shows negligence, not deliberate

21  indifference; that there's not support for punitive

22  damages; that the defendants are entitled to qualified

23  immunity to the extent they're being held liable for

24  negligent acts or gross negligence acts, as opposed to

25  deliberate indifference.

 1          And, also, based on the evidence that's come in
 2    the offers of proof that the case law, the *J.K.J. v. Polk*
 3    *County* that we've cited previously, indicates that it
 4    is -- a jury can find that there's no deliberate
 5    indifference if it's a consensual sexual act, if there's
 6    consent.  Our defendants would not have known, based on
 7    this case law, that they were required to protect
 8    somebody from the consensual sexual activity.
 9          There is certainly state law, state criminal
10    law, and there's departmental policy that prohibits it,
11    but those are not the constitutional standard.  To the
12    extent they're being held to that standard, they would
13    also be entitled to qualified immunity.
14          Thank you.
15          THE COURT:  Thank you, Mr. Higgerson.
16          MS. STUPAR:  I can briefly respond, Your Honor.
17          THE COURT:  Yes.  Briefly, please.
18          MS. STUPAR:
19                        OFFER OF PROOF
20    BY MS. STUPAR:
21          So there are a couple of points, or couple of
22    buckets of evidence that Mr. Higgerson mentioned in his
23    offer of proof, and so I'd like to take those one by one.
24          First is the convictions before and after
25    related to drug offenses.  Their justification was that

 1  it would go to her credibility under 609.  However, he

 2  stated, without any other foundation or reasoning why,

 3  the mere fact of having some sort of a drug offense would

 4  go to her credibility.  I heard nothing about

 5  credibility.  I heard everything about prejudice.

 6          As Your Honor is aware, Rule 609 also has to be

 7  weighed under Rule 403.  He did not give a single

 8  probative factor that could weigh into what happened in

 9  this case, a drug history as it relates to being sexually

10  assaulted in prison.

11          So there is no probative value there, there's

12  high prejudice there, and they did not provide any facts

13  or justification otherwise, just the fact that she has

14  drug-related convictions.  That's insufficient.

15          Second, he talked about the consent.  Again, as

16  Your Honor knows, we have argued this throughout the

17  entire week, so I incorporate all of our points therein.

18          One of the things he pointed out was consent for

19  some sort of a benefit from Mr. MacLeod.  You've also

20  heard expert testimony from both of our experts talking

21  about how a witness can be -- or an inmate could be

22  manipulated or victimized in that kind of a situation.

23  And so I think that the expert testimony there already

24  makes that plain, the reasoning behind that.

25          We've heard every relevant defendant and all

 1   relevant testimony in this case again and again and again

 2   attest that consent is irrelevant, the steps that they

 3   were supposed to take, and whether or not they were

 4   legally obligated to protect my client.  And, therefore,

 5   consent is still, once again, not relevant in this case

 6   and highly prejudicial.

 7           That's it.

 8           Oh, and we also would like to renew our Rule 50

 9   motion, too.

10           THE COURT:  Denied and denied.

11           MS. STUPAR:  Thank you.

12           THE COURT:  So I have Court's 26A.  Have they

13   been given a copy?

14           THE CLERK:  Yes.

15           THE COURT:  So I also have defendants', which

16   was unnumbered.  I'm going to reject defendants'.  I'm

17   going to give Court's 26A, unless there are further

18   objections.

19           THE CLERK:  I apologize.  That was

20   Defendants' 11.

21           THE COURT:  Defendants' 11, I'm sorry.

22   Apparently, it was numbered.  My copy was not.

23           MS. SCHULT:  No objections from Plaintiff on

24   Court's 26A instruction.

25           THE COURT:  Now, I think that there was also

 1  additional evidence that the plaintiffs had intended to

 2  offer from the personnel file.

 3          MS. CRAMER:  Yeah.  We'd like to put that into

 4  evidence, Your Honor.

 5          And, I mean, if you would like, we can -- I'm

 6  just going to be frank -- we have not had a lot of time

 7  with this file.  So we have a couple points.  I think we

 8  identified what those are.  And we would appreciate any

 9  instruction you might offer for how we can highlight

10  those to the jury.

11          We endeavor to keep my closing argument to

12  45 minutes.  We've worked on that very hard.  I don't

13  think I should have to spend that time going through a

14  file that's three-inches thick, four.  I'm really bad at

15  eyeballing stuff.  Big, fat file that we got yesterday,

16  late at night.

17          So I'd take any advice that you might offer on

18  how we can get the relevant points in, and we'd do it by

19  stipulation, if you're willing to read them.  Or we can

20  throw them on the ELMO.  I don't know.  I'm not sure.

21          MR. HIGGERSON:  Your Honor, we object to any

22  evidence coming in during closing arguments.

23          MS. CRAMER:  So do we.  That's our point.

24          MR. HIGGERSON:  I'd like to finish.

25          We object to them coming in during closing

1  argument.  If the plaintiff wants to reopen their

2  evidence and put something in, you know, that's at the

3  Court's discretion, but it's something that the jury has

4  never seen as part of the case, that Plaintiff's counsel

5  is just going to, you know, open up and give their own

6  interpretation of what it is.  We object to that.

7         And to the extent that it keeps being insinuated

8  that we've somehow withheld this, as we said, there was a

9  subpoena, there was an objection.  There was no due

10  diligence after that.  That is why this is all coming to

11  light now, instead of when it could be resolved and they

12  would have time to look at the file.

13         MS. STUPAR:  I understand the most recent

14  statement about that, but I would like to say that, you

15  know, they received the file.  Your Honor had told them

16  to turn it over immediately and they did sit on it for a

17  day.  We didn't get it until 8:00 p.m. last night.  We

18  couldn't use the file to question either of the

19  defendants in the case and correct their witnesses.

20         THE COURT:  May I see the documents you want to

21  use?

22         MS. CRAMER:  We have -- Jennifer, our associate,

23  went through it.

24         Thank you.  You can hand that up to the Judge.

25  I'm not familiar with it.  It's going to have to be you.

```
1              THE COURT:  Have you shared this with counsel?

2              MS. CRAMER:  I'm sorry, no.  We're trying to

3    figure out what to do.  Yeah, we have -- I'm sorry.

4              THE COURT:  Can you incapsulate or summarize the

5    content?

6              MS. CRAMER:  Sure.

7              Do you mind, Jennifer?

8              MS. MANCINI:  No.

9              MS. CRAMER:  And, Jennifer, just do add lines.

10             MS. MANCINI:  So the first tab mostly shows that

11   there was no records of calls between August of 2016 and

12   February of 2017.  That's flagged in the record that

13   there's absolutely no records of calls.

14             There's also a list of all the classes and

15   programs that the plaintiff was kicked out of after she

16   transfers to Decatur and clearly shows that she did not

17   want to be transferred to Decatur.

18             There were a few other things in there.  Those

19   were our main two.

20             MS. CRAMER:  I know we had at least one

21   discipline incident, Your Honor -- because I insisted

22   that be included -- where our client was written up for

23   contraband and she had peppers and onions that she pulled

24   in from the garden.  And we just think that really goes

25   to show the kind of discipline that prisoners were
```

1  subject to while rampant sexual abuse was happening at

2  this prison, and there was nothing being done about it.

3          THE COURT:  So present to Mr. Higgerson over the

4  short lunchtime.  We're going to have a stipulation that

5  you think would be acceptable, and we'll see if

6  Mr. Higgerson will agree to the stipulation.

7          MS. CRAMER:  Okay.  Thank you.

8          I have one other question.  I'm so sorry.

9          I just recently learned that Ms. Wilson, former

10  Warden Wilson, was actually terminated from IDOC.  It was

11  before her deposition, but she was terminated.  She was

12  fired from them.  And she's actually bringing a case for

13  retaliation against her former employer, and I would like

14  that to be a stipulation fact, too, that's read to the

15  jury.

16          MR. HIGGERSON:  No.  We object to that.

17          First, they could have explored this at her

18  deposition and come up with it at that point.

19          MS. CRAMER:  We acknowledge that.

20          MR. HIGGERSON:  And, you know, it's being sprung

21  on us.  We have had no ability to explore this, and this

22  doesn't involve the defendants.  The two of them are not

23  her former employer.  The Department of Corrections is

24  her former employer.

25          THE COURT:  It won't come in.  I agree.

1           All right.  So we shall break until one o'clock.

2           And you'll limit your closings to 45 minutes.

3    And I hope I can get through the jury instructions in a

4    half-an-hour, but that'll be reading very fast.

5           MS. CRAMER:  We have a suggestion on that.

6           THE COURT:  Mm-hmm.

7           MS. CRAMER:  Mr. Young's willing to put them up,

8    too, on the screen, if you think that would be easier for

9    the jury to follow them.

10          THE COURT:  We do put them up on the screen, but

11   we use the ELMO.  I think Mr. Taylor probably could do it

12   more sufficiently and quicker if you've got them all.

13          MS. CRAMER:  We scanned them, yeah.

14          THE COURT:  Okay.  But if it's all right with

15   you, let Adam go through with you and make sure they

16   compare to our physical copies and we'll do that.

17          MS. CRAMER:  And, Adam, do you have everything

18   you need for our closing deck?

19          THE CLERK:  I have not seen it.

20          MS. CRAMER:  Okay.  So this is the last -- I

21   swear this is the last thing, really do think.

22          So I know for -- I'm sorry, Jayde.

23          So for our closing slides, we have cited to that

24   transcript that the defendants keep objecting to whenever

25   we use it, the one we've hired our own Court Reporter so

1  we can have available.  We have a copy of all those

2  slides.  We have transcript cites on all of them.  We

3  brought both days, and we thought we could give it to

4  your Clerk over the lunch.

5          I'm so sorry.  I know I'm really springing this

6  on you.  And we could give it to them over the lunch.

7          THE COURT:  Defendants?

8          MS. CRAMER:  Yes, to the defendants so that

9  we're not subject to repeated objections like we saw

10  yesterday with both -- well, I guess it was just mostly

11  Ms. Burke's testimony.

12          THE COURT:  I assume you'd like a look at them

13  before you state your objections?

14          MR. HIGGERSON:  I guess I don't understand at

15  this point -- we're not putting on evidence -- what the

16  transcript is for.

17          THE COURT:  I assume it's a demonstrative for

18  closings.

19          MS. CRAMER:  Yeah, it's citations.  We just got

20  repeated objections yesterday from the co-counsel

21  whenever we tried to talk about trial testimony that

22  we've taken down.  So we just don't want that to be

23  happening during my closing argument, which I have

24  45 minutes for.

25          MR. HIGGERSON:  Your Honor, I don't think there

1   should be citations to these.  They're not supposed to be

2   cited for that purpose.  But there's nothing that keeps a

3   demonstrative -- a demonstrative exhibit from showing

4   things that were said in court.

5           THE COURT:  I agree.

6           MR. HIGGERSON:  I just don't think there should

7   be a citation of that kind.

8           THE COURT:  I agree.

9           MS. CRAMER:  So you want us to remove the

10  transcript citations?

11          THE COURT:  Let me see what it looks like.

12          MS. CRAMER:  Yeah.  It says citation at the

13  bottom.  And we just want it to be clear because they're

14  direct quotes.

15          THE COURT:  Well, you can't use them as direct

16  quotes because it's not the official transcript.

17          MS. CRAMER:  I know, but we don't have an

18  official transcript.  So we're trying to figure out what

19  to do.

20          THE COURT:  And, certainly, you've been hampered

21  by that.

22          MS. CRAMER:  Yes.

23          THE COURT:  So with Mr. Taylor, can you remove

24  the --

25          MS. CRAMER:  We can do that over lunch.

1          THE COURT:  Okay.

2          MS. CRAMER:  Okay.  And then that saves you a

3  lot of work.

4          MR. HIGGERSON:  Thank you.

5          MS. CRAMER:  And we'll go ahead and take those

6  transcripts back.  Sorry.

7          THE COURT:  Did you get your response to

8  Court's 26A?

9          MS. CRAMER:  Actually -- oh, yeah.

10          MR. HIGGERSON:  It's the same objection that we

11  had.  It didn't include the additional element that we

12  proposed, but, otherwise, nothing else.

13          THE COURT:  All right.  Thank you.

14          MS. STUPAR:  Very briefly.

15          Should we look over lines of the exhibits that

16  we have to make sure they're correct?

17          MS. CRAMER:  And we also want to make sure none

18  of the official transcripts we marked yesterday are going

19  to go into the jury room.

20          COURTROOM DEPUTY:  Nope.

21          MS. CRAMER:  Thank you.

22                 *(Recess at 12:19 p.m.)*

23                 *(In open court; jury absent.)*

24          THE COURT:  Back on the record.

25          Ms. Cramer?

1          MS. CRAMER:  Your Honor, at this time,

2   Plaintiffs would like to admit PX 272 into evidence.

3          THE COURT:  Any objection?

4          MR. HIGGERSON:  Yes, Your Honor.

5          Although we've admitted to the authenticity of

6   the master-file documents that we handed over this week,

7   there's certainly no foundation for relevance for any of

8   this.  There's been no introduction to the jury of what

9   any of this is.  So, yes, we object to just a mass stack

10  of documents without any other explanation being

11  admitted.

12         THE COURT:  Do you wish to make an explanation?

13         MS. CRAMER:  Yes.  That would be great.

14         Actually, I'd prefer Your Honor do one.  We're

15  happy to stipulate to one.  I could propose some language

16  right now, if that would be helpful.

17         THE COURT:  Okay.

18         MS. CRAMER:  I would propose that the Court tell

19  the jury that, at the close of Wednesday's testimony, you

20  instructed defense counsel to conduct a search as to

21  whether Ms. Nielsen's master file was available to them

22  in Logan or IDOC records, and I would like to further

23  instruct that defense counsel obtained the master file

24  sometime that same evening, but did not disclose it to

25  Plaintiff's counsel.

```
 1              THE COURT:  Well, I'm not going to go there with
 2    it.
 3              MS. CRAMER:  It was provided to Plaintiff's
 4    counsel the following day after court; is that okay?
 5              THE COURT:  Is that acceptable?
 6              MR. HIGGERSON:  I object to the jury being told
 7    anything about this.  This is all, you know --
 8              THE COURT:  Well, there was testimony that the
 9    file was missing.
10              MR. HIGGERSON:  I don't remember if she said
11    *missing* or she said they couldn't find it, which I know
12    is pretty close.
13              THE COURT:  I think she might have said
14    *destroyed* at one point.
15              MR. HIGGERSON:  Right.
16              But she was talking about the staff at Decatur.
17    So I don't see any further relevance to this beyond the
18    ISP person said that it wasn't available for her to look
19    at when she went to talk in 2018.  Nothing else about
20    interaction between us or --
21              THE COURT:  I wasn't going to do any interaction
22    between them, just that you did produce it and it's
23    admitted in evidence at this time.
24              MR. HIGGERSON:  I don't know why it needs to
25    come into evidence.  I mean, there's no specific
```

 1   relevance to this unless somebody's talking about these

 2   exhibits and saying why they are relevant to this case.

 3   It's just a stack of documents from the Department of

 4   Corrections.

 5            MS. CRAMER:  May I respond?

 6            THE COURT:  Yes.

 7            MS. CRAMER:  These documents show -- well, let

 8   me just start here.

 9            THE COURT:  Well, you've already argued why --

10   what you needed to get out.

11            MS. CRAMER:  Yeah.

12            Well, we would have loved to ask

13   Defendant Sexton about these documents because they're

14   the records that he could have and should have reviewed

15   when he received them.

16            THE COURT:  Do you want to put him back on the

17   stand?

18            MS. CRAMER:  I really don't, Your Honor.  I

19   really want to get this case to our jury so they can go

20   home.  I don't think this is a hard case for them.  I

21   think they're ready to decide.

22            THE COURT:  I'm going to show 272 of Plaintiff's

23   as admitted over objection in lieu of sanctions for

24   failure to produce it promptly.

25

1              *(Plaintiff's Exhibit No. 272 admitted into*

2              *evidence.)*

3         MS. CRAMER:  Thank you, Your Honor.

4         THE COURT:  And I will simply indicate that this

5    is a document that's been admitted into evidence.  It's

6    the personnel file that has been produced.

7         MR. HIGGERSON:  I'm sorry, Your Honor.  It's not

8    a personnel file.  It's a master file.

9         THE COURT:  Master file, excuse me.

10        MS. CRAMER:  Thank you.

11        And I'll note for the record that there are

12   redactions applied to this and we'd like to reserve our

13   right, if we need to, to apply additional redactions in

14   accordance with your MIL rulings.  We just were in a bit

15   of a rush last night with everything going on.

16        THE COURT:  I understand.

17        MS. CRAMER:  Okay.

18        THE COURT:  So have you looked at all the

19   exhibits, and you're aware that the exhibits are

20   acceptable to go back to the jury?

21        MS. STUPAR:  Yes, Your Honor, I have.

22        THE COURT:  Not 272.  It has not been redacted.

23        MS. CRAMER:  272 has been redacted.  We've done

24   our very best to redact in accordance with the motion in

25   limine, but I think that just means it's extra important

1   to make sure we're very clear about things like

2   incarcerated status and prior history not being something

3   that should be considered for purposes of this case.

4          THE COURT:  We'll address the exhibits before

5   they go back.  So I want to get the jury back in since

6   I've rushed their lunch hour.  I assume they're all back.

7          MR. HIGGERSON:  I'm sorry.  Your Honor, just on

8   the issue of discipline, there was a motion in limine to

9   keep out discipline.  So we haven't touched on it, but

10  part of what I think is on top of there is discipline.

11         MS. CRAMER:  He is absolutely right, Your Honor,

12  and that's an oversight of ours.  And so we'd like

13  permission to correct it before it goes back to the jury.

14         THE COURT:  And you will.

15         MS. CRAMER:  Yes.

16         THE COURT:  So keep that out.

17         So we have nine jurors.  Do we wish to excuse

18  one or have all nine deliberate?

19         MR. HIGGERSON:  I've always, in the trials I've

20  done in Federal Court, had everybody proceed to the --

21         THE COURT:  Well, usually, it's eight.

22         MR. HIGGERSON:  I've had everywhere from six to

23  twelve, depending on what the plaintiff wanted.

24         MS. CRAMER:  We have no objection.

25         THE COURT:  Okay.  Then 45 minutes for your

 1  argument.  Are you going to reserve some for rebuttal?

 2          MS. CRAMER:  Yes, Your Honor.

 3          THE COURT:  Do you want me to know so I can tell

 4  you when your time is up or do you --

 5          MS. CRAMER:  Actually, that's great.  I'd

 6  appreciate that very much.  I'd like to reserve five

 7  minutes for rebuttal, please.

 8          THE COURT:  Okay.  All right.

 9          So I will then try to read the jury

10  instructions.  And you've gone over them and everything's

11  fine at this point, other than prior objections?

12          MR. HIGGERSON:  Yes.

13          THE COURT:  Okay.  So, Mr. Taylor, did

14  Mr. Dustin fix it?

15          MR. YOUNG:  Yes, ma'am.  Yes, Your Honor.

16          THE COURT:  Makes me nervous.  All right.

17          MR. YOUNG:  That was -- it was my fault.  I had

18  to disconnect it and then plug it back in.

19                    *(In open court; jury present.)*

20          THE COURT:  Please be seated.  The Court is

21  reconvened.

22          I know we're all brushing crumbs off after a

23  hasty half-lunch.  I hope you didn't get too wet.

24          My husband was unable to get my lunch to me.  He

25  was driving around the perimeter of the city, so I

1   finally had him feed the homeless.

2           So, at this time, I'm going to instruct you.

3   We'll give you a copy of the instructions to go back to

4   deliberations.  I apologize for my cough and my voice.

5           I'll start with the first instruction.  Can we

6   display it?

7           Why don't you bring the TV over so they can see

8   it?  If you'll take it straight over so they can still

9   see me.  Put it by the ELMO.

10          If you're like me, if you miss a word, it might

11  help if you can see my mouth moving.

12          Members of the jury, you've seen and heard all

13  the evidence and will hear the arguments of the

14  attorneys.  Now I will instruct you on the law.

15          You have two duties as a jury.  Your first duty

16  is to decide the facts from the evidence in the case.

17  This is your job and yours alone.

18          Your second duty is to apply the law that I give

19  you to the facts.  You must follow these instructions,

20  even if you disagree with them.  Each of the instructions

21  is important and you must follow all of them.

22          Perform these duties fairly and impartially.  Do

23  not allow sympathy, prejudice, fear, or public opinion to

24  influence you.  You should not be influenced by any

25  person's race, color, religion, national ancestry or sex.

1          Nothing I say now and nothing I said or did

2    during the trial is meant to indicate any opinion on my

3    part about what the facts are or about what your verdict

4    should be.

5          During this trial, I may have asked a witness a

6    question myself.  Do not assume that because I asked

7    questions, I hold any opinion on the matters I asked

8    about or on what the outcome of the case should be.

9          The evidence consists of the testimony of the

10   witnesses, the exhibits admitted in evidence, and the

11   stipulations.

12         A stipulation is an agreement between both sides

13   that certain facts are true.

14         Certain things are to be considered as evidence.

15   I will list them for you:

16         First, if I told you to disregard any testimony

17   or exhibits, or struck any testimony or exhibits from the

18   record, such testimony or exhibits are not evidence and

19   must not be considered.

20         Second, anything you may have seen or heard

21   outside the courtroom is not evidence and must be

22   entirely disregarded.

23         Third, questions and objections or comments by

24   the lawyers are not evidence.  Lawyers have a duty to

25   object when they believe a question is improper.  You

should not be influenced by any objection and you should
not infer from my rulings that I have any view as to how
you should decide the case.

Fourth, the lawyers' opening statements and
closing arguments to you are not evidence.  Their purpose
is to discuss the issues and the evidence.  If the
evidence, as you remember it, differs from what the
lawyers said, your memory is what counts.

During the trial, certain testimony was
presented to you by video.  You should give this
testimony the same consideration you would give it had
the witnesses appeared and testified here in court.

Any notes you have taken during this trial are
only aids to your memory.  The notes are not evidence.
If you have not taken notes, you should rely on your
independent recollection of the evidence and not be
unduly influenced by the notes of other jurors.  Notes
are not entitled to any greater weight than the
recollections or impressions of each juror about the
testimony.

In determining whether any fact has been proved,
you should consider all of the evidence bearing on the
question regardless of who introduced it.

During the course of this trial, I may have
instructed you that I admitted certain evidence for a

1  limited purpose.  You must consider this evidence only

2  for the limited purpose for which it was admitted.

3          You should use common sense in weighing the

4  evidence and consider the evidence in light of your own

5  observations in life.

6          In our lives, we often look at one fact and

7  conclude from it that another fact exists.  In law, we

8  call this *inference*.  A jury is allowed to make

9  reasonable inferences.  Any inference you make must be

10  reasonable and must be based on the evidence in the case.

11          You may have heard the phrases *direct evidence*

12  and *circumstantial evidence*.  Direct evidence is proof

13  that does not require an inference, such as the testimony

14  of someone who claims to have personal knowledge of a

15  fact.  Circumstantial evidence is proof of a fact or a

16  series of facts that tends to show that some other fact

17  is true.

18          As an example, direct evidence that it is

19  raining is testimony from a witness who says, I was

20  outside a minute ago and I saw it raining.

21  Circumstantial evidence that it is raining is the

22  observation of someone entering a room, carrying a wet

23  umbrella.

24          The law makes no distinction between the weight

25  to be given to either direct or circumstantial evidence.

1   You should decide how much weight to give to any

2   evidence.  In reaching your verdict, you should consider

3   all the evidence in the case, including the

4   circumstantial evidence.

5           You must decide whether the testimony of each of

6   the witnesses is truthful and accurate in part, in whole,

7   or not at all.  You also must decide what weight, if any,

8   you give to the testimony of each witness.

9           In evaluating the testimony of any witness,

10  including any party to the case, you may consider, among

11  other things:

12          - the ability and opportunity the witness had to

13  see, hear, or know the things that the witness testified

14  about;

15          - the witness's memory;

16          - any interest, bias, or prejudice the witness

17  may have;

18          - the witness's intelligence;

19          - the manner of the witness while testifying;

20          - and the reasonableness of the witness's

21  testimony in light of all the evidence in this case.

22          You may consider statements given by a party or

23  witness under oath before trial as evidence of the truth

24  of what he or she said in the earlier statements, as well

25  as in deciding what weight to give his or her testimony.

1            With respect to other witnesses, the law is

2    different.  If you decide that, before the trial, one of

3    these witnesses made a statement not under oath or acted

4    in a manner that is inconsistent with his or her

5    testimony here in court, you may consider the earlier

6    statement or conduct only in deciding whether his or her

7    testimony here in court was true and what weight to give

8    to his or her testimony here in court.

9            In considering a prior inconsistent statement or

10   conduct, you should consider whether it was simply an

11   innocent error or an intentional falsehood and whether it

12   concerns an important fact or an unimportant detail.

13           In this case, Plaintiff was an incarcerated

14   individual throughout the relevant period.  All parties

15   are equal before the law and an incarcerated individual

16   is entitled to the same fair consideration that you would

17   give any individual person.

18           You have heard evidence that Plaintiff and other

19   witnesses have been convicted of a crime.  You may

20   consider this evidence only in deciding whether their

21   testimony is truthful in whole, in part, or not at all.

22   You may not consider this evidence for any other purpose.

23           It is proper for a lawyer to meet with any

24   witness in preparation for trial.

25           You may find the testimony of one witness or a

1  few witnesses more persuasive than the testimony of a

2  larger number.  You need not accept the testimony of the

3  larger number of witnesses.

4          The law does not require any party to call as a

5  witness every person who might have knowledge of the

6  facts related to this trial.  Similarly, the law does not

7  require any party to present as exhibits all papers and

8  things mentioned during this trial.

9          The law does not require any party to call as a

10 witness every person who might have knowledge of the

11 facts related to this trial.  Similarly, the law does not

12 require any party to present as exhibits all papers and

13 things mentioned during this trial.

14         Defendants are being sued as individuals.

15 Neither the Illinois Department of Corrections, nor the

16 State of Illinois is a party to this lawsuit.

17         When I say that a party must prove something by

18 a *preponderance of the evidence*, or when I use the

19 expression, *if you find or if you decide*, this is what I

20 mean:  When you have considered all the evidence in the

21 case, you must be persuaded that it is more probably true

22 than not true.

23         Each party is entitled to have the case decided

24 sole ly on the evidence that applies to that party.  You

25 must consider the evidence concerning each individual

1  defendant only in the case against that defendant.  You

2  must not consider it against any other party.

3       You must give separate consideration to each

4  claim and each party in this case.  Although there are

5  multiple defendants, it does not follow that if one is

6  liable, any of the others is also liable.

7       You have heard evidence about whether

8  defendants' conduct violated the Federal Prison Rape

9  Elimination Act, PREA, and certain rules or procedures of

10  the Illinois Department of Corrections.  You've also

11  heard evidence that Defendant MacLeod violated a state

12  law against having sexual contact with a prisoner.

13       You may consider this evidence in your

14  deliberations, but remember that the issue is whether

15  Defendants Burke and Sexton failed to protect Plaintiff

16  from being sexually assaulted by Defendant MacLeod, not

17  whether a rule, procedure, state law, or PREA might have

18  been violated.

19       I have determined that certain information is

20  not relevant or otherwise admissible in this case.  As a

21  result, certain exhibits admitted into evidence contain

22  redactions.  You should not guess or speculate what the

23  redacted information contains.

24       The parties have stipulated or agreed to the

25  following facts.  You must now treat these facts as

1    having been proved for the purpose of this case.

2          Plaintiff, Andrea Nielsen, was an individual

3    previously in custody of the Illinois Department of

4    Corrections.  Plaintiff was incarcerated at Logan

5    Correctional Center from March 13, 2015, until August 4,

6    2017.

7          Defendants were employed by the Illinois

8    Department of Corrections at Logan Correctional Center

9    for all times relevant to this cause of action.

10   Defendants were acting under color of law at all times

11   relevant to this case.

12         The following stipulations are made only as it

13   relates to Defendant MacLeod and are not stipulated by

14   Defendant Margaret Burke and Defendant Todd Sexton.  You

15   should not consider these facts as any admission of fact

16   or liability by Defendant Burke or Defendant Sexton.

17         During her incarceration, Plaintiff had

18   court-ordered telephone calls with her daughter once per

19   week.

20         Plaintiff loves her daughter dearly and it was

21   very difficult for her to be separated from her daughter

22   while she was in prison.  While incarcerated, the weekly

23   phone calls to her daughter were extremely important to

24   her.

25         At all times, MacLeod knew how important

1  Plaintiff's phone calls with her daughter were to her and

2  he knew that Plaintiff would need to go through him in

3  order to have the calls.

4        In August 2016, MacLeod called Plaintiff to his

5  office in the Vocational Building so she could use his

6  phone to call her daughter.  After Plaintiff spoke with

7  her daughter, Defendant MacLeod kissed Plaintiff, which

8  shocked and surprised her.  She immediately left the

9  office.

10        Subsequently, on a weekly basis, MacLeod would

11  call Plaintiff to his office in the Vocational Building

12  for her phone calls, during which, he would engage in

13  custodial sexual assault of Plaintiff and subject her to

14  sexual harassment.

15        On several occasions, MacLeod exposed his penis

16  to Plaintiff while she was on the phone with her

17  daughter.  He also made sexual comments to her while she

18  was on the phone with her daughter.

19        Plaintiff did not report MacLeod's conduct

20  because he told her that if she did so, she would get *a*

21  *year across the board*, a phrase that Plaintiff understood

22  to mean that she would have to spend a full year in

23  segregation and that she would have to spend an extra

24  year at IDOC.

25        MacLeod also told Plaintiff that he had a friend

1    in IDOC, Defendant Sexton, who gave him advice on how to

2    avoid punishment if his sexual misconduct was discovered.

3    Plaintiff understood this to mean that MacLeod would not

4    be held accountable for his actions, even if she did

5    report his misconduct.

6            MacLeod abused other women at Logan in the same

7    way that he abused Plaintiff.  The Illinois State Police

8    investigated MacLeod's sexual assault of Plaintiff.

9    During that investigation, a number of other prisoners

10   described having sexual encounters with

11   Defendant MacLeod.

12           As a result of Defendant MacLeod's misconduct,

13   Plaintiff has suffered and continues to suffer severe

14   emotional distress, including, but not limited to,

15   humiliation, depression, rage, anxiety, panic attacks,

16   insomnia and post-traumatic stress.

17           These facts are deemed admitted by

18   Defendant MacLeod and established by the Court as to him.

19           To succeed on her claim that Defendant Sexton

20   and Burke failed to protect her from harm by

21   Defendant MacLeod, Plaintiff must prove each of the

22   following things by a preponderance of the evidence as to

23   each defendant:

24           One, there was a strong likelihood that

25   Plaintiff would be seriously harmed as the result of an

1    assault or assaults.

2            Two, the defendant under consideration was aware

3    that Defendant MacLeod would seriously harm a prisoner in

4    Plaintiff's situation, or strongly suspected that

5    Plaintiff would be seriously harmed, but refused to

6    confirm whether these facts were true.  You may infer

7    this from the fact that the risk was obvious.

8            Three, the defendant under consideration

9    consciously failed to take reasonable measures to prevent

10   the assault or assaults.

11           In deciding this, you may consider how serious

12   the potential harm to Plaintiff was and how difficult it

13   would have been for the defendant under consideration to

14   take corrective action.

15           Four, Plaintiff would not have been harmed, or

16   would have suffered less harm, if the defendant under

17   consideration had taken reasonable measures.

18           If you find that Plaintiff has proved each of

19   these things by a preponderance of the evidence as to the

20   defendant under consideration, then you should find for

21   Plaintiff and go on to consider the question of damages.

22           If you find that Plaintiff has failed to prove

23   any one of these things by a preponderance of the

24   evidence, then you must find for the defendant under

25   consideration and you will not consider the question of

1   damages.

2          You must determine the amount of money that will

3   fairly compensate Plaintiff for any injury you find she

4   sustained and is reasonably certain to sustain in the

5   future as a direct result of defendant's conduct.

6          Plaintiff must prove damages by a preponderance

7   of the evidence.  Your award must be based on evidence

8   and not speculation or guesswork.  This does not mean,

9   however, that compensatory damages are restricted to the

10  actual loss of money.  They include both the physical and

11  mental aspects of injury, even if they are not easy to

12  measure.

13         You should consider the following types of

14  compensatory damages and no others:

15         The physical, mental, and emotional pain and

16  suffering Plaintiff experienced and is reasonably certain

17  to experience in the future.  No evidence of the dollar

18  value of physical, mental, or emotional pain and

19  suffering needs to be introduced.  There is no exact

20  standard for setting the damages to be awarded on account

21  of these factors.  You are to determine an amount that

22  will fairly compensate the plaintiff for the injury she

23  sustained.

24         If you find for Plaintiff on the question of

25  liability, you may not deny or limit Plaintiff's right to

1    damages resulting from this occurrence because any injury

2    resulting from an aggravation of a pre-existing condition

3    or a pre-existing condition which rendered Plaintiff more

4    susceptible to injury.

5            If you find for Plaintiff, you may, but are not

6    required to assess punitive damages against defendants.

7    The purposes of punitive damages are to punish a

8    defendant for his or her conduct and to serve as an

9    example or warning to defendants and others not to engage

10   in similar conduct in the future.

11           Plaintiff must prove by a preponderance of the

12   evidence that punitive damages should be assessed against

13   each defendant.  You may assess punitive damages only if

14   you find that the conduct was malicious or in reckless

15   disregard of Plaintiff's rights.

16           Conduct is malicious if it is accompanied by

17   ill-will or spite and was done for purpose of injuring

18   Plaintiff.  Conduct is in reckless disregard of

19   Plaintiff's rights if, under the circumstances, the

20   defendant simply did not care about Plaintiff's safety or

21   rights.

22           If you find that punitive damages are

23   appropriate, then you must use sound reason in setting

24   the amount of those damages.  Punitive damages should be

25   an amount sufficient to fulfill the purposes that I've

1  described to you, but should not reflect bias, prejudice,

2  or sympathy toward any party.  In determining the amount

3  of punitive damages, you should consider the following

4  factors:

5          - the reprehensibility of defendants' conduct;

6          - the impact of defendants' conduct on

7  Plaintiff;

8          - the relationship between Plaintiff and

9  defendants;

10          - the likelihood that defendant would repeat the

11  conduct if an award of punitive damages is not made; and

12          - the relationship of any award of punitive

13  damages to the amount of actual harm the plaintiff

14  suffered.

15          Upon retiring to the jury room, you must select

16  a presiding juror.  The presiding juror will preside over

17  your deliberations and will be your representative here

18  in court.

19          A verdict form has been prepared for you.

20          Take this verdict form to the jury room, and

21  when you've reached unanimous agreement on the verdict,

22  your presiding juror will fill in and date the form and

23  all of you will sign it.

24          I do not anticipate that you will need to

25  communicate with me.  If you do need to communicate with

1  me, the only proper way is in writing.  The writing must

2  be signed by the presiding juror, or if he or she is

3  unwilling to do so, by some other juror.  The writing

4  should be given to the court security officer, who will

5  give it to me.  I will respond either in writing or by

6  having you return to the courtroom so that I can respond

7  orally.

8          If you do communicate with me, you should not

9  indicate in your note what your numerical division is, if

10  any.

11          Throughout your deliberations, you may discuss

12  with each other the evidence and the law that has been

13  presented in this case, but you must not communicate with

14  anyone else by any means about this case.  You also

15  cannot learn from outside sources about the case, the

16  matters in the case, the legal issues in the case, or

17  individuals or other entities involved in the case.  This

18  means you may not use any electronic device or media such

19  as phone, computer or tablet, the Internet, any text or

20  instant messaging service or any social media apps such

21  as Twitter, Facebook, Instagram, LinkedIn, YouTube,

22  WhatsApp and Snapchat to research or communicate about

23  what you've seen and heard in this courtroom.

24          These restrictions continue during your

25  deliberations because it is essential under our

1   Constitution that you decide this case based solely on

2   the evidence and law presented in this courtroom.

3   Information you find on the Internet or through social

4   media might be incomplete, misleading, or inaccurate.

5   You are permitted to discuss the case with only your

6   fellow jurors during deliberations because they have seen

7   and heard the same evidence and instructions on the law

8   that you have.  And it is important that you decide this

9   case solely on the evidence presented during the trial

10  without undue influence by anything or anyone outside the

11  courtroom.  For this reason, I expect you to inform me at

12  the earliest opportunity should you learn about or share

13  any information about this case outside of this courtroom

14  or the jury room or learn that another juror has done so.

15          The verdict must represent the considered

16  judgment of each juror.  Your verdict, whether for or

17  against the parties, must be unanimous.  You should make

18  every reasonable effort to reach a verdict.  In doing so,

19  you should consult with one another, express your own

20  views and listen to the opinions of your fellow jurors.

21  Discuss your differences with an open mind.  Do not

22  hesitate to re-examine your own view and change your

23  opinion if you come to believe it is wrong.  But you

24  should not consider your honest beliefs about the weight

25  or the effect of the evidence solely because -- excuse

 1  me.  But you should not surrender your honest beliefs

 2  about the weight or effect of evidence solely because of

 3  the opinions of other jurors or for the purpose of

 4  returning a unanimous verdict.

 5          All of you should give fair and equal

 6  consideration to all the evidence and deliberate with the

 7  goal of reaching an agreement that is consistent with the

 8  individual judgment of each juror.  You are the partial

 9  judges of the facts.

10          The verdict form reads as follows:

11          One, we, the jury, find as follows on

12  Plaintiff's claims.  Place an "X" on the appropriate line

13  for each claim.

14          Margaret Burke, for plaintiff or for defendant,

15  and the line underneath each one.  Todd Sexton, the same.

16  Defendant Richard MacLeod has already been found liable.

17          Two, we fix Plaintiff's total compensatory

18  damages at dollar sign, blank.

19          Three, we fix Plaintiff's damages, if any, as

20  follows:  Richard MacLeod, dollar sign, blank.

21          If you found for Plaintiff against Defendant

22  Margaret Burke and/or Defendant Todd Sexton, number one,

23  proceed to the following:  We fix Plaintiff's punitive

24  damages, if any, as follows:  Margaret Burke, dollar

25  sign, blank line.  Todd Sexton, dollar sign, blank line.

```
 1              And then, finally, we, the jury, having reached
 2    a unanimous agreement on Plaintiff's claim, sign below,
 3    with a date line, the presiding juror line, and a
 4    signature for each of you, except we need another
 5    signature line for our ninth juror.  So we will get that
 6    taken care of.
 7              MR. HIGGERSON:  Your Honor?
 8              THE COURT:  Yes?
 9              MR. HIGGERSON:  I'm sorry.  Just a technical
10    issue.  Can the record reflect that the parties renewed
11    their Rule 50 motions on the grounds already stated after
12    this exhibit was entered?
13              THE COURT:  Yes.
14              MR. HIGGERSON:  But before the jury got the
15    case?
16              THE COURT:  Yes, it so reflects.
17              MR. HIGGERSON:  Thank you.
18              THE COURT:  Closing, Ms. Cramer?
19              MS. CRAMER:  Thank you, Your Honor.  With your
20    permission, may I stand up here?
21              THE COURT:  You may.
22              MS. CRAMER:  May I proceed, Your Honor?
23              THE COURT:  Yes, you may.
24              MS. CRAMER:  Members of the jury, I want to
25    start my closing argument by thanking you for your time,
```

1   thanking you for your due diligence, and thanking you for

2   your attention this week.  I can promise you it has not

3   gone unnoticed by any of us.

4           And so, from my client to you, thank you.  Thank

5   you for staying late; thank you for taking notes; and

6   thank you for not just hearing, but listening to the

7   words that describe the terrible things that happened to

8   my client at Logan Correctional from 2016 and 2017, when

9   she was entrusted to the care of the three defendants in

10  this case.

11          We know it has been a difficult week.  I think

12  it's been difficult for most of us here.  The testimony

13  we've heard has been distressing.  A lot of the facts we

14  reviewed in this court are hard to hear.  But hearing

15  them is really important because, to hold somebody

16  accountable, they have to know and you have to know what

17  they've done.  They have to acknowledge.  They have to

18  accept.  They have to take some of the blame.

19          You have to do all of that before you can even

20  begin to think about an apology, which I think we all

21  noticed we did not hear from any of the defendants in

22  this courtroom, or their counsel, let alone

23  Defendant MacLeod, Defendant Richard MacLeod, who didn't

24  even have the courage to come to this court to sit in our

25  presence as we went through the details that we must look

1  at if we want to have any hope of holding our system and

2  our people who run that system, the individuals who run

3  it, the people who made choices, the people who now are

4  trying to point above and below and sideways and anywhere

5  else accountable.  You have to come to terms and it's

6  hard.  But the terror of it, with the ugliness of it, you

7  can't just wave it away with euphemisms, and you can't

8  just call it *some stuff*.  So, thank you.

9        At the very beginning of this case, my partner,

10  Ms. Sharkey, told you what you've now seen and you

11  understand, without a doubt, I'm sure, in a way I can say

12  that I never did before I had the privilege to represent

13  Ms. Nielsen.  There is a dangerous power imbalance in

14  prisons.  You heard it from multiple witnesses, including

15  world-renown experts in these spaces that deal with

16  places a lot of us hope to never go and a lot of us hope

17  to never see.

18        For my client and other prisoners like her at

19  Logan and all female prisons, they have to live in this

20  dangerous environment.  The prison staff, who control

21  their movements, who can punish them, who can summon them

22  to be with them in any space, at any time, at least at

23  Logan under Defendants Burke and Sexton, can't escape

24  that place.  It's where you live and the staff have total

25  control.  You can't go home.  And that's where my client

1  was in 2016 and 2017.  That's where she had to be.

2         That's where they put her when she had a

3  daughter who's only six years old, a daughter that you

4  heard her testify is one of the most important things in

5  her life, if not the most important thing.  That daughter

6  was known.  That daughter was important to my client, and

7  that daughter, whose communication she was allowed to

8  have with her daughter, the one she fought for, the one

9  that she went to court after her partner tried to make

10  claims and make sure that they couldn't talk because she

11  was at Logan; the one she spent months and months -- I

12  think she called herself earlier today *lucky* to be one of

13  the few women who was able to access the services that

14  were supposed to be provided so that she could get a

15  court order and she could guarantee her right to her

16  daughter, to those phone calls.  It was her lifeline to

17  the outside world.

18         And while my client was trying so hard to hold

19  onto and to strengthen that lifeline with her then

20  six-year-old daughter, Brianna, who we heard a little bit

21  about today -- who, fortunately, has grown up to be a

22  lovely teenage girl, who Andrea talks to now every day

23  now that she can -- what we heard unequivocally in this

24  case is that Defendant MacLeod, he was in a position to

25  manipulate, to try to use that lifeline against Andrea to

1    control her, to threaten her, and to silence her.

2             Don't think we have any doubt that's what

3    happened.  And as you heard the Judge just read, those

4    facts as to Defendant MacLeod, they are stipulated.

5    That's a legal word for admitted.  We all know what

6    stipulated means.  He admits it.  He can't come here to

7    face her, and he can't come here to face you.

8             And because Defendant MacLeod understood he was

9    a Vocational Counselor -- he taught Healthy Relationship

10   classes in the Women and Family Services Division of all

11   things -- because he understood how important those

12   relationships are, especially to mothers who are

13   incarcerated, he wielded that power callously and openly

14   and he used his authority and his control over these

15   women to commit repeated sexual assault of Andrea and at

16   least three other women that we know of, over months and

17   months and months.

18            And this repeated, ongoing, credible threat of

19   sexual assault, it was happening right under the nose,

20   right out in the open, in some ways, of the very people

21   who tried to come here today and yesterday and the day

22   before and look you in the eye and say that they

23   understood that their most important job at Logan was to

24   protect my client and women like her.  It was to prevent,

25   they said, ongoing sexual abuse.

1             And if it was to happen, if they were to hear

2     about it, even a whisper -- we heard a lot about the

3     whisper network at Logan.  And we know that those rumors

4     at Logan, according to Defendant Sexton, who would know,

5     were more often than not true.  They heard one of those

6     whispers.  They were obligated under the law, which they

7     knew, under their conscience -- which who knows what's

8     happening there -- and under common sense to take

9     immediate, immediate action to do something to stop it.

10            We talked about the law and we talked about it

11    in opening, but that actually understates the gravity of

12    the right that has been violated here for my client.

13    Yes, it's true.  There is a specific law, a Federal law,

14    all prisons -- we heard Defendant Sexton say it -- state,

15    local, federal prisons are required to follow, and that's

16    PREA.

17            You guys know a lot about PREA.  I'm not going

18    to belabor the point, but it is a special law that

19    Congress passed in 2003.  It has an unambiguous title,

20    the Prison Rape Elimination Act, and an unambiguous

21    purpose.  And the purpose of PREA, both of these

22    defendants know and admit, was to prevent violations of

23    women's constitutional right, the Eighth Amendment.  It's

24    in the Bill of Rights.

25            From the very beginning of this country's

 1   founding, we knew as Americans that it's important to be

 2   free from cruel and unusual punishment, and we know no

 3   one has tried to even argue otherwise because how could

 4   you?  We know that sexual assault, in that power

 5   imbalance, in that dangerous environment, we know that is

 6   a clear and unambiguous Eighth Amendment violation.  And

 7   all the defendants in this case, Defendant MacLeod,

 8   Defendant Burke, Defendant Sexton, they knew that, too.

 9          Two of those three defendants came to court and

10   they tried to say, with a straight face, we did our best.

11   I did what I thought made sense.

12          The man who didn't even bother to come to court,

13   Defendant Richard MacLeod, you still have the ability to

14   hold him accountable.  You will see on your verdict form,

15   he's there.  You need to consider his conduct when you

16   are thinking about injuries to my client, and you need to

17   think about the conduct of the individuals who were

18   charged with protecting Andrea from him when you think

19   about that fact, too.

20          Defendant Sexton actually admitted to me that he

21   had concluded, based on all the information we know now,

22   like I think any reasonable person would,

23   Defendant MacLeod probably was some form of sexual

24   predator.  I submit that's pretty clear.  At least

25   Defendant Sexton agrees.

1          But what the defendants, Warden Burke,

2    Lieutenant Sexton, what they chose to do is they chose to

3    come here and they tried to say, sure, we had a dangerous

4    sexual predator in our midst.  Sure, we knew for a fact

5    that that dangerous sexual predator had means and motive

6    and opportunity to assault women under our care, the

7    women we told on day one, Defendant Burke told on day

8    one, -- she said it in writing:  -- my promise to you is

9    to keep you safe.

10          They say, no, no, no, you have that totally

11   wrong.  We have no authority here.  There were people

12   above us.  They could do something.  We couldn't do

13   anything unless somebody came forward and actually

14   reported it.  We know that's not true.  We know that's

15   not true.

16          You heard Assistant Warden Wilson, who they

17   called in their case.  Their witness, not ours.  She came

18   here, she told you that the reason Defendant MacLeod is a

19   free man, never been criminally charged, walking around

20   today, no longer works with our incarcerated women,

21   that's true.  He's now working with our abused children

22   in this state.  That man, they say you couldn't have

23   stopped him.  We couldn't have made sure that he was held

24   accountable.

25          But, Ms. Wilson -- excuse me, Assistant Warden

1    Wilson, by video testimony today in their case, told you

2    that the reason nothing happened was because the

3    higher-ups, who weren't at Logan day-to-day, who couldn't

4    understand that dangerous toxic culture that was

5    pervasive and rampant, they concluded they didn't have

6    enough evidence to do something about it.

7              Now we can talk about whether or not that's true

8    at all.  I don't -- honestly, I don't know and I don't

9    care.  Because we know why there was no evidence; don't

10   we?  We know exactly why.  It is because of the

11   deliberate, the knowing actions of Defendants Burke and

12   Sexton.

13             Ms. Sharkey told you at the opening of this case

14   that some parts of the case are going to be easy and that

15   the easiest part of this case would be liability from

16   MacLeod because he admitted.  But I would submit, members

17   of the jury, that for all the defendants, this is easy.

18   Plaintiff has more than met her burden to prove that it

19   is more likely than not that these defendants who sit

20   here today violated her Eighth Amendment rights.  They

21   did it deliberately.  They did it recklessly.  They did

22   it through their choices.

23             I think we can all agree with that, but I can

24   tell you this:  My client has been failed before, and I

25   am not about to get up here and fail her again.  So even

 1  though I think, I suspect that you agree that it is

 2  crystal-clear, clear as a bell that these individual

 3  defendants must be held responsible and liable, I decided

 4  to take the evidence -- and I want to be very clear:

 5  It's not just me.

 6          You've probably noticed, we have a very large

 7  team.  There are a lot of people who care about

 8  Ms. Nielsen.  You met a lot of them.

 9          But leaving that aside, I would submit that it's

10  easy and clear, but just in case it's not, we went

11  through what happened this week, and we want to show you

12  now the evidence that supports each and every element of

13  those jury instructions Judge Myerscough just read to

14  you.  So, let's go.

15          One thing that you saw that I want you to think

16  about with each and every element, each and every claim

17  we talk about here in this court, is who these people are

18  and what you saw them do.  We saw that both of these

19  defendants had a public face and they had a private face.

20          And I'd submit, ladies and gentlemen of the

21  jury, that, this week, we finally cracked through that

22  two-faced approach.  We got into seeing that private

23  face, what they do when they think no one can see them,

24  what they do when they think no one is looking.

25          So let's talk about Defendant Burke's public

1   face for a minute.  And, you know, before we get into

2   detail, I want to point out something because you guys

3   have been such diligent note-takers.  And what's going to

4   happen when I'm done, defense is done, is you're going to

5   go in the back and deliberate and you're going to get a

6   binder.  You're going to get all of the documents that

7   we, as the plaintiffs, moved into evidence this week, the

8   witnesses to support our claim, to prove our client's

9   case.

10          And so, to help you, if you want to follow

11  along, we went through on the slides and we added the

12  number.  We -- that's what this is, this little

13  designation, that's the exhibit number.  So if there is a

14  document that I show you that you think, you know, *I'd*

15  *really like to take another look at that back in the jury*

16  *room*, we wanted to make sure you had the tools to do

17  that.

18          But let's get back to Defendant Burke's public

19  face.  She held herself out then, she holds herself out

20  now as some kind of PREA crusader.  We looked at what she

21  writes on the website where they're seeking donations to

22  go against prison reform.  She said she's

23  gender-responsive on this website.  She claims she's

24  trauma-informed.

25          And we also know from Ms. Wilson's testimony --

 1   apologies -- Assistant Warden Wilson's testimony that we

 2   saw today that they showed you, we know that she was so

 3   good at her public face, that even an assistant warden,

 4   who, when asked about the culture at Logan and at

 5   facilities throughout our country that have incarcerated

 6   women, started to cry with almost no prompting.  Very

 7   simple question.  We know that woman who worked with

 8   Defendant Burke all the time, was her assistant warden,

 9   even she believed Defendant Burke's public face was her

10   only one.  But we know the truth because we have the

11   evidence.

12          When Ms. Sharkey was questioning Ms. Burke --

13   and I have the whole exchange on here.  I don't want to

14   seem like I'm being misleading at all, but I'm just going

15   to read the highlighted parts because I have limited

16   time.  So I hope that's okay with you.  Feel free to read

17   it all.

18          But what she said in this courtroom today while

19   she was under oath is the following:

20          "QUESTION:  In this courtroom today, in

21   answering questions that counsel just asked you, that was

22   your public face, correct?"

23          And she said, "I guess that would be public."

24          "QUESTION:  When no one was watching in December

25   of 2016, you authorized a plan that you knew violated

1  PREA law, correct?  When no one was watching, my client

2  was put in a position to be revictimized.  It took years

3  of litigating this case to uncover what had happened in

4  private to my client, correct?

5         "ANSWER:  Correct."

6         Let's talk about Defendant Sexton's public and

7  private face.  When I was questioning Defendant Sexton,

8  he told me that, of course, women would be comfortable

9  coming to him with their issues.  And I asked him, *When*

10 *you talk about the bad culture at Logan, part of that is*

11 *being disrespectful towards people in custody.  Did you*

12 *ever do that*?

13        And he said, *No.  I tried to be as respectful as*

14 *I could*, but we know what was actually happening because

15 we saw the e-mail he thought we'd never see.

16        The e-mail from May 2017, months, months after

17 they knew that my client was being victimized with a

18 credible detailed report, he wrote to his then

19 girlfriend, now wife, "I just got a call that an inmate

20 is calling another PREA, lol," laughing out loud.  "Good

21 luck, stupid little bitch."

22        We also heard Defendant Sexton explain a little

23 bit more about this case, that this prisoner had

24 contended, told someone that she had semen-stained

25 clothing in her possession.  And when she didn't

immediately produce it in this dangerous culture to the
staff, when she asked to talk to someone higher up, she
was actually disciplined.  We heard what *discipline*
means.  It can mean losing your privileges.  It can mean
being put in segregation.

          We also talked about the tone from the top of
these individuals.  And Defendant Burke said, when we
questioned her about tone from the top under her
leadership, Ms. Sharkey asked, *You think that's a
laughing matter, don't you*?

          And because she'd done it in front of you, she
had to admit, *Yeah, I laughed.*

          Likewise, I asked Defendant Sexton the
following:

          *Your rank and your role obligated you to set a
good example, fair?*

          *Yes.*

          *Do you think you lived up to that responsibility
while you were at Logan, sir?*

          *I don't know.*

          I think we know.  He still doesn't.

          The only reason that we're even going to be here
to walk through each and every element and walk through
that jury form, to walk through what we have proven and
what you must do now under the law, given the evidence in

 1  this case; the only reason we know any of that is because

 2  of three brave women:  Ms. Hicks, Andrea's roommate, who

 3  had the courage to go to Defendant Sexton, who thinks

 4  that there's a culture of lying among the prisoners and

 5  tell him what was going on.

 6          In December 2016, you heard them both admit she

 7  gave a detailed, credible report of ongoing sexual abuse.

 8  Ms. Hicks did that.  When she knew they should have seen,

 9  when she saw they didn't care, she still did something.

10  That put her at risk in the culture of Logan.  She did it

11  anyway.

12          The second brave woman that brings us to today

13  is Correctional Officer Honea.  That Correctional

14  Officer, Ms. Honea, she endured months of sexual

15  harassment from Defendant MacLeod.  He told her he would

16  stalk her.  He told her he might already know where she

17  lives.  This is a dangerous man.  He did this for weeks.

18  There were multiple incidents.

19          And yet, we heard from Ms. Wilson, Assistant

20  Warden Wilson, today that, even still, after months with

21  the most -- I would say the most empathetic person we've

22  seen in all the IDOC culture by a long shot; when this

23  Officer Honea came to Ms. Wilson to report the abuse and

24  the sexual harassment, even she, a staff member, someone

25  who could go home, she was scared.  And she did it

1    anyway.

2          But the third brave woman I really think we're

3    here to talk about, the one that really matters, is my

4    client, Ms. Nielsen.  We've talked about her as

5    Ms. Nielsen all week and that's in part because she

6    wasn't in the room.  We didn't want her to be here to

7    hear about this.  She doesn't need to go through this

8    again, but she's doing it.  She's doing it.

9          You heard about Ms. Nielsen, but you guys got to

10   meet Andrea today and Andrea is exceptional.  She gets

11   herself out of that situation, she gets out of her

12   incarcerated time.  She's a model inmate, we've heard,

13   just doing her time, just trying to keep her head down

14   and get out of there.

15         And when it could be all behind her, what does

16   she do?  She files this case.  Just think about that.

17   She could try to bury it down deep.  That's what I would

18   do.  It's not what she does.

19         When the State Institution, when the Illinois

20   Department of Corrections, where the people who are in

21   charge of her safety, of her protection, fail her; when

22   the State Police tell the State Prosecutor's Office about

23   this and the State Prosecutor's Office decides not to

24   bring a criminal charge against Defendant MacLeod because

25   there wasn't enough evidence -- again, we know why -- did

1  she give up?  No.  She turned around and she went to a

2  different place, the only place left to her to get

3  justice.  She came here to Federal Court.  She came here

4  to ask you to hold them accountable.  She can't do it on

5  her own.

6          You're going to get this jury form.  You've seen

7  it.  And I just want to walk through all the reasons why

8  you should fill it out the way that I'm going to talk

9  about right now.

10         There's no question, none whatsoever, but even

11  if there were, it doesn't matter.  We just have to show

12  it's more likely than not.  That's our burden, more

13  likely than not, to show that defendants are liable here.

14         We already talked about Defendant MacLeod.  He

15  admits it, stipulated, didn't bother to come, didn't

16  bother to listen, couldn't even face you today, couldn't

17  face her.

18         But we're going to talk next about

19  Defendant Burke, then we're going to walk through those

20  elements for Defendant Sexton.  And I'm going to go slide

21  by slide, slowly, over those jury instructions that just

22  flew by so fast because I want to be sure that we do not

23  miss a thing.

24         You heard from the Judge that to prove her

25  claim, Ms. Nielsen has to show there was a strong

1  likelihood that Plaintiff would be seriously harmed as a

2  result of assault or assaults.  We're going to talk about

3  Defendant Burke for the next several slides.  There's

4  four elements.  I want to touch on them all pretty

5  briefly.  I don't think any of this is news, but I want

6  to do my job so you can do yours.

7           Defendant Burke knew that Defendant Sexton's

8  ridiculous jump-in-the-ceiling approach had the potential

9  to revictimize Ms. Nielsen.  She said, yes, when we asked

10 her about it.  She also said, yes, when we asked if she

11 knew that.  She authorized it anyway.

12          Defendant Burke's own words in this court tell

13 the whole story, but so do her actions and failure to act

14 in realtime.  And you know like I know that actions speak

15 louder than words, but I'd encourage you to look at both.

16          The next element that we're required to prove is

17 that the defendant was aware that -- these defendants

18 were aware that Defendant MacLeod would seriously harm a

19 prisoner in Andrea's situation, or they strongly

20 suspected it, but refused to determine whether those

21 facts were true.  And you may infer this -- and this

22 seems like just common sense from the fact that the risk

23 was obvious.  We know there was no more obvious risk at

24 Logan than continued rampant sexual abuse.  You heard it

25 time and again.  You heard it from both these defendants.

1  You heard it from Assistant Warden Wilson in their case.

2  This was a problem.  It was obvious.

3         But let me just show you a couple times -- I

4  want to call out.  Defendant Sexton said -- I asked him,

5  *I should just believe* -- and this is after the Hicks

6  Report, right?  This is after he knows he can call my

7  client -- Defendant MacLeod can call her to the

8  Vocational Center, where there's no cameras, a sexual

9  hotspot.  He told me, day or night, anytime.

10         I asked him, "I should just believe that you

11  were trying to catch my client being raped and jump out

12  and be some hero?  But you also say, don't you,

13  Defendant Sexton, that you took these steps with the

14  expressed knowledge and the expressed approval of

15  Defendant Burke, right?"

16         He said, "Yes."

17         We wanted to be positive, so we asked the same

18  type of question to Defendant Burke.  And what she said

19  was, "Oh, yes, he asked for my authorization and I

20  approved it."  The gender-informed, trauma-informed -- I

21  don't even know all these words she claims in her public

22  face.

23         Third element -- we've proven on two -- the

24  defendant under consideration consciously failed to take

25  reasonable measures to prevent the assault or assaults.

1  We know this from the ceiling, but we know it from other

2  things.  We know it from the non-investigation that they

3  try to justify today.  But, arguably, with

4  Defendant Burke, the thing I found shocking most of all

5  was this, this admission.  But you know there are others.

6  Let's look at this one.

7        "QUESTION:  You, as the leader of Logan

8  Correctional Center, allowed Ms. Nielsen to be summoned

9  to Defendant MacLeod at any time he pleased, despite

10  knowing he would revictimize her?

11        "ANSWER:  I allowed him to continue in his role,

12  yes."

13        Fourth element, Plaintiff would not have been

14  harmed or would have suffered less harm if the defendant

15  under consideration would have taken reasonable measures.

16  I think we can all agree nobody took reasonable measures

17  here.

18        Just in case we're unclear, we asked her,

19  Defendant Burke:

20        "QUESTION:  You could have placed protection

21  such that my client and other victims of

22  Defendant MacLeod's were not able to visit him

23  one-on-one, you could have done that without future or

24  further resources, right?"

25        And she said, "Yes."

1          "And you didn't do it, correct?"

2          "Correct."

3          We brought in a renowned PREA expert, one of the

4    authors of the law itself, because we thought this might

5    be difficult to explain to you.  We started our case with

6    some long explanation from this highly credentialed law

7    professor, who took time out of her busy schedule to come

8    here.  She doesn't live here.  She lives in DC.  She came

9    here and she started our case because we were worried

10   that it might not be open and obvious how dangerous this

11   situation was for our client.

12          THE COURT:  Counsel, your time has expired.

13          MS. CRAMER:  Oh, apologies.

14          THE COURT:  Do you think you could wrap up?

15          MS. CRAMER:  Sure.  I'll just jump ahead.  I get

16   passionate about it, lose time.  We didn't even get to

17   Defendant Sexton.

18          And I would argue -- I'm going to tell you in a

19   second -- I'm sorry.  I can do it.

20          How do I do it, though?

21          MR. YOUNG:  Just number enter.

22          MS. CRAMER:  Oh, I don't know that.

23          I was going to talk a lot about what they knew

24   and how they knew it and why we know that, but I actually

25   want to go right here.

1          How do I enter?

2          Guys, I'm sorry.  It's been a long week.

3          Yeah.  Thank you.  No, no.  This one.  Thank

4   you.

5          I submit to you, and I apologize, I really did

6   want to walk through.  I had so many notes.  I only had

7   45 minutes.  There's too much to cover, but I wanted to

8   make sure to cover this because this is your job.

9          Compensatory damages in this case are to

10  compensate my client for the harms that she suffered at

11  the hand of these three defendants.  And we brought in

12  another world-renowned expert, and we also showed you

13  testimony from our client so you could see her, so you

14  could meet her, and from another victim who we anonymized

15  because it's so important to understand the deep and

16  lasting trauma this leaves for the rest of your life.

17          And Dr. Burgess told you there were at least six

18  buckets that you need to be thinking about when you're

19  thinking about compensating Andrea's compensatory

20  damages.  Those buckets are listed here, and I would say

21  that it feels impossible to put a number on what these

22  women have gone through.  It was torture, it was hell.

23  We've heard the defendants admit it.

24          So I would argue that for each of these buckets:

25  The physical assault, the fear of retaliation,

 1   relationship, institutional betrayal, trauma, loss of

 2   opportunity after transfer, each are worth at least

 3   $2 million each.  And add those buckets together and you

 4   get your total, which is lasting psychological trauma.

 5   But we know we can't just add like that because, trauma,

 6   as Dr. Burgess told us, compounds.

 7          So we would suggest, based on all the testimony

 8   and evidence you've seen, the evidence I couldn't even

 9   get through as to one defendant, evidence you know

10   because you've been paying close attention, that

11   compensatory damages, $10 to $15 million for my client,

12   are not only warranted, they're necessary.

13          Your Honor, I can jump back up -- I know --

14   reserve times.  I can do punitives after or I could

15   quickly address it now.

16          THE COURT:  Go ahead.

17          MS. CRAMER:  I'm so sorry.

18          The law also allows us to -- and you'll see this

19   in your jury instructions --

20          Thank you, Mr. Young

21          -- we can send a message.  That's what punitive

22   damages are for.  It's their whole point.

23          These people are here, one of our defendants is

24   not, but all three of those individuals need to be held

25   individually responsible because they remain, to this

1   date, unrepentant.  They've learned nothing.  All three

2   of our defendants have made close to or more than six

3   figures every year since 2016.

4           Defendant MacLeod was allowed to work with

5   abused children because people don't know what he is.

6   Defendant Burke gives advice to other wardens about what

7   to do and how to do it right when you're dealing with

8   abused and incarcerated women.  And Defendant Sexton has

9   been promoted.  He now oversees other investigators, the

10  man who jumped in the ceiling, wanted to be a hero,

11  wanted to shout from the rafters instead of doing simple,

12  common sense steps to keep my client safe.

13          So I'm going to just leave that number up to

14  you.  You tell me -- you've seen it -- what number you

15  think is appropriate to send that message.

16          And defense counsel has said, time and time

17  again, that IDOC, the system, they're not on trial here.

18  They're not a defendant.  He's absolutely right.  They're

19  not.  We want to hold these individuals liable for their

20  choices.  But if you think the system is not watching,

21  they're not going to take a clear message from what you

22  do here, you need to think again.

23          Nothing sends a message like holding the

24  individuals in the system who had important jobs to

25  protect and prevent sexual abuse of powerless women who

1   are under their custody and control, who live in fear

2   from ongoing sexual assault, and they can hear that

3   message from you.

4           I apologize for going over my time, Your Honor.

5           Thank you so much for your service.

6           THE COURT:  Thank you, Ms. Cramer.

7           Ms. Powell, closing?

8           MS. POWELL:  Thank you, Your Honor.  I'm going

9   to move the television, too.  Can we move it?

10          COURTROOM DEPUTY:  Yep.

11          THE COURT:  Are you going to use the ELMO?

12          MS. POWELL:  I'm just going to use my voice,

13  Judge.

14          Ladies and gentlemen of the jury, Ms. Cramer is

15  absolutely right.  I'm going to remind you, the Illinois

16  Department of Corrections is not on trial.  And day after

17  day, throughout this week, you heard what the Illinois

18  Department of Corrections did wrong.  You heard their

19  expert, that they -- their world-renowned expert that

20  they keep talking about talk about what IDOC did wrong.

21  They kept using *they*.  The IDOC is not on trial.  Logan

22  Correctional Center is not a defendant in this case.

23          You are not here to decide whether or not Logan

24  Correctional Center is a toxic culture.  The question for

25  you here today is whether or not my clients,

1    Margaret Burke and Todd Sexton, violated the plaintiff's

2    constitutional rights, whether they subjected her to

3    cruel and unusual punishment by failing to protect her

4    from the actions of Richard MacLeod.

5         As you go back to deliberate, I ask that you

6    stay focused on the issues that are before you today and

7    don't allow yourself to be distracted by the efforts to

8    cloud the issues this week.  After the last five days,

9    there's been a large focus on the toxic culture of Logan

10   Correctional Center and testimony about the terrible

11   things that Richard MacLeod did to Andrea Nielsen and I'm

12   not excusing those.  But Margaret Burke and Todd Sexton

13   are not responsible for those things.  You cannot impute

14   that responsibility onto my clients simply because of the

15   roles that they filled at the facility.

16        You heard plaintiff's counsel say it several

17   times that they've been fighting this case for years,

18   that Andrea has been fighting this case for years.  So

19   have my clients.  My clients have been fighting for years

20   to defend their name, to defend the actions that they

21   took, to defend the good work that they did at Logan

22   Correctional Center.

23        They are two of the people that fought hardest

24   to make changes in that facility.  Margaret Burke, you've

25   heard her.  She came to Logan when it was transitioning

1   from a male facility to a female facility, and it was a

2   hard transition.  She told you that, that some of the

3   women didn't want to move, the staff didn't want females

4   in the facility, that the administration fought her every

5   step of the way.  They didn't provide the tools and the

6   resources necessary to make that transition successful,

7   and as a result, there was chaos.  But despite that

8   chaos, Maggie Burke did everything in her power to make

9   things better.

10          You heard her tell you that she first spoke to

11  the women.  She listened to them, she gave them an

12  opportunity to be heard.  She made every effort to make

13  them feel comfortable coming to her.  She gave them a

14  direct line of communication to her and her alone to

15  report anything that was going on in that facility.

16          She did that because she saw a need for it.  She

17  listened to their needs and their wants.  She tried to

18  provide the things that they identified as lacking.  And

19  even before she became warden in 2016, she started making

20  those efforts.

21          She was the one that brought in the outside

22  agency to do the GIPA Report, to do the assessment.  And

23  she told you that she did it because she wanted

24  supporting information so that when she went to her boss,

25  the people that controlled the money, the people that

1   have the power of the purse; she wanted support from

2   someone else to justify what she was asking them for.

3        She changed the policy surrounding PREA, and,

4   immediately, as soon as she could, eliminated the

5   practice of sending women to segregation.  And she did so

6   because she wanted to encourage reporting.

7        And you saw, yeah, those numbers went up because

8   Maggie Burke encouraged people to report it.  And you

9   heard the testimony about those numbers, and I submit to

10  you that you cannot simply look at the number of

11  allegations that are made and say Logan has a problem

12  because there are unfounded reports, there are

13  unsubstantiated reports, and there's substantiated

14  reports.  There is a difference.  Allegations don't mean

15  events, but allegations means an environment that

16  encourages reporting.

17       She educated everyone, staff and inmates, about

18  those policy changes, on what to do and what not to do

19  when a PREA complaint came in, on how to report a PREA,

20  on what even was a PREA complaint.  And she continued

21  those efforts to educate and make positive changes the

22  entire time that she was the warden at Logan.  You heard

23  from Angel Wilson that Maggie Burke was leading the

24  charge.

25       That GIPA Report, Mr. Higgerson read it.  On two

1   separate occasions, the GIPA Report referred to a small

2   but mighty team in Women and Family Services, led by

3   Maggie Burke, making the changes that were necessary.

4           I also want to thank you for your time this

5   week.  I know that you guys have had long days and you've

6   paid diligent attention to the testimony that you have

7   been presented and exhibits that have been shown, and I

8   want to thank you for that as well and extend the

9   gratitude that Ms. Cramer already expressed.

10          But the evidence in this case consists of the

11  testimony you heard from the witnesses from that witness

12  stand, the deposition testimony, and the exhibits that

13  you have seen, and those are the things that you should

14  consider when you go back into deliberation.  Take that

15  evidence and the law that the Judge just gave you, and

16  it's your role to decide the case; no one else's.

17          The lawyers' opening statements, our closing

18  arguments, our questions, the commentary you've heard

19  throughout this week by the lawyers, none of that is

20  evidence.  The demonstrative exhibits you have seen,

21  those are not evidence either.

22          I'm going to take you back to the beginning as

23  well to that first witness that you saw, Brenda Smith.

24  She had a lot of opinion-based information that she had

25  read in the record.  She has no first-hand knowledge

1  about the facts that she definitively testified happened

2  or didn't happen.  Her testimony is all based on the

3  statements of other people, primarily the plaintiff's

4  statements, which she categorically and unequivocally

5  accepted, as you heard, and the records and the reports

6  created by other people because that's how expert

7  testimony works.  She doesn't have the first-hand

8  knowledge.

9        But Ms. Smith wants to come in and say, based on

10  everything that I have read, each of these defendants is

11  liable.  But, ladies and gentlemen, that's your decision

12  to make, not hers.  You do not have to adopt her opinion.

13  You get to make that decision.  If you had to adopt her

14  opinion, we could have been done on Monday.

15        And I ask you to take a look at her testimony

16  because when she was reading from her pre-prepared

17  slides, she had an answer for everything.  But every time

18  Mr. Higgerson asked her a question about any of the

19  things that she identified, she would shift and go back

20  to a different topic that she wanted to give a better

21  answer to.

22        You heard her say, at the end, when plaintiff's

23  counsel was questioning her again, would any of those

24  things that Mr. Higgerson talked about change your

25  opinion?  And she repeatedly said no.  And I submit to

1   you that nothing would have changed her opinion in this

2   case because she was paid $200,000 to come here and give

3   that opinion to you.  Maggie Burke and Todd Sexton could

4   have done everything that she suggested, and if an

5   individual at Logan had been sexually assaulted while

6   they were employed there, she would have said that they

7   were responsible.

8          Like I said, Ms. Smith kept making generalized

9   statements about IDOC and *they* and she would tag my

10  clients into it without any evidence that they had any

11  involvement or that they had any control or that they had

12  the authority to do the things that she was suggesting

13  they do.  But it was her opinion that, well, they're in

14  charge, so they must have known about these things.  But,

15  ladies and gentlemen, that is not the standard and IDOC

16  is not on trial here.

17         Plaintiffs essentially presented two different

18  theories that they laid out for you, asking you to find

19  my clients liable, that they want you to believe that my

20  clients failed to protect her from the beginning, even

21  from the very first time that she was with

22  Counselor MacLeod in August of 2016, because of the

23  culture at Logan Correctional Center.  And they claim

24  that that is what allowed the sexual abuse to occur.  And

25  the second theory is for the period of time after

1   December of 2016, when the Hicks Report came in.

2           But, ladies and gentlemen, the plaintiff has

3   failed to prove either one of those theories and has

4   failed to prove that the defendants have violated her

5   constitutional rights.  You were instructed on the law as

6   to the elements that Plaintiff has to prove to succeed on

7   her claims.  Ms. Cramer went through them.  I won't go

8   through each and every one of them again, but I'm going

9   to hone in on a few of the words.

10          In the second step, that defendants under

11  consideration were aware that Defendant MacLeod would

12  seriously harm a prisoner in Plaintiff's situation or

13  strongly suspect that Plaintiff would be seriously

14  harmed, but refused to confirm it.  They did everything

15  they could to confirm that information that they were

16  given.  They tried to confirm it to gather more evidence.

17          Was his idea to get into the ceiling crazy?

18  Yes.  But he tried it because he wanted to do anything

19  possible to get the information that he needed to be able

20  to substantiate and corroborate that claim that was made

21  by Ms. Hicks.  And as soon as he realized that it wasn't

22  going to work, he shifted and he tried something else.

23  He did additional surveillance, trying to see if he could

24  catch him calling her over there at night.  He told you

25  he wasn't going to let her be sexually abused while he

 1  was watching.

 2          The law requires that you find the defendants

 3  consciously failed to take reasonable measures.  And you

 4  can look at how difficult it would have been for the

 5  defendants to take corrective action.

 6          So let's go back to that first theory, the

 7  generalized risk of harm of sexual assault because of the

 8  culture at Logan Correctional Center.  To put it simply,

 9  ladies and gentlemen, a generalized risk of harm, I

10  submit to you, is not sufficient to establish a

11  constitutional violation.  A generalized risk of harm is

12  not sufficient to prove that my clients were objectively

13  aware that Defendant MacLeod would sexually assault the

14  plaintiff or any other inmate at Logan.

15          There was a lot of talk about e-mails and what

16  those meant.  They paraded in e-mails that Todd Sexton

17  had written to his significant other, to other

18  individuals that he was friends with in the facility, and

19  he said he takes full accountability for the fact that

20  those e-mails were unprofessional and he shouldn't have

21  made those statements.  But to say that that shows that

22  he was part of the toxic culture that was engaging in

23  rampant sexual misconduct, not a single one of those

24  e-mails said that he was meeting up with anybody to

25  engage in sexual conduct at the facility.  He told you

1  that he's never done that.

2          Should he have shared the PREA information with

3  his significant other?  No.  And he admits that.  But it

4  doesn't mean that he doesn't take PREA investigations

5  seriously.

6          Should he have called an inmate out of her name?

7  Should he have called her a *stupid little bitch*?  No.

8  And he admits that.  But he was venting to his

9  significant other about an individual who had filed

10  multiple, unfounded PREA allegations and had just filed a

11  false allegation against him.  It doesn't mean he

12  violated the plaintiff's rights here.

13          We heard a lot about Mr. MacLeod's e-mails and

14  how, somehow, that that means they should have known that

15  he was a sexual predator.  First of all, you heard that

16  they didn't have access to these e-mails, that they

17  couldn't have pulled them.  They didn't have a

18  justification to do so.  And I submit to you that

19  flirtatious e-mails between consenting adults,

20  co-workers, is not a sign that someone is a sexual

21  predator or someone is going to sexually assault an

22  inmate that they are charged with overseeing.

23          You heard testimony about the means, motive,

24  opportunity theory, and how that points to the fact that

25  Defendant MacLeod could pull over a female at any given

1  time and that that -- they obviously should have known

2  that that put them at risk for sexual abuse.  You heard

3  that inmates had these one-on-one meetings with

4  counselors for various reasons, including to have private

5  phone calls with their children, but yet they want to

6  take away their privacy of those phone calls and the

7  privacy of those meetings with their counselors.  And to

8  say that having a one-on-one meeting puts you at risk for

9  sexual abuse and that they should know that that puts you

10  at risk for sexual abuse, would lead to the absurd result

11  that every single individual that is employed at the

12  Illinois Department of Corrections should be seen as a

13  sexual predator anytime that they are with an inmate they

14  are charged with counseling.

15          You heard testimony about the type of person

16  that Richard MacLeod was.  He was rude and arrogant.  But

17  you also heard Defendant Sexton say that none of that

18  meant that he was a sexual predator.  None of that would

19  have given an obvious sign that he was going to sexually

20  assault a prisoner.

21          Now let's turn to the December '16 Hicks Report.

22  You heard -- how many times? -- it was a detailed,

23  credible report, followed by the implication that the

24  defendants did nothing in response to that report, but

25  that is just patent false.  So let's look at what the

1  defendants did do in response to the December 2016 Hicks

2  Report.

3         When Mr. Sexton got that report, he documented

4  that report.  He documented the information that was

5  given to him, and he wrote down everything that Ms. Hicks

6  told him.  He immediately took all that information to

7  his chain of command, as he is charged with doing, to the

8  warden and to his deputy commander.

9         And with the information that Ms. Hicks

10  provided, External Investigations told him, *you need*

11  *more.  Try to get more evidence and let us know what you*

12  *find*.  He didn't ignore that report.  He did the exact

13  opposite.  He tried to find evidence.

14         Plaintiff's focus on the PREA directives to show

15  what Defendant Sexton didn't do only serves to confuse

16  you because the Judge told you that violation of PREA is

17  not the standard here.  It's not about whether or not he

18  followed directives of PREA.  It's not about whether or

19  not he followed the directives of the Illinois Department

20  of Corrections.

21         Let's talk about what Defendant Sexton knew from

22  the Hicks Report.  He knew that there was a report of

23  custodial sexual misconduct by Richard MacLeod against

24  Andrea Nielsen.  So he did what any investigator would do

25  with a third-party report and he tried to corroborate it,

1  tried to gather additional evidence.  He even went to

2  Plaintiff, a short time after, and he tried to open the

3  lines of communication.  When she was in the IA Office

4  reporting a separate PREA, he tried to see if he could

5  get any information from her.

6          He said, *hey, is anything going on with staff*?

7  And he's not going to interrogate her.  He told you why

8  he didn't go to her and say, hey, is something going on

9  with Richard MacLeod?  Because, as Monica Strandberg

10  said, you don't want to let everything out there until

11  you know what you've got on your hands.  And Ms. Nielsen

12  said nothing.

13          Now, let me make this crystal-clear that the

14  defendants are not excusing Defendant MacLeod's conduct.

15  What we now know that he was doing, that's inexcusable,

16  and you should hold him accountable for that.  Defendants

17  are also not blaming Ms. Nielsen for her sexual abuse.

18          Counsel kept asking Mr. Sexton, *Do you*

19  *understand why she wouldn't want to report*?  Of course.

20  Everyone understands why victims of sexual abuse don't

21  report them.  But when we are looking at a claim for

22  failure to protect, when they are trying to say, *you*

23  *didn't do enough to protect her when you knew she was in*

24  *danger*, the fact that she withheld the very information

25  that they needed in that moment for whatever reason she

1  had, undeniably, makes it more difficult for them to

2  investigate that claim.

3          She had the information he needed.  She didn't

4  tell Lieutenant Sexton, she didn't tell anybody else at

5  the facility.  And when she told her mom, she told her

6  mom not to tell anybody else.  *Don't go to the police*.

7  It's understandable that she was afraid, but that was the

8  key to corroborating the statement that they received.

9          And you heard that that credible, detailed

10 report that their credibility assessment on that changed,

11 that they had reason to believe that it was no longer

12 credible.  So now they have a questionably credible

13 statement; they have no corroborating evidence, despite

14 their efforts to investigate; and they have a victim who

15 will not confirm the abuse.

16         He took that report seriously.  He investigated

17 that report.  Could he have done things differently?

18 Sure.  And he told you that this week.  But best practice

19 is not the standard and negligence is not the standard.

20         Based on what Defendant Sexton had at that time,

21 hindsight's 20/20.  He could tell you all day long that

22 he wishes that he had done things differently, but based

23 on the information that he had at that time, he could not

24 make the speculative leap that Plaintiff wanted him to

25 make and say, *questionable report, but there's a toxic*

1 *culture, so this must be true.*

2          Ladies and gentlemen, I submit to you that the

3 conduct of my clients does not even rise to the level

4 needed to establish a constitutional violation occurred

5 and it most certainly does not rise to the level that

6 warrants punitive damages.

7          The Judge told you what is necessary, what the

8 plaintiff has to prove, in order for you to consider

9 punitive damages against my clients.  And Plaintiff must

10 prove by a preponderance of the evidence that defendants'

11 conduct was malicious or in reckless disregard to

12 Plaintiff's rights.  That is certainly not an accurate

13 description of what occurred here.  There has been no

14 evidence of malice and no evidence of reckless disregard.

15          Mr. Higgerson opened by telling you that this

16 case was about, what did they know, when did they know

17 it, what did they do, and why did they do it.  And they

18 talk about the reasonable measures and how that would

19 have made a difference.  But the reasonable measures that

20 they talk about, pulling call passes, you've heard that

21 there weren't any.  They don't have control over whether

22 or not he uses that call-pass system.

23          If he had searched for DNA in Ms. Fitzer's

24 office, you heard that there would not have been any

25 because the last event of abuse at that time had happened

1  six weeks prior.  If he had interviewed MacLeod at that

2  time, he would have denied it just like he denied it when

3  ISP interviewed him.  And when he went to Ms. Nielsen,

4  she told him nothing.

5          So when you look at those suggestions of what

6  they should have done and the other suggestions about

7  different policies and procedures that could go into

8  place and what they should have done about the culture, I

9  ask you to remember and ask yourself, could they have

10  done it?  Did they try?

11          You heard there is no try, and I submit to you

12  that is absolutely false.  An unsuccessful investigation

13  that doesn't uncover any evidence does not mean an

14  investigation did not occur.

15          There have been so many references to what we

16  know now, and like I said, hindsight is 20/20.

17  Defendant Burke and Defendant Sexton took the information

18  that was available to them at that time, that they knew

19  at that time, and took it to their chain of command and

20  followed directives.  They didn't ignore that

21  information; they tried to get more.  They tried to get

22  enough to do what they were finally able to do in August

23  of 2017, when they received confirmation of the abuse

24  from Ms. Nielsen.

25          They aren't responsible for the actions of

1   others.  They aren't responsible for External

2   Investigations, or ISP, or the State's Attorney and

3   whether or not they prosecuted this case.  And they can

4   only act on what they know from the information that they

5   receive.

6           I ask you that you consider all of the testimony

7   and the evidence that you have seen and heard here this

8   week and I ask that you find my clients did not violate

9   Ms. Nielsen's constitutional rights.

10          Thank you.

11          MS. CRAMER:  Your Honor?

12          THE COURT:  Thank you, Ms. Powell.

13          MS. CRAMER:  May we have a quick sidebar?

14          THE COURT:  Yes.

15               *(Sidebar at the bench.)*

16          MS. CRAMER:  Your Honor, Ms. Powell started by

17  talking about how much our experts were paid, and we were

18  barred by them from noting that we were donating our

19  firm's time and resources, so Ms. Nielsen is paying for

20  nothing.  We're here for justice.  She doesn't have the

21  money to pay $200,000 for an expert.  We had to go find

22  her donated clothes to wear to court.

23          I do not want the jury to be left with this

24  misimpression and she has opened the door.  So I would

25  like the permission of the Court to do a very short

1  statement, like, literally not even five minutes.  I know

2  I said I could do it in 45.

3          THE COURT:  Don't worry about that.

4          MS. POWELL:  That information is already in

5  evidence.

6          THE COURT:  Yes, it is in evidence.

7          MS. POWELL:  The evidence of the expert's being

8  paid?

9          MR. HIGGERSON:  The information about the

10  expert's in evidence, but the rest of this isn't.

11  Counsel shouldn't be testifying to the jury at this point

12  now in time.

13          MS. CRAMER:  I think the implication was clear,

14  Your Honor, that she paid an expert to lie about her

15  trauma.  She's paying no one.

16          MR. HIGGERSON:  It is standard practice to

17  question experts on how much they're paid and whether

18  that affects their opinion.  That does not open the door

19  to counsel testifying to things that have not been

20  provided in court.

21          MS. CRAMER:  Because you refused to let us bring

22  it up in opening after we asked.

23          THE COURT:  I will let you indicate in your

24  argument that your client's pro bono.

25          MS. CRAMER:  Okay.  Thank you.  And, Your Honor,

```
 1    I take it I should just make one statement at this time?

 2              THE COURT:  Mm-hmm, yeah.

 3                    (In open court; jury present.)

 4              MS. CRAMER:  So there's a lot I could say, but

 5    the Court has given me permission to clear up just one of

 6    the things that you just heard and that's this:  No one

 7    here is being paid by Ms. Nielsen.  My firm is doing this

 8    work pro bono.  Thank you.

 9              THE COURT:  Thank you, Counsel.

10              At this time, then, we'll give you the jury

11    instructions.  The evidence will be in shortly.  And

12    we'll allow you to deliberate.

13                    (Jury deliberations begin at 2:42 p.m. )

14                    (Officer sworn.)

15              THE COURT:  So, outside the presence of the

16    jury.

17              Could we have some white noise, please?

18              Counsel, I apologize if you misunderstood me.

19    Ms. Cramer, I was still going to give you five minutes

20    for your rebuttal.

21              MS. CRAMER:  Oh, I did misunderstand.  But

22    that's okay.  I'm fine with it.  I'm fine with it.  I

23    couldn't possibly -- it's probably for the best,

24    honestly.  I wouldn't have been able.

25              THE COURT:  All right.  I also think that there
```

 1   is sufficient evidence for admission of Plaintiff's

 2   Exhibit 272 on this record given authentication is

 3   admitted, but I'm concerned about what's in it.  I

 4   haven't had a chance to review it.

 5            MS. CRAMER:  Us either.

 6            THE COURT:  You didn't reference it in your

 7   closing.  So I'm going to not send it back to the jury.

 8            MS. CRAMER:  Okay.

 9            THE COURT:  And if sanctions are sought, -- this

10   is not a sanction -- you may seek that afterwards.

11            MS. CRAMER:  Okay.  Thank you.

12            THE COURT:  Would you look at the exhibits and

13   make sure that this is all you want to go back?

14            MR. HIGGERSON:  We did.

15            THE COURT:  You did already, Mr. Higgerson?

16            MS. STUPAR:  I did, Your Honor.

17            THE COURT:  You did, Ms. Stupar?

18            MS. STUPAR:  Yes.

19            THE COURT:  Okay.  272 is removed.

20            MR. HIGGERSON:  And our 17 and 18 are not in

21   there, right, Deputy?

22            COURTROOM DEPUTY:  Right.

23            MR. HIGGERSON:  Okay.

24            THE COURT:  Do you want to look?

25            MR. HIGGERSON:  I trust you.  I just wanted to

 1  make sure we're clear that those were the ones that were

 2  just part of our offer of proof.

 3                    *(Off-the-record discussion had.)*

 4                    *(Recess at 2:45 p.m.)*

 5                    *(In open court; jury absent.)*

 6          THE COURT:  Jury Question One is:  Can we get

 7  some Post-it notes?

 8          MS. SCHULT:  I have some, if they would like

 9  them.

10          THE COURT:  I think the Court can afford Post-it

11  notes still.

12                    *(Recess at 3:32 p.m.)*

13                    *(In open court; jury absent.)*

14          THE COURT:  Jury Deliberation Question Two:  Can

15  we get Burke and Sexton's deposition?  Can we get

16  Assistant Warden's transcript of video deposition?

17          So the whole deposition was not in evidence.

18          MS. SCHULT:  Right.

19          MR. HIGGERSON:  Right.

20          THE COURT:  Do you wish to send those segments

21  read back?

22          MS. SCHULT:  I don't know that we have that

23  available in writing.

24          MR. HIGGERSON:  Yeah.  They were just

25  highlighted, but the old stuff was still there.

1          MS. SCHULT:  Yeah.  Right.  So we don't have

2   that portion separated out.  It's just highlighted within

3   the deposition in its entirety.

4          THE COURT:  Did Mr. Taylor leave?

5          MS. SCHULT:  He's at the hotel.  I can make him

6   come back.

7          THE COURT:  What about -- do we have a written

8   transcript of Assistant Wardens'?

9          MS. SCHULT:  Well, that's Warden Wilson's

10  deposition, correct?

11         THE COURT:  I assume.

12         MS. SCHULT:  Yeah.  We have a full-written one,

13  but it has the entire three, four-hour deposition in it,

14  not just the segment.  I think we would object to having

15  that.

16         I think we would also object to having them have

17  Sexton's deposition, as that was not a part of evidence

18  at all.  But I can double-check with my co-counsel.

19         THE COURT:  Okay.  What do you want me to do?

20         MR. HIGGERSON:  Yeah, if those weren't already

21  in evidence, I think, usually, we just tell them to rely

22  on the information they already have.

23         THE COURT:  So go ahead and check and see.  Do

24  you want to check with Ms. Powell?

25         MR. HIGGERSON:  She's not back yet, so...

1              *(Off-the-record discussion had.)*

2          MS. SCHULT:  Your Honor, in consulting with my

3    co-counsels, they agree with me that we would not provide

4    the jury with those documents.

5          THE COURT:  I will simply respond, if you agree,

6    we are unable to produce those at this time.  Please rely

7    on the evidence that you have.

8          MS. SCHULT:  That sounds accurate.

9          MR. HIGGERSON:  That's fine, yes.

10          THE COURT:  I'll say, please rely on your memory

11   of the evidence and the documents which you have.  Good?

12          MS. SCHULT:  Yes.

13          THE COURT:  Can I put a smiley face on it?

14          MS. SCHULT:  Sure.

15              *(Recess at 3:45 p.m.)*

16              *(In open court; jury absent.)*

17          THE COURT:  Jury Question in Deliberations

18   No. 3:  How will compensatory damages be split among

19   defendants?

20          Your position?

21          MS. SCHULT:  My position is that the jurors need

22   to rely on the instruction as written.  We can't provide

23   them any further guidance.  This is a joint and severally

24   liable case.  The only question is how much Andrea is due

25   for compensation and not who is paying that compensation

1   for the jury to answer.

2            MR. HIGGERSON:  I think just the very first part

3   of that answer, that you have to rely on the instruction

4   that you've been given.  We can't give you any further

5   guidance.  I don't think they need to hear about joint

6   severally or anything like that.  That's an additional

7   instruction.

8            THE COURT:  Well, the instruction itself says,

9   You are to determine an amount that will fairly

10  compensate the plaintiff for the injuries she sustained.

11  Any objection to my saying, you need to -- you must

12  follow the instructions; is that what you want me to say,

13  Mr. Higgerson?

14           MR. HIGGERSON:  I think it should -- yeah, just

15  say, follow the instructions as you've been given.  We

16  can't give you any further --

17           THE COURT:  Is that acceptable, Ms. Schult?

18           MS. SCHULT:  Yes.

19           THE COURT:  Can I say, please follow the

20  instructions?

21           MS. SCHULT:  Yes.

22           MR. HIGGERSON:  Yes.

23           MS. SCHULT:  I would appreciate that.  You can

24  end it with a thank you or a smiley face, also.

25           THE COURT:  So I've written, Please follow the

1  instructions that you have been given.  Thank you.

2  *(Recess at 4:31 p.m.)*

3  *(In open court; jury present.)*

4  THE COURT:  Have you reached a verdict?

5  FOREPERSON:  Yes, we have.

6  THE COURT:  If you will please give the verdict

7  form to the court security, I'll read it to the

8  courtroom.

9  Thank you, sir.

10  We, the jury, find as follows on Plaintiff's

11  claims:  For Plaintiff, Margaret Burke and Todd Sexton.

12  We fixed Plaintiff's total compensatory damages at

13  $8 million.

14  We fixed Plaintiff's punitive damages, if any,

15  as follows:  Richard MacLeod, $10 million.  Punitives:

16  Margaret Burke, $500,000; and Todd Sexton, $800,000.

17  We, the jury, having reached a unanimous

18  agreement on Plaintiff's claims, sign below, signed by

19  our full jury, including our foreperson.

20  Do you wish me to poll the jury?

21  MR. HIGGERSON:  No, Your Honor.

22  MS. CRAMER:  No, Your Honor.

23  THE COURT:  All right.  I know this has been a

24  very long day, and I hope you enjoyed your dinner.  It's

25  from La Piazza.  It's right down here, down the street.

 1   I know they do a big business here at the courthouse.  So

 2   they were very kind to agree to cater this tonight

 3   because they are very packed, of course, with the car

 4   show.

 5          The car show is having its parade right now, so

 6   you may have some difficulty getting out.  I know I'm

 7   going to have difficulty getting out.  They're going down

 8   6th Street, but I don't know where they turn.

 9          Does anyone here know where they turn?  I think

10   they turn and may come back 7th.  So, be careful.  Court

11   security will --

12          Can you help the jury get to their cars?

13          THE OFFICER:  If you're at the Wyndham, you'll

14   be able to go south on 7th, but you might have to cross

15   the parade route at some point.  And then, if you're at

16   6th and Capitol, you'd be able to get out.  You might be

17   able to shoot across and go to 5th Street.  If not, then

18   you can come up to Capitol and go east.

19          THE COURT:  East, though.

20          FOREPERSON:  I think we're all at the Wyndham.

21   We're all at Wyndham parking.

22          THE COURT:  Okay.  Well, thank you very much for

23   your service.  It's been a long week and I know it's been

24   a very tough case for everybody.

25          We do have counseling that we can offer, if

1  anyone wishes to, for any reason.  I'll have these cards

2  passed out.  Like you, we are entitled to six visits with

3  a counselor.  I do know that, for my staff, it's been

4  very helpful, if you're interested.

5            Thank you very much.  Your service has been very

6  good.  I've been very impressed with your dedication and

7  attention.  I didn't have to wake anyone up, which is the

8  hardest part about my job.  It's usually keeping court

9  security awake.  But as I said before, we could not do

10 this if it weren't for you, who take a full week out of

11 your schedule to perform this function.  So, thank you

12 very much.

13            You're excused and you do not have to serve jury

14 duty in the next two years.  So if you should be called,

15 which you shouldn't, just tell them you've served already

16 and I've excused you.

17            FOREPERSON:  Can I get a work excuse?  I haven't

18 got a work excuse for jury duty.

19            THE COURT:  Yes, you may.  Do you have them

20 ready?

21            COURTROOM DEPUTY:  I will have to --

22            THE COURT:  Can you e-mail them?

23            COURTROOM DEPUTY:  -- search Bernie.  Yeah.

24            THE COURT:  Bernie is not here.  So we have all

25 of your e-mail, correct?

1        COURTROOM DEPUTY:  I believe so.  Yeah, they

2    should on the jurors.

3        THE COURT:  So we will send those to you.  Do

4    you need them Monday morning?

5        FOREPERSON:  Yes.

6        THE COURT:  We will make sure you have them by

7    seven o'clock on Monday morning.

8        You'll have to call Bernie at home.

9        COURTROOM DEPUTY:  Yep.

10        FOREPERSON:  Thank you.

11        THE COURT:  Okay.  Thank you very much.

12        You may talk about the case now, if you wish.

13        If you do indicate that you wish to talk to the

14    lawyers or if you want me to step back to ask me any

15    questions -- anybody want me to step back?

16        No.  I think you all want to go home.

17        All right.  Thank you very much.  It was very

18    nice to meet everybody.

19                *(Jury excused.)*

20        THE COURT:  Judgment is entered on the verdict.

21        Congratulations.  I didn't expect that reaction.

22        And I thought you did a very nice job as well.

23        Court is adjourned.

24                *(Proceedings concluded at 6:53 p.m.)*

25

* * * * * * * * * * * * *


REPORTER'S CERTIFICATE

     I, KAILEY FENWICK, RPR, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

     Dated this 15th day of April, 2023.


       ___/s/ *Kailey Fenwick*___

       Kailey Fenwick, RPR
       IL License # 084.004869